J2P3HOW1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              17 CR 611 (RWS)

5    CHRISTOPHER HOWARD,

6                   Defendant.

7    ------------------------------x

8                                              New York, N.Y.
                                               February 25, 2019
9                                              10:00 a.m.

10

11   Before:

12                     HON. ROBERT W. SWEET,

13                                             District Judge

14                            APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     ALEXANDRA ROTHMAN
17   CHRISTOPHER J. CLORE
          Assistant United States Attorneys
18
     RICHARD B. LIND
19   DAVID K. BERTAN
          Attorneys for Defendant
20

21   ALSO PRESENT:
     William Magliocco, Paralegal Specialist
22   Detective Jared Tepperman, NYPD

23

24

25

J2P3HOW1

1          (In open court; jury not present)

2          THE COURT:  Thank you for starting my Monday off with

3    in limine motions, always very helpful.  Thank you very much.

4    Strange that you couldn't have thought of this before.

5    However, having said that, we all have to do our thing.

6          So, this is where I come out:

7          The slashing of the defendant.  I don't think the

8    probative value in terms of whether he is a member of the group

9    of MBG and BG is worth the potential prejudice.  So, no

10   slashing.

11          The description of the person as the shooting, the

12   excited utterance, certainly the witness gets in.  Of course

13   the witness doesn't remember too good.  The detective's notes I

14   think are appropriate recorded recollection.

15          The membership in YGz, I don't see that that has any

16   particular value.  So that's out.  The narcotics conspiracy is

17   in because that's part of the RICO charge.

18          Anything else?

19          MS. ROTHMAN:  Your Honor, if I can on the YGz point, I

20   think it is part and parcel of the defendant's MBG membership

21   to explain his additional association with that gang.  I don't

22   see --

23          THE COURT:  Relevant to what?

24          MS. ROTHMAN:  Relevant to his membership in the gang.

25          THE COURT:  Forgive me.  I don't see YGz being

J2P3HOW1

1    relevant to membership in MBG.  Why is that?

2                MS. ROTHMAN:  Your Honor, because our witnesses will

3    testify that MBG members from Mill Brook also affiliated with

4    the broader YGz gang.

5                THE COURT:  Okay, fine.  So what?

6                MS. ROTHMAN:  I think two issues.  It's consistent

7    with his membership in MBG.  Moreover, our cooperating

8    witnesses are going to talk about their own membership in the

9    YGz as part of the crimes that they pled guilty to.

10               THE COURT:  That's okay.

11               MS. ROTHMAN:  To omit Howard from -- the defendant --

12   from that picture, tells an incomplete story of the

13   relationship between those cooperating witnesses and Howard.

14   Practically, they're going to say "I was a member of MBG, I

15   then became a member of the YGz."

16               THE COURT:  Yes, but what is the value of the

17   membership in the YGz?

18               MS. ROTHMAN:  I think it's difficult to separate the

19   two.  There are Facebook messages, your Honor --

20               THE COURT:  I know, but that's not a charge here.  As

21   the defense points out, he is not being charged with being a

22   member of the YGz.

23               MS. ROTHMAN:  Correct, your Honor.  But practically,

24   to tell the story of the defendant's gang membership in MBG,

25   without reference to his additional allegiance to the YGz --

J2P3HOW1

1        THE COURT:  What is that allegiance?  I don't see the

2   probative value of that allegiance.

3        MS. ROTHMAN:  I guess I am not being persuasive.  The

4   more practical question is there are a host of exhibits that

5   speak of the defendant's MBG membership that also refer to his

6   YGz membership.

7        THE COURT:  His?

8        MS. ROTHMAN:  Yes, the defendant's.

9        THE COURT:  That's okay.  That, it seems to me --

10        MS. ROTHMAN:  Okay --

11        THE COURT:  If there is evidence of his membership,

12   documentary evidence of his membership, let me hear from the

13   defense.

14        MR. LIND:  Judge, they had plenty of opportunity to

15   charge him with membership in the YGz, and they didn't.  This

16   case has been going on for a year and a half.  They had plenty

17   of time to amend the indictment, charge him with this.  And

18   this just goes beyond the bounds of what's charged in the case.

19        THE COURT:  There certainly isn't anything charged,

20   but what's the harm?

21        MR. LIND:  The harm is he's not involved with this,

22   and it just enlarges --

23        THE COURT:  Well, but I'm told there are documents

24   that indicate that he was involved.

25        MR. LIND:  Judge, I submit that it goes beyond the

J2P3HOW1

1      bounds of what was charged in the indictment.

2              THE COURT:  That's clear.

3              MR. LIND:  And so the probative value of these is,

4      like your Honor said, the documents --

5              THE COURT:  There isn't a lot of harm in it.

6              MR. LIND:  Yes, there is, because it enlarges his

7      responsibility for being involved in another gang as well.

8      Judge, it goes way beyond the circle --

9              THE COURT:  All right.  I will permit any documentary

10     evidence that says that he is a member of that.  I don't see

11     that there is any -- at the moment, I don't see any particular

12     probative value in his membership in the YGz.

13             MS. ROTHMAN:  Your Honor, our witnesses, our

14     cooperating witnesses will explain the connection between the

15     two gangs.  The government recognizes that the defendant is not

16     charged in a YGz indictment, and we're going to proceed

17     cautiously here.  We're going to only introduce what is

18     necessary so the jury understands what the YGz are.

19             Every act of violence that the jury will hear about is

20     an MBG act of violence.  There will be little, if any,

21     testimony that presents the YGz as a worse gang, a more

22     dangerous gang.

23             What the jury will hear is MBG itself, the gang that

24     the defendant committed a shooting as a member of, is a violent

25     gang.

J2P3HOW1

1      THE COURT:  That all goes to the relative irrelevance

2  of his membership in YGz.

3      MS. ROTHMAN:  But your Honor, we would not oppose a

4  limiting instruction if your Honor wanted to give it to tell

5  the jury he is not charged in a YGz gang.  It is simply being

6  introduced --

7      THE COURT:  If you want that, Mr. Lind, you got it.

8  If you want it.

9      MR. LIND:  Judge, I just don't see, once again, the

10  central allegations here are about a shooting, okay.

11      THE COURT:  Yes.

12      MR. LIND:  The shooting has nothing to do with YG.

13  The government just admitted that.  So all they are doing is

14  adding on fluff here which I think distracts the jury from what

15  are the actual charges in this case.

16      And indeed -- let me just finish.  Indeed, the charges

17  make it very specific that this shooting, his activities which

18  were MBG.  And now they are saying, oh, gee, they are related.

19  Well, they may be related, but not for him.

20      They had a full opportunity to change the indictment,

21  to add this, and they didn't.  And it has to be a point where

22  we're sticking with what the charges are, Judge.

23      And they also made a motion in limine, and they didn't

24  say 404(b), we have also his membership in YGz.  They didn't.

25  They had a full opportunity to do that, Judge.  And they

J2P3HOW1

1      brought up a lot of other stuff.

2              THE COURT:  I think YGz is out.

3              MS. ROTHMAN:  Your Honor, practically, so if we can

4      pull up Government Exhibit 405.  I don't know if it is coming

5      up on your screen yet.  Your Honor?

6              THE COURT:  Yes.

7              MS. ROTHMAN:  With respect to the government's

8      exhibits that reference MBG YGz in tandem, I'm looking at

9      Government Exhibit 405, the defendant writes, "Free the bros,

10     Mike White and Joey Crack, miss ya" N word "man MBG YGz."

11             THE COURT:  I will permit that exhibit to go in.  If

12     you want a limiting instruction that he is not charged with

13     anything involving YGz, I will give it.

14             MS. ROTHMAN:  And so there are other --

15             THE COURT:  That will be the end of it.

16             MS. ROTHMAN:  There are other exhibits like this, your

17     Honor.

18             THE COURT:  Any exhibits that refer to YGz is all

19     right.  But nothing more than that.  But, the instruction if,

20     you want it, Mr. Lind, you have it.

21             MR. LIND:  Yes, Judge.

22             THE COURT:  Okay.

23             MS. ROTHMAN:  I'm sorry to belabor --

24             THE COURT:  Just be sure that I remember this.

25             MS. ROTHMAN:  I'm sorry to belabor --

J2P3HOW1

1          MR. LIND:  I'll make sure, Judge.

2          MS. ROTHMAN:  Our cooperating witnesses are going to

3  testify as to what this means.  Their understanding of what the

4  defendant is saying by writing on his Facebook page MBG YGz.

5  There has to be a minimal explanation, a minimal explanation

6  for this.

7          THE COURT:  I don't think so.  I don't think so.  It

8  will go in.  It --

9          MS. ROTHMAN:  Okay.  I think I understand your Honor's

10  ruling.

11          THE COURT:  Okay.  Any other problems?  I hope not.

12          By the way, what's the government's best guess as to

13  how long their case is going to take?

14          MS. ROTHMAN:  Your Honor, I think it is likely that we

15  will rest before the end of the week, at the end of the day

16  Thursday, if our witnesses move as quickly as we expect.

17          THE COURT:  Okay.  And we had a special verdict form

18  in White, and I haven't looked at it.  But I sort of assume

19  that it would work pretty well here.

20          MS. ROTHMAN:  That's fine with the government, your

21  Honor.

22          THE COURT:  Okay.  So we'll plan to use that.

23          MR. LIND:  Judge, we haven't seen it, the defendants

24  haven't seen it.

25          THE COURT:  Okay.  We'll get you a copy.

J2P3HOW1

1      MR. LIND:  May I also raise something very briefly,

2  Judge.  I think the government, maybe I'm wrong, but I think

3  the government is proceeding with like a modified indictment

4  for the trial, so there will be like three counts or something

5  like that.

6      THE COURT:  I assumed so.

7      MS. ROTHMAN:  That's correct, your Honor.

8      MR. LIND:  We haven't seen a copy of that.

9      MS. ROTHMAN:  I'll pass a copy to the defense by the

10  end of the day.

11      MR. LIND:  Thank you, Judge.

12      THE COURT:  When we get to places, what do we do about

13  the Polo Grounds?

14      MS. ROTHMAN:  I think you can remove that from the

15  list of places for the government.

16      THE COURT:  That's a happy sort of --

17      MS. ROTHMAN:  We're trying to accommodate, your Honor.

18      MR. LIND:  It's now in San Francisco, Judge, anyway.

19      MS. ROTHMAN:  Your Honor, if I can flag two things for

20  the Court.  The first, are we planning on sitting on Friday

21  this week?

22      THE COURT:  Yes.

23      MS. ROTHMAN:  The second, one of the government's

24  witnesses that we intend to call today, her name is Officer

25  Cerda, she's with ECT.  She recovered the shell casings and

J2P3HOW1

1    bullet from the scene of the shooting.  She goes on vacation

2    tomorrow and returns Monday.  Next Monday.  So, we're hoping to

3    get her on today.  If not, we're going to ask to keep the

4    government's case open until Monday to allow her to testify.  I

5    wanted to raise that for the Court.  Her testimony is very

6    short.

7              THE COURT:  Okay.  Well, you know, 10:30 for the jury

8    turns out to be 10:50.  So, what can I say here, after I've

9    said I'm sorry.

10             MS. ROTHMAN:  I understand, your Honor.

11             THE COURT:  We'll do the best we can.

12             MS. ROTHMAN:  Okay.

13             THE COURT:  Why don't we plan, maybe we try to go late

14   tonight.  By the way, I mean, what I would like is 10, 9:30,

15   10, 10:30, depending on various things, and quitting at 4:30.

16   But we could go later and that may be the best solution.

17             MS. ROTHMAN:  That's fine with the government.  Again,

18   the two witnesses we hope to call today are both relatively

19   short.  So I think if we had a little bit of flexibility at the

20   stop time, we could get them both on today.

21             THE COURT:  Fingers crossed.

22             (A jury of 12 and 2 alternates was impaneled and

23   sworn)

24             THE COURT:  Ladies and gentlemen, I'm going to give

25   you some very brief instructions as to how the case is going to

J2P3HOW1

go forward.  Both sides have an opportunity to make opening

statements, though, of course, the defendant is not required to

make any opening statements, not required to put on any

evidence at any time.

These opening statements are statements by the

lawyers, they are not evidence.  They're simply an effort to

demonstrate to you what the lawyers believe the evidence will

or will not show.

After these opening statements are made, then the

government will present its evidence in support of the charges.

After the government has completed its case, the defendant can

present any evidence, but the defendant is under no obligation

to do that, because he's cloaked by the presumption of

innocence.  But if some evidence is produced, then the

government may seek to produce some rebuttal evidence.

After all the evidence is in, and we are hopeful that

that will be done this week, after all the evidence is in, then

the lawyers will again address you in their closing arguments,

and then I will instruct you as to the law which you will apply

to the facts as you find them.  Then you will reach your

verdict.

Obviously, faithful performance of your duty is very

important, both to society in general, but also obviously to

the parties that are before you now.  It's going to be your job

to decide what the facts are, and you must do that fairly and

J2P3HOW1

impartially.

Evidence of course is going to be presented, that will be testimony from the stand, or evidence which are documents that are introduced in evidence.

The lawyers may make objections.  Those objections are matters that they are under an obligation to help me be sure that the evidence which gets to you meet the rules of evidence. And so, they will make objections, and we'll deal with those. Those matters do not concern you, and you should pay no attention to that, unless of course I give you an instruction with respect to it.

Obviously, you have to remain fair and impartial.

You are the sole judges of the facts, and I will not have any view as to how you should perform that.  Your job is going to be to watch the witnesses, make a determination as to the weight and the value of their evidence.

Until the case gets in your hands, at the end, you mustn't discuss it with anyone.  You mustn't learn anything about the case except that which you learn right here in this courtroom.  The lawyers have been instructed not to say anything to you.  No one should talk to you about the case.  If you should, by some chance, learn something about the case, other than what you learn right here, please let me know and we'll see what action, if any, needs to be taken.  But, you mustn't make any effort to learn anything about the case, to

J2P3HOW1

1    Google it or use the internet or anything like that.  No

2    outside information should get to you about this case except

3    that which you learn right here.

4          I would also ask you, as a general rule, probably not

5    a good idea to eat here in the building, although we have a

6    cafeteria.  Two reasons:  You may bump into someone

7    inadvertently that might say something about the case, and the

8    other reason, it's just been renewed and we don't know how good

9    the food is.

10          I think we're ready now for lunch, and then we will

11    resume after lunch.  I think I've introduced everybody to you

12    except Rebecca, who is one of our prized court reporters.  She

13    and Sam, Rebecca Forman and Sam Mauro, they are going to keep a

14    marvelous record.  They are the best court reporters in the

15    United States in this courtroom.  And my clerk, my law clerk

16    Chas Kerin, will help me on any problems that may arise.

17          So thank you very much for your service.  Have a

18    pleasant lunch.  We'll resume at 2 o'clock.

19          A JUROR:  Can I ask you a question about timing?

20          THE COURT:  If you have anything, talk to Tsz or give

21    me a note.

22          (Jury excused)

23          THE COURT:  Anything further?

24          MS. ROTHMAN:  There is one thing to raise, your Honor.

25    I couldn't help but notice after we had impaneled the jury,

1    that Juror No. 3 seemed very upset to have been placed on this

2    jury.  She was shaking her head, speaking under her breath.

3    When your Honor remind the jury they had a duty to be fair and

4    impartial, I saw her roll her eyes.  That's concerning since

5    the case hasn't started yet.  And I wanted to make the Court

6    aware of that.

7              THE COURT:  What would you like me to do?

8              MS. ROTHMAN:  Well, I think your Honor may want to ask

9    her if she has any concerns about her ability to be fair and

10   impartial, reminding her of her obligation.  If she does, we

11   would ask to strike her and impanel an alternate.  Which is not

12   ideal since we just got this jury, but that fact is concerning

13   to the government.

14             THE COURT:  Mr. Lind, what do you think?

15             MR. LIND:  I have no opposition to that, Judge.  As

16   the prosecutor just mentioned, we just got the jury, and I

17   don't know if we should bring back a couple of jurors for

18   selection of another alternate.  In other words, if your Honor

19   thinks having one alternate is sufficient, that's fine with me.

20             THE COURT:  I dislike singling out a juror.  I think

21   what I will do is just, when we get back, I will tell them what

22   the hours are that we expect, and I will ask if there is anyone

23   who for any reason feels that they cannot serve on this jury

24   and be fair and impartial.  How's that?

25             MR. LIND:  Fine with me, Judge.

J2P3HOW1

1           MS. ROTHMAN:  Your Honor, could we have one moment

2    just briefly?

3           That's fine with the government, thank you.

4           THE COURT:  That's what I'll do.  Thanks, enjoy your

5    lunch.  Let me just ask the openings, I mean, we'll be able to

6    get the witnesses in, won't we?

7           MS. ROTHMAN:  Yes, your Honor.

8           THE COURT:  Okay.

9           (Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J2P3HOW1

                              AFTERNOON SESSION

                                  2:00 p.m.

1               (In open court; jury not present)

2               THE COURT:  I take it you've seen the note.  I take it

3       we quit at 4 tomorrow?

4               MS. ROTHMAN:  That's fine with the government.

5               MR. LIND:  That's fine.

6               THE COURT:  Likewise --

7               MS. ROTHMAN:  Before we start, can I raise one thing

8       with the Court?

9               THE COURT:  Sure.

10              MS. ROTHMAN:  Okay.  Tomorrow the government intends

11      to offer two pieces of evidence and I wanted to --

12              THE COURT:  Let's do that then at the end of the day.

13              MS. ROTHMAN:  Understood.  Thank you, your Honor.

14              THE DEPUTY CLERK:  Jury coming out.

15              (Jury present)

16              THE COURT:  Something I forgot to the mention to you

17      this morning, that is our general plan will be that we'll start

18      at 9:30 or 10 o'clock, maybe sometimes 10:30.  We'll go to

19      lunch, we'll have a lunch break.  We may have a break in the

20      morning, in between starting and lunch, and then the same thing

21      in the afternoon.

22              If anybody has any problems about serving on the jury,

23      please let me know with a note and we'll see what we can do.

J2P3HOW1                    Opening - Ms. Rothman

1    And this is a very smart jury.  I've already gotten one such

2    note.  And we'll accommodate it by quitting tomorrow at

3    4 o'clock.

4            Incidentally, if you want to take notes, perfectly

5    okay.  Good news about taking notes, it helps people remember.

6    Bad news about taking notes is it distracts from watching the

7    witnesses and making a determination of credibility.  But if

8    you want to take them, if you want notes, you certainly can do

9    that.

10           We're ready for the opening statements.  Let me just

11   say, as I told you before, opening statements are not evidence.

12   They're just argument, a roadmap by counsel.  Okay.  Thank you.

13           MS. ROTHMAN:  Thank you, your Honor.

14           Late one night, in the summer of 2014, the defendant,

15   Christopher Howard, shot into a crowd in the Bronx, trying to

16   kill a rival gang member.

17           His target, Shadean Samuel, also known as Scraps, who

18   broke Howard's jaw a few years earlier.  That night, Howard got

19   his gun, and went down the block looking for Scraps.  When

20   Howard found Scraps, he paused, raised his gun, and fired

21   multiple rounds, sending Scraps and two other people to the

22   hospital that night.

23           Ladies and gentlemen, that is why we're here today.

24   Because Christopher Howard, the defendant, participated in a

25   violent street gang that wreaked havoc in the Mill Brook Houses

J2P3HOW1                    Opening – Ms. Rothman

1    for many years.  Because in August 2014, the defendant,

2    Christopher Howard, tried to kill someone.

3              So what will the evidence show at this trial?  It will

4    show that Christopher Howard, who was also known as JuJu, was a

5    member of a violent street gang called MBG.  That stands for

6    Money Bitches Guns, or Mill Brook Gangstas.

7              Now, MBG, it was a neighborhood gang.  It controlled

8    the territory on one side of the Mill Brook Houses.  As you'll

9    learn in this trial, MBG members sold crack cocaine and

10   marijuana throughout Mill Brook, and they engaged in senseless

11   acts of violence.

12             Now, during this trial, you will learn about Mill

13   Brook and the surrounding area.  It is a place where people

14   live and work, where children go to school and play.  There are

15   buildings, playgrounds, benches, a daycare center.  But, back

16   in 2007, a violent gang rivalry broke out in Mill Brook between

17   two Mill Brook gangs:  MBG on the one hand, and Killbrook or

18   KB, on the other hand.  And as part of that rivalry, Scraps

19   broke Howard's jaw, and Howard shot Scraps.

20             Let me now tell you some more about the shooting in

21   this case.  Back in 2011, when tensions were high between MBG

22   and Killbrook, Scraps and other Killbrook members broke

23   Howard's jaw in the chicken spot, a restaurant just a block

24   away from Mill Brook.  Howard was furious, telling his fellow

25   gang members on Facebook that he wanted to kill the person who

J2P3HOW1                    Opening - Ms. Rothman

1   did it.  That he wanted to kill Scraps.

2          Now, in August 2014, the defendant tried to kill

3   Scraps, and he didn't act alone.  He recruited a fellow gang

4   member to serve as a lookout that night.  That person told

5   Howard where Scraps would be, and Howard, gun in hand, went

6   looking for Scraps.  Howard found Scraps down the block in

7   Killbrook territory on some benches near a flagpole with other

8   Killbrook members.  Howard walked up to the flagpole, paused,

9   raised his arm, and fired, sending Scraps and two people to the

10  hospital that night.

11         Everyone fled from the scene, and the victims were

12  taken to the hospital.  Scraps was hit in the left arm, another

13  victim in the right arm, and a third was grazed on the leg.

14         You'll learn that when law enforcement went to the

15  scene that night, they recovered two .40 caliber shell casings,

16  the part of the bullet that's left behind after it's fired, as

17  well as one live round of ammunition on the ground.  And you'll

18  learn in this trial that a year before the shooting, Howard

19  told a fellow gang member -- Howard showed a fellow gang member

20  his gun.  A .40 caliber gun.

21         Now, as a result of the defendant's actions, he faces

22  three federal charges here.  The first is for the participation

23  in the MBG gang; the second is for the attempted murder of

24  Scraps that night; and the third is for a firearms offense.

25         So how will the government prove its case at this

J2P3HOW1                    Opening - Ms. Rothman

1    trial?  You will hear and see many different types of evidence.

2    You will see the shell casings and the bullet recovered from

3    the scene of the shooting.  You will see photographs of Mill

4    Brook, of the defendant with his fellow gang members, of the

5    crime scene.  You will see and read Howard's own words on

6    Facebook, messages where he complains about his broken jaw, and

7    speaks about wanting revenge.  Status updates where he posts

8    about the MBG gang, and the violent rivalry with down-the-block

9    Mill Brook or Killbrook.  Even a message from shortly after the

10   shooting in August 2014, when he tells a fellow gang member

11   that he's staying away from Mill Brook because there's too much

12   talk in the air.

13            The evidence at this trial will also include the

14   testimony of many different witnesses.  In this trial, you will

15   hear from an eyewitness to the shooting, someone who was there

16   that night, on those very benches.  He will tell you that he

17   saw JuJu, the defendant, shoot that night, and he will tell you

18   that he spoke with the defendant about the shooting afterwards.

19            You'll also hear from another individual who spoke

20   with the defendant after the shooting.  That person will tell

21   you that Howard told him he was still looking for Scraps, even

22   after the shooting.  That his main focus down the block was

23   Scraps.

24            You'll hear from law enforcement witnesses.  They

25   responded to the scene that night, interviewed witnesses,

J2P3HOW1                    Opening – Ms. Rothman

1   collected evidence.  You'll hear from a firearms expert.  He

2   examined those two .40 caliber shell casings found at the scene

3   of the shooting, and he will tell you that those two shell

4   casings were fired from the same gun.

5          In this trial, you'll also hear from two cooperating

6   witnesses, witnesses who, like Howard, were also members of

7   MBG.  These witnesses will tell you about the history of the

8   gang, about the violence committed by the gang, about the drug

9   dealing by the gang.  And they will tell you that Howard was a

10  member of this gang.  That this was his gang.  One will even

11  tell you about the night that Howard showed him his gun, a .40

12  caliber gun that he kept in his bedroom.  A gun designed to

13  fire the same type of bullets recovered from the scene of the

14  shooting.

15         Now, these witnesses we're talking about, they are

16  criminals.  They're members of a gang.  They have committed

17  shootings, one of them even participated in a murder.  You will

18  hear how these witnesses were arrested and prosecuted by the

19  government, how they entered into what we call a cooperation

20  agreement with the government.  They have pled guilty to their

21  crimes.

22         With respect to these cooperating witnesses, just like

23  any other witness who testifies before you, the question is not

24  whether you approve of what they have done.  The question

25  simply is whether they are telling the truth.  So when you

J2P3HOW1                         Opening - Mr. Lind

1   listen to their testimony, please consider it very carefully.

2   Think about whether that testimony makes sense.  Whether it's

3   consistent with the other evidence that you heard in this case.

4   The physical evidence, the photographs, the defendant's own

5   words on Facebook.

6          After you have seen and heard the evidence in this

7   case, you will know exactly what happened here.  That the

8   defendant participated in a violent street gang, and as part of

9   that gang in August 2014, he tried to kill someone.

10          The defendant, time and again, put himself and his

11  gang ahead of the safety and well being of the residents of the

12  Mill Brook Houses.

13          Soon you will begin to hear and see the evidence for

14  yourself.  Before I sit down, I'm going to ask you to do three

15  things during this trial:  First, please pay close attention to

16  the evidence.  Second, please follow Judge Sweet's instructions

17  on the law.  And third, please use your common sense.  The same

18  common sense that you use every day in your lives to make a

19  whole host of decisions.  If you do these three things:  Pay

20  close attention to the evidence, follow the judge's

21  instructions, and use your common sense, you will reach the

22  only conclusion that is consistent with the evidence and the

23  truth.  That the defendant, Christopher Howard, is guilty.

24          THE COURT:  Yes, sir.

25          MR. LIND:  Thank you, Judge.

1          Judge Sweet, prosecution team, good afternoon, members

2     of the jury.  Let me reintroduce myself.  My name is Richard

3     Lind, and together with David Bertan, we represent Christopher

4     Howard, who is the gentleman there.

5          It's interesting that the government in finishing

6     their remarks to you this afternoon talked about a couple of

7     things that you should keep in mind.  She didn't mention that

8     he's presumed not guilty.  He's presumed not guilty unless the

9     government can prove him guilty beyond a reasonable doubt.  She

10    didn't bring that one up.

11         I want to talk to you about this case.  Ms. Rothman

12    has just given you a preview of what the government intends to

13    prove during this trial.  I want to underscore the term

14    "intends," because you have to understand, Ms. Rothman and

15    Mr. Clore were not there when this incident occurred.  They

16    have no personal knowledge of what took place on August 17,

17    2014.  Basically, all they know is what their witnesses have

18    told them.  Whether or not they've told the prosecutors the

19    truth, and whether or not they testify truthfully is for you,

20    and you alone, to determine.  And that's your principal

21    function in this case.

22         And you heard her mention a couple of cooperating

23    witnesses.  I guarantee you, you're going to hear a lot about

24    these animals.  Not only animals, most importantly, lying

25    animals.  I'm going to bring it out, if the government doesn't

1    bring it out.  I guarantee you're going to hear about their

2    records and the many acts they admitted to doing.  Murders,

3    attempted murders.  I'm not talking about one or two or three.

4    I'm talking about dozens of murders and attempted murders.  And

5    if she doesn't bring it out.  Mr. Clore doesn't bring it out, I

6    guarantee you, I will bring it out.

7            Now, as you know from when you were being selected,

8    Mr. Howard's pleaded not guilty to each and every charge

9    against him.  The first charge is joining this, being a member

10   of this racketeering conspiracy, MBG.  He's pleaded not guilty

11   to that.

12           He's pleaded not guilty to the second count, which is

13   the violent crime he is accused of committing.  The attempted

14   murder of this guy named Scraps.

15           And he's pleaded not guilty to the third count, which

16   is using firearms or brandishing or discharging them in

17   connection with these crimes.

18           And because of this plea of not guilty, two very

19   important things are set in motion.  First, during the course

20   of the trial, you have to presume him to be not guilty of these

21   charges.  That's your duty.  And you have to presume he's not

22   guilty throughout the openings, the evidence at trial, the

23   summations by the parties, and indeed, throughout your

24   deliberations.  Even after the judge's charge, you must presume

25   him not guilty until you reach a verdict that may go the other

J2P3HOW1                    Opening - Mr. Lind

1    way.

2              Second, throughout this trial, the government has the

3    sole burden of proof.  We don't have to produce any evidence.

4    We don't have to cross-examine witnesses, although I can

5    guarantee you we'll cross-examine most of them.  We don't have

6    to call Mr. Howard to the stand or call any witnesses on his

7    behalf.  We don't have to introduce any exhibits.  Although, I

8    can guarantee we'll cross-examine most of these witnesses.

9              Second, in order to prevail, the government must prove

10   his guilt beyond a reasonable doubt.  "Reasonable doubt," I'm

11   sure you've heard that term before.  It is the most stringent

12   burden of proof our law imposes, for good reason.  It rests

13   squarely over here and never shifts to the defendant.  They

14   must prove every element of each charge against Mr. Howard,

15   beyond a reasonable doubt.

16             Now, you've heard the different ways in which the

17   government says it's going to prove this evidence.  In large

18   part, you're going to hear from these animals.  You're going to

19   hear from some police testimony.  They don't fall into that

20   category.

21             I want to just concentrate on Andy Seda, one of the

22   people you are going to hear from later on this week.  A

23   confessed murderer, and perhaps more important, an habitual

24   lawyer.  You will learn he cut a deal with the government, and

25   how do I know you will learn about this?  If the government

J2P3HOW1                    Opening - Mr. Lind

1    doesn't bring out the content of his deal, I assure you, the

2    defense will.

3            You will learn, for example, in 2017, he cut a deal

4    with the government, he pled guilty to six charges, including

5    two racketeering conspiracies, a separate narcotics conspiracy,

6    firearms charges, and the murder, the coldblooded murder of

7    someone he knew.  And if that's not enough, as I mentioned

8    before, Mr. Seda admitted to committing a list of 30 crimes in

9    the space of a few years.  This is just one of the witnesses

10   the government's relying on.

11           Well, the minimum for murder, ladies and gentlemen,

12   that he committed, is life.  Well, you say, that's not such a

13   great deal.  But you'll find out what the deal really is

14   between the government and this man.  Because if the government

15   is satisfied with Andy Seda's testimony, for example, they can

16   write to the judge, and they can write a letter to Judge Sweet,

17   that he get a sentence of what the judge considers, including

18   time served.  And you'll hear, ladies and gentlemen, that's

19   precisely what Andy Seda wants.  You'll hear it.  Because if he

20   doesn't testify to it, I guarantee you, I will bring it out.

21   And possibly he'll be released to the streets again.  He can be

22   out there killing people again or committing other serious

23   crimes.

24           In short, ladies and gentlemen, and I believe the

25   judge will instruct you about this later on in the course of

1       this trial.  These cooperators that you'll hear from must be

2       scrutinized with great care, because they have a motive to lie

3       to get a low sentence.

4              I want to go back now to the shooting.  With respect

5       to the August 2014 shooting, the government will call a few

6       witnesses.  You heard about this.  You'll have an opportunity

7       to judge their ability to view the incident and their overall

8       credibility.  They will introduce a bunch of exhibits, and I

9       want to talk very briefly about the nature of some of the

10      exhibits.

11             You're going to see, apart from the casings, the

12      bullet casings that were mentioned, the Facebook entries of him

13      being on Facebook.  I'm sure all of you know about Facebook.

14      You're going to hear about this stuff.

15             Ladies and gentlemen, there is a difference between

16      association and conspiracy.  Being around people, sending

17      messages to people, doesn't mean that you've conspired to be an

18      animal with the rest of these guys.  Okay?  It's very important

19      for you to understand, and I think that makes sense.

20             Now, also, I'm getting close to my finishing, I'm sure

21      you're all glad about that.  This case is not about whether or

22      not Christopher Howard should get the citizen of the year

23      award.  This trial is about whether or not the government can

24      sustain its burden of proof beyond a reasonable doubt.

25             You will see also that for a large period of time,

1    Mr. Howard wasn't living in the Killbrook area.  He wasn't

2    living in the Mill Brook area.  He was living in Staten Island

3    with his mother.

4         In short, despite the government's efforts, you will

5    see by the end of this trial, I submit, that the government has

6    failed to meet its burden of proving the essential elements of

7    this case beyond a reasonable doubt.  And that as a result, we

8    submit, at the end of this case, you will have a duty to acquit

9    him.

10        We will show you, and you will see that the government

11   has failed to prove beyond a reasonable doubt that he murdered

12   Scraps, that he is a member of this conspiracy, or that he

13   discharged a weapon.

14        There is one last thing I want to mention and then

15   I'll finish.  Ladies and gentlemen, this is not a TV show or a

16   movie that you go to where you pride yourself on figuring out

17   what's going to happen after a day or so of testimony or after

18   a few hours of testimony that you hear.  I'm sure you can

19   understand the difference.  It is only after listening to --

20   seeing and listening and examining all the evidence, listening

21   to counsel's final arguments, and particularly the judge's

22   charge, at the end of the case that you can make up your minds.

23   It is only then that you can intelligently, responsibly,

24   discharge your duties as jurors in this case.

25        If you remember nothing else that I've said to you

J2P3HOW1                         Syed - Direct

1    this afternoon, I implore you to remember this.  Please don't

2    rush to judgment.  If you keep your eyes on the ball, and you

3    follow the Court's instructions, you will see that Christopher

4    Howard insisted on going to trial in this case, and the reason

5    is clear:  He is on trial because he's not guilty.  Thank you.

6               MR. CLORE:  Your Honor, the government calls Officer

7    Surfraz Syed.

8     SURFRAZ SYED,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11   DIRECT EXAMINATION

12   BY MR. CLORE:

13   Q.  Officer Syed, what organization do you work for?

14   A.  The NYPD.

15   Q.  How long have you been with the NYPD?

16   A.  For approximately five years.

17   Q.  What is your current rank?

18   A.  My current rank is police officer.

19   Q.  Were you in a particular bureau within the NYPD?

20   A.  Yes.

21   Q.  What bureau are you in?

22   A.  The housing bureau.

23   Q.  Officer Syed, can you describe briefly for the jury what

24   the housing bureau is.

25   A.  Yes.  The housing bureau is basically a precinct for the

J2P3HOW1                        Syed - Direct

1    NYCHA developments around the city.

2    Q.  Are you currently in the housing bureau?

3    A.  Yes.  No, I'm sorry, no.

4    Q.  How long had you had with the housing bureau?

5    A.  I was with the housing bureau for five years.

6    Q.  When did you leave the housing bureau?

7    A.  The end of January I left.

8    Q.  Where are you currently assigned?

9    A.  I'm currently assigned to the police academy.

10   Q.  Why are you assigned to the police academy?

11   A.  For a leadership development program.

12   Q.  What's that for?

13   A.  It's basically training to become a sergeant.

14   Q.  Are you familiar with the term police service area or

15   P.S.A. for short?

16   A.  Yes.

17   Q.  Can you describe for the jury what a police service area

18   is.

19   A.  Yes.  A police service area is basically what they call the

20   precinct for the housing developments.

21   Q.  Were you with the NYPD housing bureau in August of 2014?

22   A.  Yes.

23   Q.  Were you working out of a specific police service area at

24   that time?

25   A.  Yes.

J2P3HOW1                          Syed - Direct

1    Q.  What police service area were you working out of in August

2    of 2014?

3    A.  P.S.A. 7.

4    Q.  What borough was P.S.A. 7 located?

5    A.  In the Bronx.

6    Q.  Where in the Bronx is P.S.A. 7 located?

7    A.  The South Bronx.

8    Q.  Are there certain NYCHA housing developments that are

9    covered by P.S.A. 7?

10   A.  Yes.

11   Q.  Which housing developments?

12   A.  P.S.A. 7 covers Mott Haven, Mill Brook, Mitchell,

13   Patterson, among many others.

14   Q.  What were your responsibilities as a member of the housing

15   bureau?

16   A.  My responsibilities at the time were I was a beat officer.

17   So, my responsibilities were to patrol the housing developments

18   on foot, to conduct interior patrols, directed patrols, and to

19   address the conditions.

20   Q.  What do you mean by interior patrols?

21   A.  Interior patrols are basically when we go inside the

22   housing development, and cover each floor by staircase to make

23   sure there's, like, no crime occurring within that building.

24   Q.  Turning your attention to the early morning of August 17,

25   2014.  Were you working that day?

1    A.  Yes.

2    Q.  If you recall, what shift were you working that day?

3    A.  I was doing like a 7 to 3, a 7 p.m. to 3 a.m.

4    Q.  Okay.  So does that mean your shift actually began the

5    night of August 16, 2014?

6    A.  Yes.

7    Q.  Then you worked into the early morning of August 17, 2014;

8    is that correct?

9    A.  Yes, that's correct.

10   Q.  Since your shift went into the early morning hours of

11   August 17, 2014, for purposes of my questioning, I'll refer to

12   it as the early morning of August 17, 2014.  Is that okay?

13   A.  Yeah, that's okay.

14   Q.  Are you familiar with the term "post"?

15   A.  Yes.

16   Q.  What is a post?

17   A.  A post is basically where you were for that day.  Like,

18   what street corner or what building you are assigned to for

19   that day.

20   Q.  Is a post typically monitored on foot or in a vehicle?

21   A.  It can be either on foot or a vehicle.

22   Q.  Were you on a post in the early morning of August 17, 2014?

23   A.  Yes.

24   Q.  What was your post that morning?

25   A.  It was the Mill Brook Development.

1              MR. CLORE:  Mr. Magliocco, will you please publish for

2    the witness, the Court, and defense counsel only what's been

3    marked for identification as Government Exhibit 305.

4    Q.  Officer Syed, do you recognize this?

5    A.  Yes.

6    Q.  It's on your screen?

7    A.  Yes.

8    Q.  What are you looking at?

9    A.  The Mill Brook Housing Development.

10   Q.  Does this picture accurately depict the Mill Brook Housing

11   Development?

12   A.  Yes.

13             MR. CLORE:  Your Honor, the government offers

14   Government Exhibit 305 into evidence.

15             THE COURT:  It's admitted.

16             (Government's Exhibit 305 received in evidence)

17             MR. CLORE:  Mr. Magliocco, will you please publish

18   Government Exhibit 305 for the jury.

19             You can take it down.  Mr. Magliocco, will you please

20   publish for the witness, the Court, and defense counsel what's

21   been marked for identification as Government Exhibit 300.

22   Q.  Officer Syed, do you recognize this?

23   A.  Yes.

24   Q.  What is this?

25   A.  That's a map of the Mill Brook Housing Development.

J2P3HOW1                          Syed - Direct

1    Q.   Does this map accurately depict the Mill Brook Housing

2    Development?

3    A.   Yes.

4            MR. CLORE:   The government offers Government Exhibit

5    300 into evidence.

6            THE COURT:   It's admitted.

7            (Government's Exhibit 300 received in evidence)

8            MR. CLORE:   Mr. Magliocco, will you please publish

9    Government Exhibit 300 for the jury.

10   Q.   Officer Syed, looking at this photo, which buildings

11   represent the Mill Brook Houses?

12   A.   The ones in pink.

13   Q.   Can you see the names of the streets in this map?

14   A.   Yes.

15   Q.   Using street names, can you describe generally the area you

16   patrolled on August 17, 2014.

17   A.   Yes.  I patrolled from Brook to Cypress, 135 Street to 137

18   Street.

19           MR. CLORE:   Mr. Magliocco, you can take Government

20   Exhibit 300 down.

21   Q.   Officer Syed, during your patrol on August 17, 2014, were

22   you on foot or in a vehicle?

23   A.   I was on foot.

24   Q.   Were you alone or with another officer?

25   A.   I was with another officer.

J2P3HOW1                          Syed - Direct

1   Q.   Who were you with?

2   A.   P.O. Jordan.

3   Q.   Were you in uniform or in plainclothes?

4   A.   In uniform.

5   Q.   What, if anything, happened during your post on August 17,

6   2014?

7   A.   There was a radio run of shots fired.

8   Q.   Briefly, what do you mean by a radio run?

9   A.   Basically a call came over the radio saying there was a

10  shots fired at a location.

11  Q.   To be clear, did you hear any shots fired?

12  A.   No.

13  Q.   Do you recall at approximately what time the shots fired

14  radio run came in?

15  A.   It was approximately 3:10.

16  Q.   Was location information about the shooting provided over

17  the radio?

18  A.   Yes.

19  Q.   If you recall, what location was given?

20  A.   It was 137 Street and St. Ann's Avenue.

21         MR. CLORE:   Mr. Magliocco, will you please publish for

22  the witness, the Court, and defense counsel what's been marked

23  for identification as Government Exhibit 306.

24  Q.   Is it on your screen, Officer Syed?

25  A.   Yes.

J2P3HOW1                           Syed - Direct

1    Q.  Do you recognize this?

2    A.  Yes.

3    Q.  What are we looking at?

4    A.  You're looking at the bottom half of Mill Brook Housing

5    Development.

6    Q.  Does this photo accurately reflect that part of Mill Brook

7    as it was on August 17, 2014?

8    A.  Yes.

9              MR. CLORE:  Your Honor, the government offers

10   Government Exhibit 306 into evidence.

11             THE COURT:  It's admitted.

12             (Government's Exhibit 306 received in evidence)

13   Q.  Did you and Officer Jordan ultimately respond to the radio

14   run?

15   A.  Yes.

16   Q.  Did you go to East 137 Street and St. Ann's?

17   A.  Yes.

18   Q.  Officer Syed, if you could, would you circle on your screen

19   East 137 Street and St. Ann's on Government Exhibit 306 for the

20   jury.

21             MR. CLORE:  Let the record reflect that the witness

22   has circled the top-right corner in Government Exhibit 306.

23             THE COURT:  Yes.

24             MR. CLORE:  Thank you, Judge.

25   Q.  What side of the street were you on when you got to that

1    location, Officer Syed?

2    A.  So I was on the right side of the street, the street with

3    the commercial developments, not on the housing side.  The

4    other side.

5    Q.  If you recall, were other officers already on the scene

6    when you arrived?

7    A.  Yes.

8    Q.  What were they doing?

9    A.  Well, some were canvassing to see where the shots fired job

10   came from, to see if there was anybody running from the

11   location.  Some were rendering medical aid.  Some were talking

12   to the group, trying to speak to witnesses.

13            MR. CLORE:  Mr. Magliocco, will you please publish for

14   the witness what's been marked for identification as Government

15   Exhibit 204.

16   Q.  Officer Syed, do you recognize this photo?

17   A.  Yes.

18   Q.  What is it?

19   A.  It's 137 Street, St. Ann's to Brook.

20   Q.  Does this photo accurately reflect the location to which

21   you responded on August 17, 2014?

22   A.  Yes.

23            MR. CLORE:  The government offers Government Exhibit

24   204.

25            THE COURT:  It's admitted.

J2P3HOW1                              Syed - Direct

1          (Government's Exhibit 204 received in evidence)

2    Q.   Officer Syed, do you see in the middle of the photo there

3    is a little girl on a bike?

4    A.   Yes.

5    Q.   What street is she on?

6    A.   She's on 137 Street.

7    Q.   Do you see the intersection all the way to the right of the

8    photo?

9    A.   Yes.

10   Q.   What street is that?

11   A.   That's St. Ann's Avenue.

12   Q.   Officer Syed, using this photo again, can you indicate for

13   the jury approximately where you were when you initially

14   responded to the radio run.

15   A.   Yes.  I was right around here.

16          MR. CLORE:  Let the record reflect that the witness

17   has indicated the area to the right of the 24-hour parking

18   garage in Government Exhibit 204.

19          THE COURT:  Yes.

20          MR. CLORE:  Thank you, your Honor.

21   Q.   Officer Syed looking at this photo, where are the Mill

22   Brook Houses?

23   A.   The Mill Brook Houses are -- would be behind the

24   photographer of this picture, on the other side of the street.

25          MR. CLORE:  Mr. Magliocco, will you please publish for

J2P3HOW1                        Syed - Direct

1    the witness what's been marked for identification as Government

2    Exhibit 212.

3    Q.  Officer Syed, do you recognize this photo?

4    A.  Yes.

5    Q.  What is this a photo of?

6    A.  137 Street.

7    Q.  What direction is it facing?

8    A.  It's facing towards Brook Avenue.

9    Q.  Does this photo accurately reflect the location you

10   responded to after the radio run for shots fired?

11   A.  Yes.

12           MR. CLORE:  The government offers Government Exhibit

13   212 into evidence.

14           THE COURT:  It's admitted.

15           (Government's Exhibit 212 received in evidence)

16           MR. CLORE:  Mr. Magliocco, can you please publish

17   Government Exhibit 212.

18   Q.  Officer Syed, do you see the photos to the left in the

19   photo?  I mean, excuse me, the buildings to the left in the

20   this photo?

21   A.  Yes.

22   Q.  What buildings are those?

23   A.  That's the Mill Brook Housing Development.

24           MR. CLORE:  Mr. Magliocco, will you please publish for

25   the witness what's been marked for identification as Government

J2P3HOW1                        Syed - Direct

1    Exhibit 209.

2    Q.  Officer Syed, do you recognize this photo?

3    A.  Yes.

4    Q.  What is this?

5    A.  That's, again, it is 137 Street.  It is where I responded

6    to.

7    Q.  Again, does this photo accurately reflect the location to

8    which you responded on August 17, 2014?

9    A.  Yes.

10            MR. CLORE:  The government offers Government Exhibit

11   209.

12            THE COURT:  It's admitted.

13            (Government's Exhibit 209 received in evidence)

14            MR. CLORE:  Mr. Magliocco, will you publish it for the

15   jury.

16   Q.  Officer Syed, what, if anything, did you first observe when

17   you got to the shooting location?

18   A.  Well, when I first got there, there was -- I saw one person

19   shot, there was two others complaining that they were shot.

20   There was a large crowd of people, and they were very irate.

21   They were going back and forth with the police officers who

22   responded.  And like I said, there was many police officers

23   there already.  You know, some were canvassing for the perp,

24   for the shooter, some were trying to get witness statements,

25   some were rendering medical aid.

J2P3HOW1                          Syed - Direct

1   Q.  Using Government Exhibit 209, can you indicate for the jury

2   approximately where the large group of people were when you

3   first observed them.

4   A.  Yes.  They were like right around the deli.

5             MR. CLORE:  Let the record reflect that the witness

6   has indicated a location in front of the deli grocery in

7   Government Exhibit 209.

8             THE COURT:  Yes.

9   Q.  Officer Syed, did you eventually approach that group of

10  people?

11  A.  Yes.

12  Q.  What, if anything, did you observe when you approached the

13  group?

14  A.  They were basically just irate, like yelling at us to help,

15  to try to get like medical attention, and we were just trying

16  to calm the group down.

17  Q.  I think you mentioned this.  Did you notice if anyone had

18  been injured?

19  A.  Yes.

20  Q.  If you recall, do you remember what any of those injuries

21  were?

22  A.  I just remember that there was definitely someone shot.  I

23  don't remember exactly what the injuries were.

24  Q.  What did you do next?

25  A.  Next, well, an ambulance arrived at the scene, and I went

J2P3HOW1                          Syed - Direct

1   to the hospital with the victim.

2   Q.  What hospital did you go to?

3   A.  To Lincoln Hospital.

4   Q.  Did you ride in the ambulance with one of the victims?

5   A.  I don't remember if I rode in the ambulance with them or if

6   I took the RMP there.  The police vehicle there.  But I did --

7   escort the victim to the hospital.

8   Q.  Were the other victims transported to the hospital as well?

9   A.  Yes.

10  Q.  Did you speak with any of the victims while you were at the

11  hospital?

12  A.  Yes.

13  Q.  What, if anything, did they tell you happened that night?

14  A.  I don't recall exactly what we spoke about.

15          MR. BERTAN:  Objection.

16  Q.  Officer Syed, were you eventually able to identify the

17  victims?

18  A.  Yes.

19  Q.  Do you recall what their names were?

20  A.  Yes.

21  Q.  What were their names?

22  A.  Shadean Samuel, Perez Jonathan, and Dykes Aaron.

23  Q.  The last two, are you saying first name first or last name

24  first?

25  A.  Last name first.

J2P3HOW1                              Syed - Direct

1    Q.  How long did you stay at the hospital that day?

2    A.  Approximately two hours.

3    Q.  Do you recall what time you left the hospital?

4    A.  It was approximately 5:30.

5    Q.  What, if anything, was your involvement in this

6    investigation after you left the hospital?

7    A.  I drew up the complaint reports, and I vouchered the

8    victims' clothing as evidence.

9    Q.  When you say you drew up the complaint reports, what does

10   that mean?

11   A.  I basically typed up what happened, the complaint.

12   Q.  Officer Syed, I'd like to shift gears here for a bit.

13   Again, how long had you been with the housing bureau when the

14   August 17, 2014 shooting happened?

15   A.  A little over a month.

16   Q.  Did you ever patrol the Mill Brook Housing Projects again

17   after this incident?

18   A.  Yes.

19   Q.  Did you patrol the Mill Brook Housing Projects more than

20   one time after this incident?

21   A.  Yes.

22   Q.  Were you aware of other shootings that occurred at the Mill

23   Brook projects after this incident?

24   A.  There were other shootings that occurred.  I don't recall

25   exactly when or what time.

J2P3HOW1                          Syed - Direct

1    Q.  Are you generally familiar with the layout of the Mill

2    Brook projects?

3    A.  Yes.

4    Q.  Are you aware of any names used to refer to different sides

5    of the projects?

6    A.  Yes.

7    Q.  What names are used?

8              MR. BERTAN:  Objection.

9              THE COURT:  Overruled.

10   A.  There was a Mill Brook up and a Mill Brook down.

11   Q.  If you recall, where is Mill Brook up?

12   A.  Mill Brook up is St. Ann's to Cypress.  135 to 137.

13   Q.  Where is Mill Brook down?

14   A.  St. Ann's to Brook.  135 to 137.

15             MR. CLORE:  Mr. Magliocco, will you bring up

16   Government Exhibit 300 for the jury.

17   Q.  Officer Syed, can you indicate where Mill Brook down is for

18   the jury.

19   A.  Yeah, Mill Brook down would be buildings one through four.

20   Q.  Okay.  And where would Mill Brook up be?

21   A.  Be buildings five through 10.

22             MR. CLORE:  May I have a moment, your Honor?

23             THE COURT:  Yes.

24             MR. CLORE:  Thank you.

25   Q.  Officer Syed, were you aware of any issues between the two

J2P3HOW1                           Syed - Direct

1   sides of Mill Brook?

2                MR. BERTAN:  Objection, your Honor.

3                THE COURT:  Overruled.

4   A.  Yes.

5   Q.  What was your general understanding of the issues?

6   A.  Well, generally, it was known that Mill Brook up and Mill

7   Brook down, they had beef between each other.

8   Q.  What do you mean by the term "beef"?

9   A.  They -- basically, they were opposing -- I mean, they were

10  opposing gangs, basically, and they used to fight each other.

11  Q.  Looking at Government Exhibit 300, do you know the address

12  for building three?

13  A.  Yes.

14  Q.  What's the address?

15  A.  165 St. Ann's.

16  Q.  Do you know the address for building four?

17  A.  Yes.

18  Q.  What was the address for building four?

19  A.  530 East 137.

20               MR. CLORE:  May I have one more moment, your Honor?

21               Two more brief questions.  Mr. Magliocco, will you

22  bring up Government Exhibit 306, please.

23  Q.  Officer Syed, in Government Exhibit 306, can you circle 165

24  St. Ann's.

25               MR. CLORE:  Let the record reflect that the witness

J2P3HOW1                         Syed - Cross

1    has circled the bottom most building in Government Exhibit 306.

2              THE COURT:  Yes.

3    Q.  Officer Syed, can you indicate for the jury where the

4    530 137 Street building is?

5              MR. CLORE:  Let the record reflect that the witness

6    has circled the right most building in Government Exhibit 306.

7              THE COURT:  Yes.

8              MR. CLORE:  No further questions, your Honor.

9    CROSS-EXAMINATION

10   BY MR. BERTAN:

11   Q.  Good afternoon, Officer Syed.  I have a few questions for

12   you.  You were on foot patrol that night with Police Officer

13   Jordan.  Is that correct?

14   A.  Yes.

15   Q.  Approximately 3:10 a.m. you received a radio call, correct?

16   A.  Yes.

17   Q.  And you received that radio call from another officer?

18   A.  No.

19   Q.  Did that come from dispatch?

20   A.  Yes.

21   Q.  What was the radio call?

22   A.  Shots fired.

23   Q.  Did you actually hear the shots?

24   A.  No.

25   Q.  Where were you when you received that radio call?

J2P3HOW1                        Syed - Cross

1  A.  I was on 138th Street, between St. Ann's and Brook at that

2  time.

3  Q.  You were breaking up a fight at that point, right?

4  A.  Yes.

5  Q.  Okay.  You didn't hear the shots?

6  A.  No.

7  Q.  How far from 137 and St. Ann's is 138 and St. Ann's?

8  A.  It would be around the block.  So --

9  Q.  A block away?

10  A.  A block away, yeah.

11  Q.  So you ran to the location, one block?

12  A.  Yes.

13  Q.  That's where you saw the crowd?

14  A.  Yes.

15  Q.  And after you were there for a little while, you went to

16  the hospital?

17  A.  Yes.

18  Q.  Do you know if anyone was arrested that night?

19  A.  I don't know.

20  Q.  Do you know if Mr. Shadean Samuels was arrested at the

21  hospital that night?

22  A.  Not that I am aware of.

23          MR. BERTAN:  Just one moment, your Honor.

24          Nothing further.  Thank you.

25          MR. CLORE:  No redirect, your Honor.

J2P3HOW1                            Cerda - Direct

1              THE COURT:  Thank you, Officer.

2              (Witness excused)

3              MS. ROTHMAN:  Your Honor the government calls Estefani

4     Cerda.

5      ESTEFANI CERDA,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8     DIRECT EXAMINATION

9     BY MS. ROTHMAN:

10    Q.  Good afternoon.

11    A.  Good afternoon.

12    Q.  Where do you work?

13    A.  NYPD, Evidence Collection.

14    Q.  How long have you worked for the New York City Police

15    Department?

16    A.  13 years.

17    Q.  How long have you been with the Evidence Collection Team?

18    A.  Nine years.

19    Q.  Officer Cerda, what are your duties and responsibilities as

20    a member of the Evidence Collection Team with the New York City

21    Police Department?

22    A.  To identify, document, and collect evidence left behind in

23    a crime scene.  We also collect firearms and firearm-related

24    evidence.

25    Q.  Officer Cerda, I'm going to ask you to speak into the

49

1   microphone so everyone can hear you.

2          I believe you just testified that your

3   responsibilities with ECT are to collect evidence from crime

4   scenes, including firearms-related evidence.  Is that correct?

5   A.  Correct.

6   Q.  Would that include shell casings and bullets?

7   A.  Yes, correct.

8   Q.  Officer Cerda, as a member of the New York City Police

9   Department, have you received basic training in firearms?

10  A.  Yes.

11  Q.  Are you familiar with basic firearms concepts and

12  terminology?

13  A.  Yes.

14  Q.  I want to direct your attention to August 16, 2014.  Did

15  you work that day?

16  A.  August 16?  Yes.

17  Q.  What tour were you working?

18  A.  2300 by 0735, which is 11 p.m. to 7:35 in the morning.

19  Q.  So that tour continues into the following day, correct?

20  A.  Yes, correct.

21  Q.  That would have been August 17, 2014?

22  A.  Yes.

23  Q.  Thinking about that shift, did there come a time when you

24  responded to the scene of a shooting?

25  A.  I did, yes.

J2P3HOW1                          Cerda - Direct

1    Q.   Why did you go to that scene?

2    A.   Well, we got notified at our office.

3    Q.   What were you notified of?

4    A.   Three males shot.

5         MS. ROTHMAN:   Mr. Magliocco, can you please pull up

6    what's in evidence as Government Exhibit 306.

7    Q.   Officer Cerda, that should also be on your screen too.

8    What address did you respond that day?

9    A.   Well, I responded to 530 East 137 Street.

10   Q.   What type of building is located at that address?

11   A.   Those are projects.

12   Q.   Housing buildings?

13   A.   Yes, housing.

14   Q.   Approximately what time did you arrive at 530 East 137th?

15   A.   0456.

16   Q.   What time had ECT been notified of the shooting?

17   A.   I believe it was 4:20 in the morning.

18   Q.   What did you do when you arrived on the scene that morning?

19   A.   Well, I responded to 530 East 137 Street.  I then walked

20   over to where the guarding officer was, where he directed my

21   attention to where the evidence was.

22   Q.   When you say "guarding officer," what do you mean, Officer

23   Cerda?

24   A.   The officer that is guarding the evidence.

25   Q.   To where did the guarding officer direct your attention

1   that morning?

2   A.   To 165 St. Ann's.

3   Q.   What was located there?

4   A.   Two shell casings and one cartridge, live round.

5   Q.   So, the evidence was located in front of a different

6   building that you were called to respond to; is that correct,

7   Officer Cerda?

8   A.   Yes, correct.

9   Q.   I believe you testified to this.  But when you got there,

10  were officers in fact guarding that evidence?

11  A.   Yes.

12  Q.   Officer Cerda, in your practice, when you arrive on a crime

13  scene, and have identified an area where evidence is located,

14  what, if anything, do you do?

15  A.   The first thing I do is usually photograph the scene.  And

16  then take a picture of the evidence, a close range photo of the

17  evidence.

18  Q.   You take a photo first of the entire area?

19  A.   Yes.

20  Q.   Why do you do that?

21  A.   That's just protocol for us.  Anything we take into

22  evidence, we photograph.

23       MS. ROTHMAN:  Mr. Magliocco, you can take Government

24  Exhibit 306 down, and please pull up for the witness, defense

25  counsel, and the Court what's been marked for identification as

1    Government Exhibit 203.

2    Q.  Officer Cerda, do you see a photograph on your screen?

3    A.  I do, yes.

4    Q.  Do you recognize this photograph?

5    A.  Yes.

6    Q.  What is it a picture of?

7    A.  A photo that I took of the scene.

8    Q.  When you say "the scene," what are you referring to?

9    A.  The scene that I responded to.

10   Q.  The night of the shooting?

11   A.  The night of the shooting yes.

12   Q.  Is this photograph a fair and accurate depiction of the

13   scene where the evidence was located that morning?

14   A.  Yes.

15            MS. ROTHMAN:  At this time the government offers

16   Government Exhibit 203 into evidence.

17            THE COURT:  It's admitted.

18            (Government's Exhibit 203 received in evidence)

19            MS. ROTHMAN:  Mr. Magliocco, can you please publish

20   for the jury.

21   Q.  Officer Cerda, what are we looking at here?

22   A.  A photograph of what I took where the evidence was.

23   Q.  Why is the photograph so dark?

24   A.  I had a malfunction with the camera.

25   Q.  So this is the first photo that you took of the area where

J2P3HOW1                         Cerda - Direct

1    the evidence was located, correct?

2    A.   As soon as I responded, this was it.

3    Q.   Now, what evidence did you collect that day, Officer Cerda?

4    A.   Two shell casings and one live round.  A cartridge.

5    Q.   What is a shell casing?

6    A.   Shell casing is a piece of ammunition made of metal.

7    Q.   What happens to a shell casing when a bullet or a live

8    round is fired?

9    A.   So, when a firearm is fired, the shell casing is either

10   ejected from the slide, or remains in the firearm, depending on

11   what type of firearm it is.

12   Q.   What type of firearm would eject a shell casing?

13   A.   A pistol.

14   Q.   Or a --

15   A.   A semi-automatic.

16   Q.   What type of shell casing would remain in the weapon?

17   A.   A revolver.

18   Q.   What is a live cartridge?

19   A.   A live cartridge is also a piece of ammunition made of

20   metal, but it consists of the bullet or a shell casing.

21   Q.   Has a live cartridge been fired yet?

22   A.   No.

23   Q.   Did you take photographs of this evidence as well?

24   A.   I did, yes.

25            MS. ROTHMAN:  Mr. Magliocco, please take down

J2P3HOW1                          Cerda - Direct

1    Government Exhibit 203, and pull up for the witness, defense

2    counsel, and the Court what's been marked for identification as

3    Government Exhibit 200.

4    Q.  Officer Cerda, do you recognize this photograph?

5    A.  Yes.

6    Q.  What is it a photograph of?

7    A.  A photograph that I took of a shell casing.

8    Q.  Is it a fair and accurate depiction of a shell casing that

9    you saw that night?

10   A.  Yes.

11          MS. ROTHMAN:  Your Honor, at this time the government

12   offers Government Exhibit 200 into evidence.

13          THE COURT:  It's admitted.

14          (Government's Exhibit 200 received in evidence)

15          MS. ROTHMAN:  Mr. Magliocco, can you please publish

16   for the jury.

17   Q.  Officer Cerda, looking at the screen, can you please circle

18   the shell casing in this photograph.

19          How would you describe the type of ground that the

20   shell casing is located on?

21   A.  It is a grassy area.

22   Q.  Thank you, Officer Cerda.

23          MS. ROTHMAN:  Mr. Magliocco, can you please take this

24   photograph down, and pull up for the witness, counsel, and the

25   Court what's been marked for identification as Government

1    Exhibit 202.

2    Q.  Officer Cerda, do you recognize this photograph?

3    A.  I do, yes.

4    Q.  What is it a photograph of?

5    A.  A photograph that I took of a shell casing.

6    Q.  Is it a fair and accurate photograph of that shell casing?

7    A.  It is, yes.

8            MS. ROTHMAN:  Your Honor, at this time the government

9    offers Government Exhibit 202 into evidence.

10           THE COURT:  It's admitted.

11           (Government's Exhibit 202 received in evidence)

12           MS. ROTHMAN:  Mr. Magliocco, can you please publish

13   for the jury.

14   Q.  Officer Cerda, looking at Government Exhibit 202, can you

15   please circle the shell casing in this photograph.

16           Can you please describe the type of ground on which

17   the shell casing was recovered.

18   A.  It was cemented area.

19   Q.  Thank you.

20           MS. ROTHMAN:  Mr. Magliocco, you can please take this

21   done and pull up for the witness, defense counsel, and the

22   Court what's been marked for identification as Government

23   Exhibit 201.

24   Q.  Officer Cerda, do you recognize this photograph?

25   A.  I do, yes.

1   Q.   What is it a photograph of?

2   A.   A photograph that I took of a live round, cartridge.

3   Q.   Is it a fair and accurate depiction of the live round or

4   cartridge?

5   A.   Yes, it is.

6            MS. ROTHMAN:   Your Honor, at this time the government

7   offers Government Exhibit 201 into evidence.

8            THE COURT:  It's admitted.

9            (Government's Exhibit 201 received in evidence)

10           MS. ROTHMAN:   Mr. Magliocco, can you please publish

11   for the jury.

12   Q.   Officer Cerda, can you please circle the live round or

13   cartridge that you see?

14   A.   Yes.

15   Q.   Can you please describe the type of ground on which this

16   live cartridge was found.

17   A.   It's cemented area.

18   Q.   Thank you, Officer Cerda.

19           (Continued on next page)

20

21

22

23

24

25

J2pnhow2                          Cerda - Direct

1          MS. ROTHMAN:  Your Honor, may I approach the witness?

2          THE COURT:  Yes.

3          MS. ROTHMAN:  Mr. Magliocco, we can take this down.

4     Q.  Officer Cerda, I've handed you what's been marked for

5     identification as Government Exhibit 100.  It is an envelope in

6     front of you.  Feel free to open that envelope and look at the

7     contents.

8          Officer Cerda, do you recognize Government Exhibit

9     100?

10    A.  Yes.

11    Q.  What is it?

12    A.  It is the ballistic evidence that I vouchered.

13    Q.  Specifically what type of ballistics evidence did you

14    voucher that night?

15    A.  Two shell casings and one live round cartridge.

16         MS. ROTHMAN:  Your Honor, at this time the government

17    offers Government Exhibit 100.

18    Q.  How do you recognize that evidence, Officer Cerda?

19    A.  These little clear envelopes, I packaged them with my

20    handwriting.

21         MS. ROTHMAN:  Your Honor, at this time the government

22    offers into evidence Government Exhibit 100?

23         THE COURT:  It is admitted.

24         (Government Exhibit 100 received in evidence)

25         MS. ROTHMAN:  Your Honor, may we publish to the jury?

J2pnhow2                              Cerda - Cross

1          THE COURT:  Yes.

2    BY MS. ROTHMAN:

3    Q.  Officer Cerda, are you familiar with the term caliber?

4    A.  I am, yes.

5    Q.  What does caliber mean?

6    A.  It just tells you the size of the bullet.

7    Q.  What caliber are the two shell casings and one live

8    cartridge found within government Exhibit 100?

9    A.  They were .40 caliber.

10   Q.  What did you do with the shell casings and live cartridge

11   after you recovered them that night?

12   A.  They were vouchered.

13   Q.  What does it mean to voucher evidence?

14   A.  It is a specific number -- I'm sorry, specific item or

15   items that are vouchered, we give a unique number to it.

16   Q.  What is the purpose of that.

17   A.  Just the chain of custody and keep track of our evidence.

18          MS. ROTHMAN:  Your Honor, may I have one moment.

19          Your Honor, I have no further questions for the

20   witness at this time.

21   CROSS-EXAMINATION

22   BY MR. BERTAN:

23   Q.  Good afternoon Officer Cerda.

24   A.  Good afternoon.

25   Q.  A few questions for you.  You were notified while you were

J2pnhow2                          Cerda - Cross

1    at your office?

2    A.   Correct.

3    Q.   You were notified that three men had been shot, correct?

4    A.   Correct.

5    Q.   You responded to the location at 530 East 137th around 4:56

6    a.m., correct?

7    A.   Correct.

8    Q.   And when you got there, the people who had been shot had

9    been removed to the hospital?

10   A.   Correct.

11   Q.   Someone was guarding the evidence you said?

12   A.   Yes.

13   Q.   Do you know who that was?

14   A.   I don't recall.

15   Q.   Did you make a note of who that officer was?

16   A.   No.

17   Q.   So did you look for any additional evidence?

18   A.   No, I did not.

19   Q.   So you relied on what that guarding officer found?

20   A.   I did, yes.

21   Q.   You knew that there had been three men shot?

22   A.   Yes.

23   Q.   And you found two shell casings?

24   A.   Two shell casings.

25   Q.   And one live round?

1    A.  One live round.

2    Q.  Could you tell how long they had been lying there?

3    A.  No.

4    Q.  Could you tell when they had been fired?

5    A.  No.

6    Q.  How did you pick them up?

7    A.  I actually collected them gloves on and just picked them

8    up.

9    Q.  With gloves?

10   A.  With gloves.

11   Q.  OK.  Now, you said that you had -- I'm sorry -- some

12   familiarity and training with firearms?

13   A.  Right.

14   Q.  As a member of the police department, you learn how to

15   handle your own firearm, I assume.

16   A.  My own, yes.

17   Q.  Do you use a semiautomatic weapon?

18   A.  I do.

19   Q.  A semiautomatic weapon uses a magazine to feed cartridges

20   into the chamber to fire, correct?

21   A.  Correct.

22   Q.  So you take the magazine out, there are cartridges in it?

23   A.  Yes.

24   Q.  How do the cartridges get into the magazine?

25   A.  You have to put them in yourself.

1    Q.   Physically you pick them up and put them in?

2    A.   Physically, yes.

3    Q.   OK.  The unfired cartridge that you found meant that it

4    had -- well, you don't really know what happened, you just know

5    it hadn't been fired?

6    A.   Right.

7    Q.   And it was the same caliber as the others?

8    A.   Right.

9    Q.   Did you submit these for any sort of analysis?

10   A.   Ballistic analysis.

11   Q.   Did you submit any of them for fingerprint analysis?

12   A.   No.

13   Q.   Did you submit the unfired cartridge for DNA analysis?

14   A.   No.

15   Q.   One spent cartridge -- one shell casing, I'm sorry, was

16   found on the grass?

17   A.   Right.

18   Q.   One was found on the sidewalk?

19   A.   Uh --

20   Q.   Cement.  I'm sorry.  Withdrawn.

21   A.   Cement, yes.

22   Q.   Was found on the cement and the unfired cartridge was also

23   found on the cement?

24   A.   Correct.

25   Q.   How far apart were these three items?

1   A.  I don't really remember, to be honest with you.

2   Q.  Did you measure the location of each of, the distance from

3   each to the other?

4   A.  We don't measure.

5   Q.  OK.  Did you take photos showing the relationship where

6   each of the three was?

7   A.  Well, the first picture that I took, the scene, that was in

8   it, but you can't really see it.

9   Q.  Because it's dark?

10  A.  Because it's dark.

11  Q.  The camera malfunctioned?

12  A.  Yes.

13          MR. BERTAN:  If I may have a moment, your Honor.

14          THE COURT:  Yes.

15          MR. BERTAN:  Nothing further.

16          Thank you.

17          MS. ROTHMAN:  Your Honor, we have no redirect for this

18  witness.

19          THE COURT:  Thank you, Officer.

20          THE WITNESS:  Thank you.

21          Have a good day.

22          (Witness excused)

23          MS. ROTHMAN:  Your Honor, we're happy to break for

24  today with those two witnesses.  If your Honor wants to keep

25  going, we can offer some hospital records as well.  We defer

J2pnhow2                              Cerda - Cross

1    to --

2              THE COURT:  Sure.  Let's go.

3              MS. ROTHMAN:  OK.

4              Mr. Magliocco, can you please pull up what's been

5    marked for identification as Government Exhibit 801A.

6              Your Honor, at this time the government is going to

7    offer hospital records for Aaron Dykes from August 17, 2014.

8    They are marked as 801A.

9              We are offering them pursuant to a certification which

10   is marked 801C and Federal Rule of Evidence 902(11) as business

11   records and hospital records.

12             THE COURT:  They are admitted.

13             (Government Exhibits 801A and 801 C received in

14   evidence)

15             MS. ROTHMAN:  Mr. Magliocco, can we please publish for

16   the jury.

17             If you can zoom in on the top right corner,

18   Mr. Magliocco.

19             I'll read from them.

20             Aaron Dykes, adm. 17 August 14, 0337.

21             Dis., 17 August 14, 0743.

22             We can zoom out, Mr. Magliocco.

23             If you can zoom in on the middle, where it says,

24   Reason for Consult.

25             Middle of the page a little lower.

J2pnhow2                          Cerda - Cross

1              I will read:  Trauma team activation upon patient

2    arrival around 3:40 a.m.  GSW to right upper arm.

3              We can zoom out, Mr. Magliocco.

4              If we can turn to page 6 of these hospital records.

5    If you can zoom in under History in the middle of the page.

6              A little lower.  Thank you.

7              History, GSW to right upper arm.  Reports history of

8    GSW to right elbow area.

9              If we can turn to page 7 of these records,

10   Mr. Magliocco.  If you can zoom in on mode of arrival, which is

11   in the right middle of the records.

12             Corporate ambulance.

13             If you can go to page 10 of these records.

14             If you can zoom in.

15             If you can zoom out on Discharge Summary, the top

16   paragraph.

17             19M with gunshot wound to right upper arm.  Seen by

18   trauma surgery.  Received tetanus and IVFs.  R. humerus and

19   shoulder reviewed.  Patient does not want to stay in ED longer.

20   Wound cleaned.  Wants to sign out AMA.  Completed forms.  Given

21   RX for Motrin.  Appointment for surgery clinic tomorrow.

22             You can take this down.

23             If you actually can go to page 79 of these records.

24   If you can zoom in on the top left.  That reads, Departure

25   against medical advice.  A little lower.  That's fine.

J2pnhow2                              Cerda – Cross

1           If you can zoom back out and just zoom in on the time.

2    8/17/14 at 7:10 a.m.

3           We can take this down, Mr. Magliocco, and please pull

4    up what's been marked for identification as Government Exhibit

5    802A.  These are hospital records from August 17, 2014, for

6    Jonathan Perez.

7           The government offers these records pursuant to a

8    certification from Lincoln Hospital that is marked for

9    identification as 802C and again offered pursuant to Federal

10   Rule of Evidence 902 (11).

11          THE COURT:  It is admitted.

12          (Government Exhibits  802A and 802C received in

13   evidence)

14          MS. ROTHMAN:  Mr. Magliocco, can you please zoom in on

15   the top right corner of the first page of Jonathan Perez's

16   hospital records.

17          Perez Jonathan.  Adm. 17 August 14, 0347, dis., 17

18   August 14, 9:33.

19          You can zoom out, Mr. Magliocco.

20          Zoom in, Reason for Consult in the middle of the page.

21          Reason for Consult, GSW right thigh.

22          You can turn to page 11 of the hospital records,

23   Mr. Magliocco.

24          You can zoom in on the attending note at the bottom of

25   the page.  This is a 29 Y/O man who initially presented with

J2pnhow2                          Cerda - Cross

1   suspected GSW to right inner thigh.  However, wound was

2   punctate, less than 1 cm.  Did not appear consistent with GSW.

3   No scrotal pain.  Pulses 2 plus B/1; ABI 1 B/1.  X-ray of right

4   femur, knee, and also pelvis unremarkable.  No fracture.  No

5   bullet fragments appreciated.

6            If you can turn to page 67 of these hospital records.

7            If you can zoom in on the top left, that first portion

8   of the form, all the way.

9            Call Information.  Call Location, 530 East 137th

10  Street.

11           You can zoom out, Mr. Magliocco.

12           And if you can zoom in on Chief Complaint.  I think I

13  got shot in the leg (R).

14           We can take this down, Mr. Magliocco.

15           Please pull up for identification what's been marked

16  as 803A.  These are hospital records for Shadean Samuel from

17  August 17, 2014.

18           Again, the government offers these records pursuant to

19  a certification from Lincoln Hospital that's been marked for

20  identification as 803C, and we are offering them pursuant to

21  Rule 902(11) the Federal Rules of Evidence

22           THE COURT:  They are admitted.

23           (Government Exhibits 803A and 803C received in

24  evidence)

25           MS. ROTHMAN:  Thank you, your Honor.

1            Mr. Magliocco can you please zoom in on the top right

2     corner these records.  Samuel Shadean, adm. 17 August 14, 3:44.

3     Dis. 17 August 14, 9:31.

4            You can zoom out, Mr. Magliocco.

5            You can zoom in on Reason for Consult in the middle of

6     the page.  24 Y/O male, S/P GSW to left shoulder/arm.  Vitals

7     stable.

8            You can turn to page 27 of these hospital records.  If

9     you can zoom in on Property and the text to the right.  Thank

10    you, Mr. Magliocco -- all the way.

11           One pair of jeans, one pair of sneakers, one shirt

12    were taken by NYPD Officer Syed, PCT HB7, Badge 78128; money,

13    $7, one set of keys, one cell phone were taken by girlfriend,

14    Kelly Santana.

15           We can take this down and please turn to page 63.

16           If you can zoom in on the date on the top left.

17    Actually, you can take that down.  Not that.  Lower, below

18    chart group, Mr. Magliocco.  That date right there.

19           Tuesday, 19 August 14.

20           You can zoom out.  Mode of Arrival, on the right side,

21    right there.  Walk.

22           Take this down.  You can zoom out.

23           Then if you can zoom in at the bottom, that begins

24    Tue. 19 August -- one up higher.  Both of those at the bottom.

25    Thank you.  The bottom one, too.

1                    Tuesday, 19 August, 12:03, adm. check-in, destination

2      LHB, ADLP, ER wait, RM 22.

3                    And then below, Tues., 19 August 2208, discharged

4      patient.  Discharge type, patient manually discharged.  Walked

5      out before seeing MD.

6                    Please go to page 75.

7                    If you can zoom in on the top half of this page all

8      the way to the right.  Thank you.

9                    Lincoln Hospital Center Emergency Medical Services

10     reg. date and time, 8/17/2014, 3:44.  Patient name, Samuel

11     Shadean, person to be notified, Santana, Kelly.

12                    Under patient name and address, 165 St. Ann's Avenue,

13     Bronx, New York.

14                    Your Honor, may I have one moment?

15                    THE COURT:  Yes.

16                    MS. ROTHMAN:  We can take those down.

17                    Thank you, Mr. Magliocco.

18                    Your Honor, with that we would propose breaking for

19     today and resuming at a time that your Honor likes tomorrow

20     morning.

21                    THE COURT:  10 o'clock tomorrow, ladies and gentlemen.

22     It's possible we may not be able to start at 10, but let's keep

23     our fingers crossed.  I think maybe it can be worked out.

24                    Please don't discuss the case with anyone else.

25                    Have a pleasant evening.

J2pnhow2                              Cerda - Cross

1           Stay warm.  Thank you very much.

2           (Jury not present)

3           THE COURT:  Yes, what is our problem?

4           MS. ROTHMAN:  There is no problem, your Honor.

5           THE COURT:  Oh.

6           MS. ROTHMAN:  Tomorrow the government intends to offer

7  two pieces of evidence.  They are the marshals' intake form

8  from the day of the defendant's arrest in 2017 as well as a

9  video of the defendant entering the federal courthouse two

10  weeks ago for the final pretrial conference.  In both of these

11  exhibits the defendant has braids, which is different than his

12  hair today before your Honor.

13           As the Court knows, at the time of the shooting, a

14  witness, an eyewitness described the shooter as someone having

15  braids.  That is an important piece of evidence.  We want to

16  offer those two pieces of evidence to assist with the -- as

17  relevant to that identification.  So we wanted to advise the

18  Court of that in advance of doing so tomorrow.

19           I apologize, not the intake form.  It's the marshals'

20  photo of the defendant.

21           MR. LIND:  I have no objection to it, Judge.  I had

22  one objection, which I told Ms. Rothman about, about the

23  marshal's photo.  It has a prisoner registration number in the

24  upper right-hand corner.  I believe the government is going to

25  take that out.

J2pnhow2                        Cerda - Cross

1              THE COURT:  OK.  I am sure they will.

2              MS. ROTHMAN:  Yes, your Honor.

3              THE COURT:  Anything else?

4              MR. LIND:  From me, Judge, no.  I have nothing.

5              MS. ROTHMAN:  I think that's it for now.  Thank you,

6     your Honor.

7              THE COURT:  OK.  Thank you, all.

8              (Adjourned to Tuesday, February 26, 2019, at 10:00

9     a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                        INDEX OF EXAMINATION

Examination of:                                    Page

 SURFRAZ SYED

Direct By Mr. Clore  . . . . . . . . . . . . .29

Cross By Mr. Bertan  . . . . . . . . . . . . .46

 ESTEFANI CERDA

Direct By Ms. Rothman  . . . . . . . . . . .48

Cross By Mr. Bertan  . . . . . . . . . . . . .58

                        GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 305   . . . . . . . . . . . . . . . . . . . .33

 300   . . . . . . . . . . . . . . . . . . . .34

 306   . . . . . . . . . . . . . . . . . . . .36

 204   . . . . . . . . . . . . . . . . . . . .38

 212   . . . . . . . . . . . . . . . . . . . .39

 209   . . . . . . . . . . . . . . . . . . . .40

 203   . . . . . . . . . . . . . . . . . . . .52

 200   . . . . . . . . . . . . . . . . . . . .54

 202   . . . . . . . . . . . . . . . . . . . .55

 201   . . . . . . . . . . . . . . . . . . . .56

 100   . . . . . . . . . . . . . . . . . . . .57

 801A and 801 C  . . . . . . . . . . . . . .63

  802A and 802C  . . . . . . . . . . . . . .65

 803A and 803C  . . . . . . . . . . . . . .66
```