UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,      :

   -against-                 :     17 Cr. 611 (AT)

CHRISTOPHER HOWARD,       :

             Defendants.     :

-------------------------------------------------------x

## POST-TRIAL MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT HOWARD'S
## MOTION TO VACATE HIS CONVICTIONS

## PRELIMINARY STATEMENT

On March 6, 2019, a jury convicted Defendant Christopher Howard ("Christopher" or "Defendant") of each of the three Counts of Superseding Indictment S1 17 Cr. 611 (RWS), namely, Count One, participating in a racketeering ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(d); Count Two, committing a violent crime ("VICAR") in violation of 18 U.S.C. § 1959(b)(2); and Count Three, brandishing and discharging a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A) (ii) and (iii).  Defendant submits this Memorandum of Law in support of his motion to vacate his conviction on all Counts, pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29").

Rule 29 provides that the Court "*must* enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Rule 29(a) (emphasis added). However, "a defendant shoulders a heavy burden in challenging the sufficiency of evidence supporting a conviction." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also United States v. Walker*, 142 F.3d 103, 112 (2d

Cir. 1998) (same). A District Court may enter a judgment of acquittal on the grounds of insufficient evidence only if "after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002).

As we establish herein, Defendant satisfies the demanding standard under Rule 29 because the government failed to prove beyond a reasonable doubt essential elements under Counts One and Two of the Indictment. In addition, because the government failed to satisfy its burden under Counts One and Two, any prosecution under Count Three must collapse.

As to Count One, the "RICO" Count, our Circuit has made clear in *United States v. Vernace*, 811 F. 609 (2d Cir. 2016), and its progeny, that, in order to violate RICO "an individual [must] conduct or conspire to conduct an enterprise by engaging in 'a pattern of racketeering activity.' 18 U.S.C. § 1962(c); *see id.* § 1962(d)." *Vernace*, 811 F.3d at 616. As the *Vernace* court emphasized, "a pattern of racketeering activity involves, *at minimum*, two predicate racketeering activities—including, for example, murder, drug trafficking, and illegal gambling— that occur within ten years of one another. *Id.* § 1961(1), (5)." *Vernace*, at 616 (emphasis added).

Finally, the Circuit in *Vernace* stressed that:

RICO does not apply to "the perpetrators of isolated' or 'sporadic' criminal acts." [citations omitted]… Criminal conduct only "forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are *interrelated* by distinguishing characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 240 (1989) (emphasis added) (quoting 18 U.S.C. § 3575(e) (1982)). That is, predicate acts "must be related to each other ('horizontal' relatedness), and they must be related to the enterprise ('vertical' relatedness)." *United States v. Minicone,* 960 F.2d 1099, 1106 (2d Cir.1992).

Vertical relatedness requires "that the defendant was enabled to commit the offense solely because of his position in the enterprise or his involvement in or control over

the enterprise's affairs, or because the offense related to the activities of the enterprise." *United States v. Burden,* 600 F.3d 204, 216 (2d Cir.2010).

*Id.* at 615–16.

Here, a review of the record makes abundantly clear that the government failed to prove that Defendant Howard engaged in a *pattern* of racketeering activity, *or* that any alleged acts were horizontally or vertically related; *or* that such alleged conduct "embrace[d] criminal acts [that had] the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [were] *interrelated* by distinguishing characteristics and are not isolated events."  As a consequence, as we further demonstrate herein, the government's proof abjectly fails as to Count One, and Defendant Howard is entitled to a judgment vacating his conviction on that Count.

Count Two, the "VICAR" Count, "targets a person who, 'for *the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders* ... or threatens to commit a crime of violence against any individual in violation of the laws of any State ... or attempts or conspires to do so.'18 U.S.C. § 1959(a)." *United States v. Jones*, 291 F. Supp. 2d 78, 86 (D. Conn. 2003) (emphasis in original).

In the seminal case construing this statute, *United States v. Concepcion,* 983 F.2d 369 (2d Cir. 1992), the Second Circuit held that, to sustain a VICAR conviction, the government must prove five elements beyond a reasonable doubt: "(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) *that the defendant in question had a position in the enterprise*, (4) that the defendant committed the alleged crime of violence, and (5) that his *general purpose in*

*so doing was to maintain or increase his position in the enterprise.*" 983 F.2d at 381 (emphasis added).

Here, even if the government maintains that it satisfies elements 1, 2, and 4 of the statute, it completely failed to prove that Defendant had a position in the enterprise or, perhaps more significantly, that his "general purpose in committing an act of violence was to maintain or increase his position in the enterprise" – because he never had any position with MBG. Indeed, as described herein, Defendant was punished by Seda when he allegedly reported his attack on Scraps to Seda.

In addition, as to both Counts One and Two, the government's own evidence demonstrates that, at most, Defendant's alleged shooting was a purely "personal matter," and not an attempt to enhance his position within MBG. *See United States v. Bruno*, 383 F.3d 65, 85 (2d Cir. 2004). First, the defendant there had several personal motives for ordering the shootings, including that the victims had " 'set him up' for a robbery" and that he "owed them significant amounts of money from loansharking."[44] Indeed in *Vernace*, the Second Circuit distinguished *Bruno* as involving a much stronger personal angle. *See id.,* 811 F.3d at 617.

Finally, as to Count Three, the government's efforts to prove such charge must fail because it was inextricably tied to a jury finding that Count One and/or Count Two had been proved beyond a reasonable doubt.

## ARGUMENT

## POINT ONE

### THIS COURT SHOULD GRANT DEFENDANT'S MOTION TO VACATE HIS CONVICTIONS ON ALL COUNTS OF THE INDICTMENT

### A. GOVERNMENT TRIAL EVIDENCE[1]

The government first witness at trial was New York Police Department ("NYPD") Police Officer Surfraz Syed. Officer Syed testified that he has been with the NYPD for five years. During most of that time, he was assigned to its housing bureau, and police service area ("PSA") 7, which is located in the South Bronx. PSA 7 covers housing developments, including Mott Haven, Mill Brook, Mitchell, Patterson, and others. Tr. 29-31; Officer Syed's responsibilities were "to patrol the housing developments on foot, to conduct interior patrols" – i.e., to go inside developments – "to make sure there's like, no crime occuring within that building." Tr. 31.[2]

On the early morning of August 17, 2014, Officer Syed was working a shift from 7 p.m. to 3 a.m. He was on foot at a post at the Mill Brook Housing Development (occasionally, "Mill Brook") with Police Officer Jordan. At approximately 3:10 a.m. there was a "radio run" -- a police radio call -- that shots had been fired at 137 Street and St. Ann's Avenue in the Bronx. Tr. 32-39, GX 300, 305, 204, 212, 209.

When Officer Syed arrived at the shooting location, he observed one person who had been shot, and there were two others who had been complaining they were shot. There was a large crowd of people, and they were irate. There were several police offers already there; some were canvassing for the "perp;" others were trying to get witness statements and some were

---

[1] Defendant's summary of the government's proof does not include a digest of all of the prosecution's witnesses' testimony or of its trial exhibits.

[2] References to "Tr.   " are to pages in the trial transcript; "GX   " are to government trial exhibits; And "DX   " is to Defendant's trial exhibit.

rendering medical aid. Officer Syed accompanied an ambulance to a local hospital with the three victims, namely, Shadean Samuel, Jonathan Perez, and Aaron Dykes. Tr. 40-43.

The government's next witness, Officer Estefani Cerda, a member of the NYPD's Evidence Collection Team, the duties of which are to identify, document and collect evidence left behind in a crime scene, including firearms-related evidence. On the early morning of August 17, 2014, she was on duty, and, at approximately 5 a.m., responded to a location, 530 East 137 Street, where three males had been shot. A "guarding officer" directed her attention to two shell casings located in front of a building, (indicating they had been fired from a pistol). Separately, she uncovered one live round on a cemented area. The two shell casings and one live round all apparently were connected to a .40 caliber firearm. One shell casing was found in the grass; the other shell casing and the unfired cartridge were found on the cement. Tr. 48-62; GX 100, GX 200, GX 201.

Nikiena Perez was the next government witness. She was living in the Mill Brook Housing Development on August 17, 2014. That evening, she was "hanging out" in her apartment with a friend. The friend left after midnight and Ms. Perez walked her to St. Ann's Avenue so that she could put her in a cab. She returned to her apartment building, passing a flagpole on the way. On a bench nearby the flagpole she saw a group of men; she recognized two of them, namely, Jonathan Perez and "A.J." (Dykes). Ms. Perez was standing near her building, smoking a cigarette, before she returned to her apartment. While standing there, to the right of the flag pole, she saw a man raise his hands and gunshots went off. The man appeared to be slim and on the tall side. Ms. Perez was terrified and ran into her apartment building, to Jonathan's mother's apartment. Tr. 77-94; GX 25; GX 26; GX 211; GX 215; GX 218; GX 306.

Later on, Ms. Perez went outside of her apartment building, and saw an ambulance that Jonathan was in, on 137th Street.  About an hour after the shooting, Ms. Perez made a phone call to the police.  Tr. 95-99.

On cross-examination, Ms. Perez was asked whether she told the police that the person with the firearm raised his arm and that she went back into the building.  She also told the police she could not identify the person who did the shooting.  Also, Ms. Perez could not recall which hand the shooter raised.  Further, Ms. Perez acknowledged that she could not identify the shooter. Ms. Perez believed that the shooter was Hispanic. Tr. 100-103.[3]  She also recalled only one person – no one was accompanying the shooter: "All I saw was just that one person." Tr. 104.

NYPD Officer Scott Patterson next testified for the prosecution. A member of the NYPD for 27 years, for the last 14 years, Officer Patterson has been a member of the Bronx Night Watch. The primary duties of that group are to respond to different incidents. On August 17, 2014, he took notes respecting a shooting.  At shortly after 4 a.m. he responded to a phone call from Nikiena Perez that stated that a shooter came out of nowhere, "three or four shots, skinny possibly Hispanic, tall." Tr. 115.

Kelly Santana testified  for the government that she has known Shadean Samuel, the father of her children  for over ten years. His nickname is "Scraps." She lived in the Mill Brook houses with Mr. Samuel, her mother, daughter, and brother, for over ten years. Ms. Santana recalls the night Mr. Samuel was shot.  She was outside their building. Around 9 p.m. that night she left Scraps and AJ because she was drunk. Tr. 123-30. Ms. Santana later saw Scraps that night outside a deli/grocery because Scraps had already been shot; and AJ had been grazed. She

_____

[3] Defendant Howard is a light-skin African-American.

accompanied him to the hospital. Ms. Santana also testified that she did not ask Scraps who shot him because she did not have any interest in that situation. Tr. 131-136.

Raynaldo Melendez, the next witness for the government, testified pursuant to an immunity order. He grew up in the Mill Brook projects, specifically on 165 Street and St. Ann's Avenue. Between 2005-2009 he was incarcerated and from 2009 to 2013, lived in South Carolina. Since October 2014, he has been in jail on weapons charges. Tr. 146-149.

In the summer of 2014, Melendez was hanging out with his friends. He witnessed a shooting in front of 165 Street and St. Ann's Avenue. Melendez also noticed before the shooting, a kid from "up the block" was "hanging around." Tr. 149-151.

Later that summer night, Melendez was socializing with friends, including Jonathan Perez, AJ, Scraps and a friend named Koz. Melendez saw a young man with a gun, and another young man standing next to him (identifying Defendant, Tr. 155), firing a gun into crowd.[4] After that, Melendez went to his apartment, then up the block, looking for Defendant, to retaliate against Defendant. Melendez stated he encountered "Dre" and Joey (Colon). Tr. 152-159.

Melendez testified he later saw Defendant at a funeral, and snidely asked him "what happened with your aim?" (Tr. 159). Defendant supposedly answered that he "wasn't trying to hit somebody else. I was coming for Scraps." Tr. 160.

Melendez admitted that he lied to police in 2014 about the shooting incident and told them he was not present at the shooting. Tr. 166.

On cross-examination, Melendez conceded his attorney obtained an immunity order for him because Melendez had outstanding crimes for which he had not been punished. Tr. 171-173.

---

[4] In complete distinction to the testimony of Nikiena Perez, who recalled only one person – no one was accompanying the shooter: "All I saw was just that one person." Tr. 104.

When police came to arrest Melendez in 2014, he threw a .8 caliber firearm out of the window of his residence. Tr. 175-176.

In October 2014, Melendez was arrested for possession of firearm.  Among other issues, the police interviewed Melendez about the August 17, 2014 shooting at Mill Brook Houses. He falsely told police that he was not present for the shooting. Tr. 182. Two people involved: shooter and second individual that Melendez had seen earlier. Tr. 185.

William Magliocco, a government paralegal, testified for the government reviewing certain pages from GX 800-B, Defendant Howard's hospital records from April 2011, after being assaulted, specifically pages 14, 20, 24, 50-52, 71 thereof, in which Christopher stated that his broken jaw had been caused as a result of being "sucker punched" by *multiple individuals* (emphasis added)  -- not a single person. Tr. 190-93.

The government's next witness, Joey Colon, testified he was imprisoned at the GEO Correctional Facility, because of conviction for "[r]acketeering, drugs, and weapons charges." Tr. 194. Colon was part of the MBG and YGz gangs which were involved in drug dealing and shootings. "MBG" stands for "money bitches and guns" and "my brother's guardian." "YG" stands for "young gunnaz." Tr. 195. Colon identified Christopher as member of MBG; his nickname is "JuJu." Tr. 195-96. Christopher had a Facebook account with a user name of "Self Made Ju" or "Self Made Murder." Tr. 197.

Colon grew up in Building Nine of the Mill Brook Houses. According to Colon, when he joined MBG, "JuJu," "JJ,"(the nickname for Jonathan Jose) and others were members of MBG members lived in various buildings in the Mill Brook Houses. Tr. 198-200. JJ and JuJu frequently "hung out" together.  Andy Seda was a member of MBG and YG. Colon identified

photos of other members of MBG and YG. JuJu was familiar with the MBG handshake and how
to "peace" or salute  other MBG; Colon "peaced" Christopher. Tr. 201-211.

Colon and Mike White were the leaders of MBG and became that through acts of
violence, i.e. shootings.  Colon testified that if a member "puts in work" – to "do shootings, do
violence" – gains a member respect.  MBG's rivals were "KB" or "Killbrook," which started in
2007.  Tr. 212-217.

Colon recalls when Juju had a broken jaw; and saw JuJu with retainer in mouth. Colon
testifies that he was told that Scraps broke JuJu's jaw. Tr. 231; Scraps was a member of KB.
Scraps stayed with Kelly Santana's mother.  In April 2011, shortly after his jaw was broken,
Defendant initiated a series of Facebook posts. In one post,  Juju wrote, "I gotta catch *one of
these niggas* and show them I ain't playing…"  Tr. 236 (emphasis added). Significantly, Juju
supposedly wanted Colon and others to retaliate for "[g]etting his jaw broken." But Colon never
did. And Defendant does not mention anyone by name but Colon guesses it was Scraps who is
referred to. *See* Tr. 236-37.

In another post, Defendant stated that he "[w]anna murk that N word real shit?" Colon
states that indicates that Defendant  "He want to kill him." Tr. 238. In another post, on April 22,
2011, Juju states that he "wanna peter roll one of these niggas, especially that birch ass nigga that
sucker punched me."  Colon interprets  Deft. wants to kill somebody. According to colon, "Birch
ass nigga" means Scraps. Tr. 239.

Colon's girlfriend, Bolivia Beck, was killed on April 18, 2011.  Shot in the head by Gary
and Kareem Davis.. Colon told law enforcement about Gary Davis but not Kareem Davis.  Colon
did not tell  police about Kareem because Colon figured a cooperator would. Colon, however,
did not reveal everything about Gary Davis, supposedly because had a "beef." Tr. 244. Colon

was not truthful in state grand jury. Also submitted a false affidavit that Gary Davis was not the shooter of Bolivia Beck, because one of Gary's friends asked Colon to do it. Tr. 245-246.

Colon next testified about a Facebook post by Self Made "People from Down the Block gotta die." Tr. 247.

In the summer of 2014, Colon learned about a hooting while in a strip club. Went to strip club. Then selling drugs outside 620. "Ray" (Melendez) came up the block and asked for Juju. Tr. 255-2. Had to have someone with him; feel safer. Tr. 259.

Colon sold crack beginning in 2007. Made $1,500-2,000 per week in 2013 and 2014. He kept drugs in apartment 13H. Colon there – lent $600 to Colon to buy drugs; but never paid it back. Tr. 266-71.

In 2011, shortly after Juju had his jaw broken, Colon retaliated against AJ because Scraps had hit Colon's friend with a cane. Tr. 275-77. "I seen Scraps, Onyx, A.J., and a couple of other people... And I *fired a shot at them,* [including Scraps] *and I hit A.J.*" Tr. 277 (emphasis added). Nonetheless, Colon never sought to assist Defendant Howard in retaliating against Scraps, for supposedly breaking his jaw.

At private jail, Colon told girlfriend that he was coming home next year. Although not sure, Colon wanted to give her some confidence. Also told friend TJ that was telling the government "bullshit" at one point. Before signed cooperation agreement, reviewed it with attorney. Colon was charged with racketeering; narcotics sales – of crack, cocaine, and marijuana; and firearm offenses, of possessing, brandishing, and discharging weapons. Colon understands that minimum sentence against him is twenty 20 years' imprisonment. Also testifies about 5K1.1 letter; if government writes that letter, has ability to receive time served. Maximum sentence is life; hopes to get time served. Tr. 291-98.

Colon identifies Defendant in various photographs, some with other MBG members and photo of Apartment 13-H; claims saw Defendant there a lot. (But the government did not introduce any photos of Defendant there). Tr. 299 -304.

On cross-examination, Colon admits that had braids in 2014 and was skinny, weighing only 160 pounds. Denies that it is the government that determines who is telling the truth; it was only Colon: "Myself, the facts." Tr. 307. Then states it was the judge, and then the jury: "The court…The courts, the people…I don't know. I don't really know who decides who told the truth. All I'm supposed to do is tell the truth. That's up to everybody else to dictate on how that's to be found out." Tr. 306-07.

Questioned about phone call in which told friend that "the feds go by hearsay, not like the state." Tr. 309.  Examined on chart of crimes to which he admitted, stemming from shooting in October 2007; shootings in October and November 2007; Chef and Willow there. March 2011, attempted to shoot a rival gang member named Booloo; May 28, 2011, shot at rival gang member, hit him in the arm; the summer of 2011, another .32-caliber shooting at Pepe; also again at Booloo, on July 4; Winter of 2013-2014, shot at rival gang member named Ruger; the same winter shot at Andy Panda from Killbrook. Tr. 310-314. Including other occasions, it amounted to at least ten shootings.

As noted above, in  May 2011, a month after Defendant Howard had his jaw broken, *Colon shot at Scraps*, and also hit "AJ." This was immediately after Bolivia Beck had been killed.   Tr. 314-317. From 2013-2015, Colon sold drugs every day in the vicinity of the Mill Brook houses. Tr. 317-18.

Colon acknowledged prior  convictions, including for robberies, gun possession, and drug sales. Tr. 319-20. Admitted to felony robbery so he could get of jail sooner. Tr. 321-22. Signed a

false affidavit that stated that only Gary Davis – not including Kareem Davis – was the shooter of Bolivia Beck, because did not want to been viewed as "snitch." Afraid he could get killed. Swore to false affidavit, lied to "save own butt."  Lied about committing a crime did not do, to get out of jail soon. Tr. 323-27.

Government cooperator Andy Seda grew up in the Mill Brook projects.  Committed crimes as member of MBG and YGz. Identifies Christopher as member of MBG. Defendant has street name of "JuJu." Seda joined MBG in 2003 when he was 12 years old.  (Identifies photos of Colon, Jonathan Jose, Mike White, Devin White, James Robinson, Laquan Robinson [nickname Ant White]). Rivals were from "Killbrook." Tr. 360-67.

Seda committed numerous crimes as member of MBG, starting in 2007 when Seda was 14 years old. The only occasion in which Defendant Howard "accompanied" Seda -- for a short period -- was in 2007. Seda was going to Mitchell Projects with "JJ, Devin, Joey, Juju, *and a couple more people* …" Tr. 367 (emphasis added),  because he had "beef" with rival gang. Seda was carrying Devin's gun. Significantly, when Seda and the others approached the Mitchell Projects, he walked alone to the next block, and when "I [Seda] came back, nobody was there.  I was up there by myself.  I don't know where everybody went to.  I don't know where – people left." Tr. 368-69 (emphasis added). Everyone else stranded him. Seda was arrested; and no one was shot. Tr. 369.

Rivalry with "Killbrook" started in 2007, when Colon shot man named "Gio."  Tr. 370. After shooting of Bolivia Beck rivalry between Millbrook and "Killbrook" "got more serious" – "A lot of shootings happened after that." Tr. 371, 375.

Seda has known Defendant for an apparently indeterminate amount of time: "Ten, 15 years, around there – 15 or 17 years." Tr. 376. Seda would "peace," or greet Defendant when he met him. Seda saw other members of MBG "peace" him. Tr. 377. GX 405.

In GX 406, 408, 416 – social media posts, Defendant stated he was "Self-made Murda" - 7/12/2011 – Tr. 386 – "I have a real gun". 387-388 – won't hesitate to kill somebody. GX 423, 424, 425, 426, 427. Tr. 387-92.

Seda testified that Defendant had dispute with Scraps, because he broke Defendant's jaw in 2011 at the Chicken Spot. Defendant told Seda that "people from Killbrook walked into the chicken Spot and Scraps punched him in the face." Tr. 399.  Around that time, Defendant moved to Staten Island but did not prevent him from "hanging out with members of MBG." Tr. 400. Visited Juju at his home in Staten Island.  Identifies photos in GX 403. Tr. 401-02. Identifies, Jonathan Jose as close friends. Tr. 402. Hanging out in Defendant's bedroom.  Saw him pull out a black .40 caliber pistol from shoebox and Seda held it.  Tr. 403-04.

Seda learned of Scraps shooting in 2014 from Colon.  Seda was in a strip club . After returning home, he called Melendez to find out what happened. Left apartment to talk with Melendez; Seda was carrying a black .38 pistol. Tr. 404-05.  He also spoke with Jonathan Jose about the shooting.  Jose informed Seda that the night of the shooting he had informed Defendant about Scraps' presence in a park; and that Defendant shot Scraps there. Tr. 405-07.

Seda saw Defendant about six weeks after the shooting. Seda claimed that at that point he was angry at Christopher because he had not helped Defendant in a different situation . When they met, Seda punched Christopher in the face, who responded by stating "I'll do you dirty" – which Seda understood to mean that Christopher would shoot him. Tr. 409-11; which Defendant

never did.. Seda supposedly told Defendant "You think you tough because you shot Scraps." Tr. 411. Defendant did not deny it. *Id.*

Soon thereafter, Seda gathered two .357 caliber guns, went down the block and told Jose to tell Christopher to come outside. Apparently afraid, Christopher did not come outside. Shortly thereafter, got into a fist fight, but Jose broke it up. They gave each other a handshake, and the fighting ended. Tr. 412-13.

The prosecution then reviewed with Seda the lengthy list of crimes he had committed starting in 2010. In 2010, Seda was admitted to jail because he violated probation. In 2011, he went with Jarod to shoot a gun at a member of a rival gang. He committed another shooting in 2011, when he shot a kid named Vegas from down the block. That summer went to the Polo Grounds went with Anthony Bush, but did not shoot. Later that summer, Seda went to the Moore house to do a shooting with a man named Moses, but the gun jammed. Shortly thereafter, Seda participated in another shooting with Moses on Jackson Avenue; while Moses shot, Seda did not. Tr. 414-420.

In October 2011, admitted to possession of a gun that allegedly belonged to someone else. He did it to protect his sister who was pregnant. He lied under oath. Tr. 421. Shooting with Jarod. Tr. 422. Most significantly, involved in murder in December 2011 of a kid named Tray. Seda was with Jarod. Initially, they were to rob someone for a coat. Met up with people from YGz gang. Jarod shot kid. Seda bragged about murder on Facebook; he was proud of it. At end of 2011 arrested for robbery along with Jarod and Maurice on the 6 train. Tr. 425-26.

Involved in shootings in 2013 with David Queendom, and separately with Mighty. Shot at Ramel and Andy. Shot at individual named Ramel. In 2013, went with Danny to do a

shooting; Danny shot at Soda's instructions. Went with Anthony Bush to do shooting in summer of 2013. Tr. 427-31.

Seda testified that certain members of MBG were involved in drug dealing, including "James, Anthony, Demetrius, myself [Seda], Joey." Tr. 431. Seda started selling crack in 2013-about $1,400 per day. Other MBG members sold for Seda: Mick, Chico and James. Tr. 431-32. While Defendant allegedly "hung out" in apartment 13-H, the stash apartment, but no mention of him selling drugs there. Tr. 432-35.[5]

Seda participated in shooting in 2014 with person named B Rod. Seda told B Rod to shoot at people from Cypress. No one hit. In December 2014 shot at people from Cypress. Tr. 437-438. Number of people with him.

In July 2015, attacked by people from Cypress. Went down and shot at people from Cypress. Arrested on federal charges in August 2015. Had 432 bullets and 92 bags of crack . He lied about whose gun it was. Lied about who cut him, to retaliate. Tr. 440-43.

On cross-examination, Seda conceded that he did not seek to cooperate with the government until he was facing death penalty charges. Seda thinks time served in this case is appropriate sentence. Denies he was killer; merely aided and abetted a murder. Tr. 450-53.

As part of his plea agreement, Seda also admitted to thirty acts of violence. Taking 2011 alone, admitted to firearm possession, attempted murder. April 2011 (Seda possessed loaded firearm in anticipation of shooting rival gang member); June 2011 (attempted murder) also in June 2011 shooting at rival gang member. Tr. in June 2011, conspiracy to commit murder – Christopher not involved.

---

[5] As the government states in its May 3, 2019 letter to the Court (Doc. 475), "although [Howard] was aware of his fellow gang members' drug dealing, he was not personally involved in drug dealing."

The December 22, 2011 – murder charged with in federal court – to which pled guilty. Christopher not involved with that. Tr. 459-60. Indeed, *Defendant Howard did not participate in any of the 30 crimes that Seda admitted to in his plea agreement*. Tr. 460.

Perhaps most important, is the following colloquy on cross-examination of Seda:

**Q.** [by defense counsel]: [W]when he [Christopher] got slashed or he got his jaw broken by Mr. Scraps, did you help him seek revenge on Mr. Scraps?

**A.** [by Seda]: No.

**Q.** The reason is *you don't like Mr. Howard very much, correct*?

**A.** I'm not going to say I don't like him. *He just ain't my circle*.

**Q.** OK. When you say your circle, *you are talking about your circle of shooters and killers, correct*?

**A.** *Yeah*.

Tr. 461:23- 462:6 (emphasis added).

During the lengthy period that he knew Christopher, Seda "never asked [Defendant] about his job"; he never saw Christopher discharge a gun; he never saw him cut, or beat up anyone. Seda never saw Christopher commit an act of violence.  Tr. 464-65.

Defense counsel also engaged in the following colloquy with Seda:

**Q.** [People like Christopher] [t]they're really sort of like artificial members; they're not real members of MBG?

**A.** They members, they real members of MBG.

**Q.** But they don't commit racketeering, right? They don't engage in acts of violence, is that correct?

**A.** You could say that.

**Q.** [Did] you ever see him commit an act of violence?

**A.** No.

Tr. 464:21-465:5.

Also, on cross-examination, Seda adhered to his claim that he learned about the shooting from Jonathan Jose that Christopher shot Scraps. The Court permitted the defense, without objection from the government, to admit into evidence a copy of a sworn affidavit from Mr. Jose in which he denied under oath that he assisted Christopher in arranging for the shooting of Scraps, or that he told Seda (CW-2) about that shooting. Tr. 465-67; DX A.[6]

Also on cross-examination, Seda admitted that he never saw Christopher selling drugs out of apartment 13-H; he was just hanging out. Tr. 467. Indeed, the only time he saw Christopher at Mill Brook was when he was visiting his grandmothers. Tr. 468-69.

The next government trial witness was Jose Rodriguez who testified pursuant to an immunity order. Rodriguez nickname is "Kiki", he was a member of the Killbrook gang. The MBG gang was one of its rivals. Tr. 494. Rodriguez stated that the rivalry with MBG was petty at first and then "escalated to more threatening violence," which included shootings. (*Id.*).

Rodriguez was the victim of an act of violence by MBG members and has committed acts of violence against MBG members. For example, Michael White a (lead) MBG member shot Rodriguez three times in his abdomen, left thigh, and "left butt cheek" in January 2010. Tr. 496.-97. At first, Rodriguez assisted law enforcement against White, but then relented because they "worked something out where I wouldn't testify on him, and he would get the person not to come to court on me." Tr. 497. Nonetheless, in January 2016, Rodriguez retaliated against White by stabbing him in the back with a screwdriver. Tr. 498. Rodriguez later spoke to law enforcement. Tr. 499.

Rodriguez also committed acts of violence against Defendant Howard. In 2009, Rodriguez was walking around with another member of Killbrook named Quentin Starkes. In

---

[6] A copy of DXA is annexed hereto as Exhibit 1.

order to get status, the two were looking for MBG rivals;  Rodriguez and Starkes encountered two men who told Rodriguez that Juju had gone into a store. Tr. 498. Rodriguez and Quentin ran into the store. They encountered Juju there where Rodriguez "put a Gemstar razor to him, and [Rodriguez told Juju] "to give me his property." Tr. 500, 501.

Rodriguez testified that a Gemstar razor is a "two-inch, three-inch sharp razor.  It's really sharp. You can cut." Tr. 501.  Although Rodriguez did not cut Juju he threatened him with the razor. Rodriguez robbed Juju of "[h]is jacket, a little pouch, and his cell phone…And the jacket, we carved KB in the back, put it in our basketball court, and somebody did a video and they lit it on fire." Tr. 501-02.

Approximately five or six years – i.e., in 2014 or 2015 – Rodriguez encountered Juju on the Staten Island ferry. According to Rodriguez, both men were alone; Juju approached him asking Rodriguez wanted to fight "because of the situation that happened where we robbed him." Tr. 503. Rodriguez told Juju it was not "a smart idea." Juju stated that "it was cool, because [Rodriguez and Starkes] didn't really hurt him the day we robbed him." *Id.*

Indeed, according to Rodriguez, who had robbed Juju in 2009 at the point of a sharp razor, threatened him, and taken his cell phone and a little pouch, and set Juju's jacket on fire, Juju nonetheless disclosed to Rodriguez that Juju's "main focus down the block is Scraps." Tr. 504, because Scraps had broken his jaw. *Id.*

On cross-examination, Rodriguez admitted that before the robbery in 2009, Juju had "never approached [Rodriguez] and tried to use violence" against him. Tr. 510. Rodriguez repeatedly acknowledged several times on cross-examination that his encounter with Defendant on the Staten Island ferry, where Defendant allegedly disclosed his future  plans for Scraps took

place in 2015 – which was months if not a year after the actual shooting place. *See* Tr. 511: 19-

25; Tr. 512: 4-6 ("I can't tell you the exact time, but I can tell you it was around 2015, yes.");

Tr. 512: 12-14: (*Q.* "OK. So *you're certain that this conversation took place in 2015, correct?*;

A. Correct."); Tr. 513:19-20 (*Q.*: But you just told us it was in 2015."; *A.*: "I said *the incident

happened in 2015*"). (Emphasis added).

## B.  THE APPLICABLE LAW

### 1.  <u>Count One</u>

As to Count One, the "RICO" Count, our Circuit has made clear in *United States v.

Vernace*, 811 F. 609 (2d Cir. 2016), and its progeny, that, in order to violate  RICO "an

individual [must] conduct or conspire to conduct an enterprise by engaging in 'a pattern of

racketeering activity.' 18 U.S.C. § 1962(c); *see id.* § 1962(d)." *Vernace*, 811 F.3d  at 616. As the

*Vernace* court emphasized, "a pattern of racketeering activity involves, *at minimum*, two

predicate racketeering activities—including, for example, murder, drug trafficking, and illegal

gambling—that occur within ten years of one another. *Id.* § 1961(1), (5)." *Vernace*, at 616

(emphasis added).

Finally, the Circuit in *Vernace* stressed that:

> RICO does not apply to "the perpetrators of isolated' or 'sporadic' criminal
> acts." [citations omitted]… Criminal conduct only "forms a pattern if it embraces
> criminal acts that have the same or similar purposes, results, participants, victims,
> or methods of commission, or otherwise are *interrelated*  by distinguishing
> characteristics and are not isolated events." *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S.
> 229, 240 (1989) (emphasis added) (quoting 18 U.S.C. § 3575(e) (1982)). That is,
> predicate acts "must be related to each other ('horizontal' relatedness), and they
> must be related to the enterprise ('vertical' relatedness)." *United States v.
> Minicone,* 960 F.2d 1099, 1106 (2d Cir.1992).

> Vertical relatedness requires "that the defendant was enabled to commit the offense
> solely because of his position in the enterprise or his involvement in or control over
> the enterprise's affairs, or because the offense related to the activities of the
> enterprise." *United States v. Burden,* 600 F.3d 204, 216 (2d Cir.2010).

*Id.* at 615–16.

Here, a review of the record makes crystal clear that the government failed to prove that Defendant Howard engaged in a *pattern* of racketeering activity, *or* that any alleged acts were horizontally or vertically related; *or* that such alleged conduct "embrace[d] criminal acts [that had] the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [were] *interrelated* by distinguishing characteristics and are not isolated events."

First, the government totally failed to demonstrate that Defendant committed two predicate acts. At most, it proved only the shooting of Scraps. Indeed, the government has essentially conceded that Defendant Howard did not commit any other predicate or racketeering act. Only days ago, in a letter to this Court, the prosecution admitted that Defendant was not involved with selling illegal drugs under MBG; and in their testimony, Seda and Colon admitted that much.

Moreover, Seda conceded in his testimony that Defendant was not a "shooter or killer" (Tr. 461) – which effectively erased any contrary testimony. Moreover, on cross-examination, Seda admitted that Defendant did not commit racketeering acts. Tr. 464-65.

Furthermore, it is not enough to simply prove two or more predicate acts, but the government was required to show that the racketeering acts were related to each other and to the enterprise, and together pose a threat of continuing criminal activity. *United States v. Pizzonia*, 577 F.3d 455, 465 (2d Cir. 2009) (predicate acts must bear a relationship to each other that "manifest[s] the continuity required to prove a pattern"); *accord*, *United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 4083571, at *4 (E.D.N.Y. Sept. 13, 2017). There is absolutely no proof of any relationship between the alleged shooting of Scraps and any other racketeering act. Accordingly, Count One should be dismissed.

## 2. **Count Two**

A similar result, namely, a judgment of acquittal, is merited with respect to Count Two, the "VICAR" Count. It "targets a person who, 'for *the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders ... or threatens to commit a crime of violence against any individual in violation of the laws of any State ... or attempts or conspires to do so.'*18 U.S.C. § 1959(a)." *United States v. Jones*, 291 F. Supp. 2d 78, 86 (D. Conn. 2003) (emphasis in original).

In the seminal case construing this statute, *United States v. Concepcion,* 983 F.2d 369 (2d Cir. 1992), the Second Circuit held that to sustain a VICAR conviction, the government must prove five elements beyond a reasonable doubt: "(1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) *that the defendant in question had a position in the enterprise*, (4) that the defendant committed the alleged crime of violence, and (5) that his *general purpose in so doing was to maintain or increase his position in the enterprise.*" 983 F.2d at 381 (emphasis added).

Here, even if the government maintains that it satisfies elements 1, 2, and 4 of the statute, it completely failed to prove that Defendant had a position in the enterprise or, perhaps more significantly, that his "general purpose in committing an act of violence was to maintain or increase his position in the enterprise" – because he never had any position with MBG. Indeed, as described herein, Defendant was punished by Seda when he allegedly reported his attack on Scraps to Seda; and also Seda admitted he was not part of the MBG enterprise. *See* Tr. 461-65.

Moreover, with particular reference to Count Two, the teachings of *United States v. Bruno*, 383 F.3d 65 (2d Cir. 2004), are applicable. Here, as in *Bruno*, the evidence demonstrated that two shootings were "simply personal matters," *id.* at 85 – where defendant "committed the shootings for personal reasons unrelated to the Genovese crime family" [the relevant enterprise]." *Id.; accord, United States v. Johnson*, No. S5 16 Cr. 281 (PGG), 2019 WL 690338 (S.D.N.Y. Feb. 16, 2019)(holding that "there is no evidence that Johnson or any other alleged member of the Blood Hound Brims perceived the dispute about the car accident as presenting a threat to the gang").

In *Bruno*, defendant Polito, an inveterate gambler, had amassed significant losses by gambling with Lombardi and D'Urso, two members of a Genovese crime family crew; Polito decided to kill both men, and hired Bruno to help commit the crime.  At a card game at a private Genovese social club, defendants Polito, Fortunato and Bruno shot both Lombardi and D'Urso; Lombardi died, but D'Urso survived.  After the shooting, the men involved denied their involvement both to members of the Genovese crime family for fear of retaliation: they also denied involvement to the police.  At the subsequent trial, the jury convicted Polito and Fortunato of racketeering crimes, including murder, along with other charges.  Later, D'Urso tried to kill Polito, even thought he was ordered by his captain not to do so.

In reversing the racketeering conviction, the Second Circuit found that the evidence was legally insufficient to prove that the shootings were committed to maintain or increase the defendants' position in the Genovese family, or that the offenses were related to the activities of the Genovese family racketeering enterprise.  None of the shooters was a "made member" of the Genovese family, the shootings were not sanctioned by the family, and it was "entirely

reasonable" for the jury to conclude the shootings were entirely personal and related to the

defendant's gambling debts and personal animosity towards the victims.

With regard to relatedness, the Court reiterated that the charged crime either had to relate

to the activities of the enterprise, or that the defendant was able to commit the crime solely

because of his position in the enterprise. In *Bruno*, the government failed on all counts. As the

Court noted, the Government was unable to establish the relatedness of the murder to the

racketeering enterprise, or that the murder was committed to maintain or increase the defendants'

position in the crime family. As explained by the Court, giving the words of § 1959 their plain

meaning, the statute encompasses acts intended to preserve a defendant's position in the

enterprise, or to enhance the defendant's reputation and wealth within that enterprise.

A similar result was achieved in *Jones*. There, the District Court reviewed defendant

Jones' motion for a judgment of acquittal after trial. In that case, the proof at trial established that

Jones was the leader of two drug crews, and used violence and intimidation to maintain his

position as leader, and to maintain his crews' abilities to sell narcotics at the PT Barnum projects.

The murder charged, however, related to a purely personal dispute, in which the drunken victim

"disrespected" Jones' girlfriend while en route to a party. In response, Jones shot and killed the

victim at the party. In discussing the elements of 18 USC § 1959, the District Court stated that

under the fifth element, the Government was obligated to prove the defendant's general purpose

in committing the violent crime was to maintain or increase his position in the enterprise. The

Court concluded, based on the credible evidence, that the Government's proof was insufficient as

to that element. The testimony of the witnesses made clear that Fewell, Jones' girlfriend,

rebuffed the victim's advances as they drove to the party, and he in turn made a disrespectful

comment, for which he then apologized. At the party, however, Fewel quickly told Jones what

had happened, and Jones pulled the victim from his chair and shot him to death.  As the Court found, the government's proof showed that the victim was not involved with any drug organizations, did not pose a threat to the defendant's operations, and was not even from the same city.  Further, there was no proof the victim knew Fewell was Jones' girlfriend, or that Jones was a gang leader.  He was simply attending a party.  The Court concluded that the dispute was purely a personal one, and did not relate to Jones' activities as a leader of a drug trafficking enterprise. As such, it was not a crime encompassed under § 1959, and the motion for judgment of acquittal was granted.

## CONCLUSION

For the foregoing reasons,  Defendant's motion for a judgment of acquittal, as to Counts One, Two and three of the Indictment should be granted.

Dated: May 6, 2019

Respectfully submitted,

*Richard B. Lind, Esq.*
575 Lexington Avenue, 4th Floor
New York, NY 10022
(212) 888-7725

*David K. Bertan, Esq.*

Attorneys for Defendant Christopher Howard

# EXHIBIT   1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA,       :

    -against-                 :      S2 17 Cr. 611 (RWS)

CHRISTOPHER HOWARD,      :      **AFFIDAVIT OF**

                Defendant.    :      **JONATHAN JOSE**

------------------------------------------------------x

STATE OF NEW YORK    )
                      : ss.
COUNTY OF NEW YORK )

DEFENDANT'S EXHIBIT A

    **JONATHAN JOSE,** being duly sworn, deposes and says:

1.  I make this affidavit in connection with the above-captioned case.  I have personal

    knowledge of the matters set forth below, except where stated to be upon information

    and belief, and, as to those, I believe them to be true.

1

████████████████████████

4. I completely deny that, on August 17, 2014, or on any day or time, I went with Mr. Howard in search of a man the government calls "Scraps;" I refute that I assisted Mr. Howard locating "Scraps" or two other men. I have no knowledge -- or belief -- that Mr. Howard "opened fire on the men."

████████████████████████████████

████████████

6. ████████████████████████ I have never been a member of the "MBG" or "YG."[1] I do not know who "CW-2" is, but I never spoke to, let alone told, anyone that Mr. Howard was responsible for any alleged shooting or that I "assisted [him] in setting it up." As stated above, I know nothing about the alleged shooting and I affirm that I did not participate in it. In addition, I completely deny that I allegedly told "CW-2" that I was "the person who told [Mr.] Howard where Samuel was so that [Mr.] Howard could go there and shoot Samuel." ████████

████████

7. ████████████████████████████████

---

[1] I also totally deny a similar falsehood ████████ that "Jose, CW-2, …, among others, were members of MBG and YGz."

3

8.

Jonathan Jose

Sworn to before me this
2D   day of  February 2019

Notary Public

RICHARD B. LIND
Notary Public, State of New York
No. 02LI5014950
Qualified in New York County
My Commission Expires October 19, 2022