UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

–against–

CHRISTOPHER HOWARD, a/k/a "JuJu,"

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/4/2019

17 Cr.  611-8 (AT)

**OPINION
AND ORDER**

ANALISA TORRES, United States District Judge:

On March 6, 2019, a jury found Defendant Christopher Howard guilty on one count of racketeering conspiracy; one count of committing a violent crime in aid of a racketeering conspiracy, specifically, assault with a dangerous weapon; and one count of possessing, brandishing, or discharging a firearm during and in relation to a crime of violence.  Howard now moves for a post-verdict judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  For the reasons stated below, Howard's motion is GRANTED in part and DENIED in part.

## BACKGROUND

### I.    Procedural History

On July 16, 2018, Howard and nine other defendants were charged in a 12-count Superseding Indictment, which detailed the criminal activities of two gangs, known as "MBG" and the "YGz," in and around the Bronx, New York.  ECF No.  169.  Howard, for his part, was charged with three counts in the Superseding Indictment.  Count One alleged that, from approximately 2007 to October 2017, Howard participated in a racketeering conspiracy in relation to his membership in the gang "MBG," in violation of 18 U.S.C. § 1962(d).  *Id.* ¶¶ 1–6. Count Six charged Howard with committing a violent crime in aid of racketeering ("VICAR"), namely, a shooting on August 17, 2014, in violation of 18 U.S.C. § 1959(a)(3), (a)(5), and 18

U.S.C. § 2.  *Id.* ¶¶ 22–23.  Count Twelve charged Howard with using and carrying a firearm, which was brandished and discharged, in connection with the racketeering conspiracy charged in Count One and the VICAR charged in Count Six, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (ii), (iii), and 18 U.S.C. § 2.  *Id.* ¶ 29.

Trial commenced on February 25, 2019 before the Honorable Robert W. Sweet.  Over the course of four days, the Government presented testimony from 15 witnesses, including cooperating witnesses, eyewitnesses, and a ballistics expert.  The Government rested its case on February 28, 2019, at which time Howard moved for a judgment of acquittal on each count pursuant to Rule 29.  Tr. 548:2–8, Feb. 28, 2019.  Judge Sweet denied the motion.  *Id.* 548:15.  Howard presented no witnesses and rested his case that day.  *Id.* 548:17–22; *id.* 550:9–13.

On March 6, 2019, after roughly two days of deliberation,[1] the jury convicted Howard on all three counts with which he was charged.  Tr. 724:6–728:22, Mar. 6, 2019.  With respect to Count Six, the VICAR, the jury determined that Howard committed assault with a dangerous weapon.  *Id.* 725:11–726:4.  With respect to Count Twelve, the firearms offense, the jury determined that Howard was guilty in relation to both the MBG racketeering conspiracy charged in Count One and the VICAR charged in Count Six.  *Id.* 726:5–727:2.

On May 5, 2019, Howard filed the instant motion for a judgment of acquittal pursuant to Rule 29.  Def. Mot. J. Acquittal, ECF No.  479.

## II.   Evidence Presented at Trial

### A.  The MBG Racketeering Conspiracy

#### i.   The MBG Enterprise

---

[1] The jury deliberated from approximately 12:45 p.m. to 5 p.m. on March 1, 2019, Tr. 682:23–24, Mar. 1, 2019; 9:30 a.m. to 3:30 p.m. on March 4, 2019, Tr. 698:1–706:15, Mar. 4, 2019; and 9:30 a.m. to 12 p.m. on March 6, 2019, Tr. 724:4–5, Mar. 6, 2019.

As noted above, this case involves a gang known as MBG,[2] which operated in and around the Mill Brook Houses ("Mill Brook") in the Bronx.

Descriptions of MBG, as well as Howard's participation in the gang, were predominantly provided by two cooperating witnesses: Andy Seda and Joey Colon. Seda and Colon both testified that they grew up in Mill Brook and had been members of MBG since the gang was created in about 2003 or 2004. Tr. 194:1–4, Feb. 26, 2019; *id.* 195:11–12; Tr. 360:15–22, Feb. 27, 2019; *id.* 363:14–17. They explained that Mill Brook consists of ten buildings; three buildings—buildings eight, nine, and ten—constitute what is known as "up the block" Mill Brook. Tr. 195:4–6, Feb. 26, 2019; *id.* 198:6–8; Tr. 362:22–24, Feb. 27, 2019; *id.* 364:6–8. MBG, which stands for "Mill Brook Gangstas" or "Money Bitches Guns," is a "neighborhood gang" based in up-the-block Mill Brook. Tr. 194:23–24, Feb. 26, 2019; *id.* 195:4–10; *id.* 198:6–8; Tr. 363:11–13, Feb. 27, 2019; *id.* 363:18–25. Most of MBG's members were raised in up-the-block Mill Brook. Tr. 363:20–23, Feb. 27, 2019. Colon and Seda testified that MBG members had their own way of "peacing," *i.e.*, greeting each other, and that MBG members would only "peace" other members of the gang. Tr. 212:1–15, Feb. 26, 2019; Tr. 377:3–8, Feb. 27, 2019; *id.* 379:4–7. Colon explained that MBG members would "peace" each other by using a specific handshake, though he could not recall at trial what the handshake was. Tr. 211:21–212:1, Feb. 26, 2019. Colon also testified that MBG members, who were typically also members of the YGz gang, would greet each other using the YGz phrase, "What's gunning?"[3] *Id.* 212:2–15; *id.* 225:13–14.

According to Seda and Colon, MBG members could earn respect and increase their status

---

[2] Because Howard was not charged with participating in the YGz gang, descriptions of that gang are only provided insofar as they are relevant to the MBG racketeering conspiracy charge.
[3] "YGz" stands for "Young Gunnaz." Tr. 195:18–19, Feb. 26, 2017; Tr. 361:16–17, Feb. 27, 2019.

in the gang by committing shootings.  *Id.* 213:3–12; 216; *id.* 259:14–21; Tr. 388:3–4, Feb. 27,

2019.  Colon testified that he became one of MBG's leaders by committing several shootings.

Tr. 212:22–213:2, Feb. 26, 2019; *id.* 281:5–6.  It was common for MBG members to commit acts

of violence together because it was safer to have others around to serve as a lookout or to grab a

gun if necessary.  *Id.* 259:11–13; Tr. 407:21–408:8, Feb. 27, 2019.  MBG members would

likewise often talk to one another about shootings they committed in order to ensure that no one

would be caught off guard by an act of retaliation.  Tr. 248:22–249:9, Feb. 26, 2019; Tr. 393:13–

24, Feb. 27, 2019.

Beyond the shootings, some MBG members—including Seda and Colon—sold drugs,

namely, crack cocaine and marijuana.[4]  Tr. 269:1–8, Feb. 26, 2019; Tr. 431:4–15, Feb. 27, 2019.

Colon, whose drug dealing earned him the nickname "Joey Crack," started selling crack cocaine

in 2007.  Tr. 211:5–10, Feb. 26, 2019; *id.* 267:21–24.  Colon sold drugs every day from 2013 to

2015.  Tr. 317:22–25, Feb. 27, 2019.  He bought his drugs from someone who lived in Mill

Brook and would sell his drugs in Mill Brook and its outskirts.  *Id.* 317:5–17; *id.* 318:3–11.

Seda, for his part, began selling crack cocaine at the end of 2013 to make money after his father

was arrested.  *Id.* 431:16–24.  Seda and Colon both testified that MBG members Anthony Bush,

Demetrius Wingo, James Robinson, David Oquendo, and Christian Perez were also involved in

drug dealing at times.  Tr. 269:1–6, Feb. 26, 2019; Tr. 431:4–15, Feb. 27, 2019.  On one

occasion, MBG member James Robinson used his drug money to buy a gun for other MBG

members to use.  Tr. 435:24–436:7, Feb. 27, 2019.

Some MBG members would use the apartment of James Robinson and Laquan Robinson

---

[4] Seda knew these other MBG members were dealing drugs because he saw them dealing and discussed it with them.  Tr. 431:10–13, Feb. 27, 2019.  Colon knew these individuals were selling drugs because they had the same customers.  Tr. 269:5–8, Feb. 26, 2019.

(the "Robinson Apartment"), located in up-the-block Mill Brook, as a stash house.  Tr. 269:11–21, Feb. 26, 2019; Tr. 433:1–17, Feb. 27, 2019.  For example, James Robinson and Bush kept their drugs in that apartment.  Tr. 434:2–4, Feb. 27, 2019.  Drugs were also cooked in and sold from there.  *Id.* 433:17–24.  In addition to drugs, James Robinson stored guns in his apartment.  *Id.* 434:5–8.  Any gun that was kept in the Robinson Apartment was considered an "MBG gun"—all of the MBG members could use it.  *Id.* 434:9–13.  Many of the MBG members would also use this apartment as a place to hang out with one another.  *Id.* 434:21–24.  MBG members would tell each other about things that happened at the Robinson Apartment, including what drug dealing was going on there and what guns were being held there at a given time.  *Id.* 435:2–10.

MBG's principal rival was a gang called Killbrook.  *Id.* 366:13–14.  Killbrook was also a neighborhood gang, whose members were generally from buildings 1, 2, 3, and 4 in Mill Brook—collectively referred to as "down-the-block" Mill Brook.  Tr. 213:13–22, Feb. 26, 2019; Tr. 366:15–24, Feb. 27, 2019.  Killbrook was created sometime in the fall of 2007, shortly after Colon shot an individual named Gio, who was friendly with people from down-the-block Mill Brook.  Tr. 370:6–371:4, Feb. 27, 2019.  By October 2010, the rivalry had subsided.  Tr. 226:5–7, Feb. 26, 2019.  In March 2011, however, Colon went to a party down the block with MBG member Wingo and their friend Kash, who was not from Mill Brook.  *Id.* 226:8–227:15.  Sometime before this party, Kash had gotten in a fight with one Killbrook member named Gary Davis, and Kash's arrival to the party was consequently ill received.  *Id.* 226:14–18.  When Colon and his friends tried to leave the party, Davis started shooting at them.  *Id.* 226:19–24.  Colon, who had a gun on him, tried to fire back at Davis, but the safety was on.  *Id.* 227:7–13.  Wingo grabbed the gun from Colon, took the safety off, and shot twice at Davis.  *Id.* 227:13–15.

Shortly after this shooting, Colon tried to "squash" the rivalry because shootings led to police presence in the area, which made it harder for him to sell drugs. *Id.* 229:9–18. Specifically, Colon met with Gary Davis to discuss setting up a one–on–one fight between Wingo and Davis to resolve things. *Id.* 230:1–4. While the two were talking, however, Kash, Seda, and another MBG member named Jarod Slater appeared, leading Gary Davis to believe that Colon had set him up. *Id.* 229:23–230:19. In April 2011, Colon was out with his girlfriend when he encountered Gary Davis and his brother Kareem Davis, who was also a Killbrook member. *Id.* 239:24–242:10. Gary and Kareem Davis shot in Colon's direction but instead hit Colon's girlfriend, who later died from her injuries. *Id.* 242:11–243:15. After this series of events in the spring of 2011, tension between the gangs escalated and more shootings at the hands of both MBG and Killbrook members ensued. *Id.* 230:20–231:1; *id.* 248:3–19; Tr. 371:9–25, Feb. 27, 2019; *id.* 375:7–13. Colon explained that, during the periods of time that MBG and Killbrook were at war, any member of Killbrook was a "fair target" for MBG members to shoot. *Id.* 328:3–19.

Background information about MBG and Killbrook was also provided by an individual named Jose Rodriguez, who testified pursuant to an immunity order. Tr. 492:9–13, Feb. 28, 2019. Rodriguez was from down-the-block Mill Brook and joined Killbrook in about 2009. *Id.* 493:20–494:18. He testified that MBG, "which was right up the block," was one of Killbrook's rivals. *Id.* 494:20–24. According to Rodriguez, the relationship between Killlbrook and MBG was initially just a "petty rivalry" with "little fights here and there," but things later escalated to involve more serious acts of violence, such as shootings in which "people almost lost their life." *Id.* 495:18–24. Rodriguez explained that he had been a victim of violent acts committed by MBG members and had also committed acts of violence against them. *Id.* 495:25–496:4.

Raynaldo Melendez similarly testified, pursuant to an immunity order, about the gangs in Mill Brook.  Tr. 146:8–9, Feb. 26, 2019.  Melendez grew up in down-the-block Mill Brook.  *Id.* 147:15–20.  He lived there for most of his life, except between 2005 and 2013 and after October 2014.[5]  *Id.* 147:21–148:7.  According to Melendez, the relationship between up-the-block and down-the-block Mill Brook was generally "a little bit hostile," meaning that there had previously been conflicts, shootings, and other incidents of that nature.  *Id.* 151:4–22.  He testified, however, that by August 2014, the relationship between MBG and Killbrook was "cordial," and there had not been any shootings for the preceding year, though there was still some tension between the two sides.  *Id.* 151:24–152:9.  Melendez believed that the violence had subsided partly because some of the people who were responsible for shootings in the past had been arrested and partly because other people in the neighborhood were making an effort to keep the relationship "peaceful" in order to preserve their ability to sell drugs.  *Id.* 152:10–23.

### ii.    Howard's Involvement in MBG

As for Howard's participation in the gang, Seda and Colon testified that Howard was a member of MBG.  *Id.* 195:22–196:7; Tr. 361:21–362:9, Feb. 27, 2019; *id.* 376:6–8.  They explained that they would "peace him MBG," Tr. 377:9–12, Feb. 27, 2019; Tr. 212:18–19, Feb. 26, 2019, and that Howard would hang out in the Robinson Apartment.  Tr. 269:24–270:2, Feb. 26, 2019; Tr. 434:21–24, Feb. 27, 2019.  In addition, Howard spoke to Seda about committing crimes and shooting people.  Tr. 479:4–11, Feb. 27, 2019, and was sometimes present when Colon was selling drugs.  Tr. 270:3–4, Feb. 26, 2019.  They both testified that MBG member

---

[5] Melendez was incarcerated for possession of a controlled substance from 2005 to 2009, and lived in South Carolina from 2009 to 2013.  Tr. 147:23–148:8, Feb. 26, 2019.  He had been incarcerated since October 2014.  *Id.* 148:11–18.

Jonathan Jose was one of Howard's close friends.  Tr. 201:21–202:5, Feb. 26, 2019; *id.* 202:17–21; Tr. 402:13–20, Feb. 27, 2019.

Seda testified that although Howard moved out of Mill Brook to Staten Island in approximately 2010, he did not stop coming to Mill Brook or hanging out with MBG members. *Id.* 399:24–400:4.  Seda further testified that he personally saw Howard in up-the-block Mill Brook every weekend after Howard moved to Staten Island.  *Id.* 400:5–8.  During cross examination, Seda stated that the reason he saw Howard at Mill Brook was that his two grandmothers lived there, so Howard would visit them on the weekends.  *Id.* 468:7–25.  Seda could not recall whether he ever saw Howard at Mill Brook during the week.  *Id.* 467:24–468:2.

During cross examination, Seda stated that he never saw Howard discharge a gun, cut anyone, beat anyone up, or commit any other act of violence.  Tr. 464:5–11, Feb. 27, 2019; *id.* 465:2–5.  Seda also admitted that Howard did not participate in a single one of the 30 crimes that Seda pleaded to in his cooperation agreement.  *Id.* 460:11–15.  According to Seda, for Howard to be a member of MBG, it was not required that he commit acts of violence or otherwise participate in crimes; there were a lot of MBG members that did not do anything.  *Id.* 464:15–20. Seda explained that, while these people did not necessarily engage in acts of violence, they were still "real members" of MBG.  *Id.* 464:21–465:1.

Colon and Seda also testified that they would take trips to Atlantic City with their friends, including Howard.  Colon testified that he, Howard, Jose, James Robinson, Laquan Robinson Seda, and some non–MBG members were supposed to go to Atlantic City for Colon's birthday in 2013.  Tr. 261:18–262:10 Feb. 26, 2019.  The group took the bus to Howard's house on Staten Island first, where they waited for someone to pick them up to drive them to Atlantic City.  *Id.* 262:15–263:6.  While at Howard's house, they hung out; some of them went to the store.  *Id.*

264:18–265:4.  The person who was supposed to drive them that day never showed up, so Colon

eventually went back to Mill Brook with James and Laquan Robinson.  *Id.* 262:11–16; *id.* 265:5–

10.

      Seda likewise testified about going to Howard's house in Staten Island as part of the

unconsummated trip to Atlantic City in 2013.  Seda explained that he, Colon, Howard, Bush,

Wingo, Devin White, Jose, James Robinson, and a few other non-MBG members took a bus to

Staten Island.  Tr. 400:21–402:22, Feb. 27, 2019.  When they got to Howard's house, Seda was

smoking and drinking in Howard's bedroom.  *Id.* 402:23–403:9.  At some point in the night,

Seda watched Howard pull a .40 caliber gun from a shoebox.  *Id.* 403:10–23. After showing

Seda, Howard put the gun back in the box.  *Id.* 403:24–404:1.  Seda never again saw Howard

with the gun.  *Id.* 404:2–4.

      Rodriguez likewise identified Howard as a member of Killbrook's rival gang.  Tr. 495:4–

16, Feb. 28, 2019.  Rodriguez also described a time that he robbed Howard in 2009.  *Id.* 499:8–

20.  According to Rodriguez, he and another Killbrook member named Quentin Starkes were

walking around the neighborhood looking for rivals—something they did to "get status"—when

they saw Howard entering a store in up-the-block Mill Brook and decided to follow him.  *Id.*

499:21–500:3.  Once inside the store, Rodriguez threatened Howard with a razor and told him to

turn over whatever possessions he had.  *Id.* 499:8–500:4.  Howard handed over his jacket and

cell phone, among other items.  *Id.* 501:20–25.  Later, Rodriguez and his fellow gang members

carved "KB" into the back of the jacket and took a video of the jacket being lit on fire.  *Id.*

502:1–4.  According to Rodriguez, they did this for "status" and to let the entire neighborhood

know that Killbrook members had "put in work" on a rival gang member.  *Id.* 502:5–9.  Prior to

this incident, Howard had never attempted to engage in any violent acts against Rodriguez. *Id.*
510:5–8.

In addition to the foregoing testimony, the Government also presented evidence from
Howard's Facebook account—specifically, several posts in which Howard references MBG,
photographs of Howard with other MBG gang members, and conversations between Howard and
other MBG members in which they discuss recent shootings and tension with people from down-
the-block Mill Brook. *See* GX 400; GX 401; GX 402; GX 403; GX 404; GX 405; GX 407; GX
408; GX 410; GX 423; GX 425; GX 426.

### B. Violent Crime in Aid of Racketeering

At trial, the following evidence was presented regarding the charge that, on August 17,
2014, Howard committed a shooting in furtherance of his MBG membership (the "Shooting").

#### 1. Howard's Broken Jaw

According to Seda, Howard had problems with one particular person from Killbrook
named Shadean Samuel, also known as "Scraps." Tr. 396:24–397:8, Feb. 27, 2019. Seda
explained that Howard had issues with Samuel because he had broken Howard's jaw in 2011.
*Id.* 397:24–398:2. Seda was not present for this incident, but he heard about it after the fact—
first, from others; later, from Howard. *Id.* 398:9–10. Specifically, Howard told Seda that he was
at a restaurant near Mill Brook when Samuel and other Killbrook members walked in. *Id.*
399:7–9; *id.* 480:17. Samuel approached Howard and punched him in the face. *Id.* 399:7–9.
Seda thought he recalled Howard saying he was with other MBG members at the time, though he
could not remember exactly. *Id.* 398:21–25; *id.* 399:1–2. Howard also told Seda that he was
going to shoot Samuel in response. *Id.* 399:10–12. In Seda's view, this incident was gang–
related insofar as MBG was "beefing with Killbrook." *Id.* 398:17–20.

During cross examination, Seda admitted that he did not help Howard seek revenge after Samuel broke his jaw. *Id.* 461:23–25. When asked if the reason he did not retaliate on Howard's behalf was that he did not like Howard very much, Seda responded that he would not say he did not like Howard—Howard was just not in his circle. *Id.* 461:23–462:3. Howard's counsel asked if this meant his "circle of shooters and killers," to which Seda answered in the affirmative. *Id.* 462:2–5.

Colon similarly testified that he recalled a time when he saw Howard with a broken jaw, and that his understanding was that Samuel was responsible for the injury. Tr. 231:5–24, Feb. 26, 2019.

Rodriguez also provided testimony relating to the fight between Howard and Samuel. Although he had seen Howard around Mill Brook "a couple times" after the robbery in 2009, Rodriguez had no further interactions with Howard until the two ran into each other on the Staten Island Ferry in 2015.[6] Tr. 502:10–18, Feb. 28, 2019; *id.* 511:19–512:20; *id.* 515:15–18. When Rodriguez saw Howard on the ferry that day, Howard approached him "kind of aggressively" and asked Rodriguez if he wanted to fight because of the time he robbed Howard. *Id.* 503:8–12. Rodriguez replied that fighting would only "spark up energy . . . [and] start something up again" between MBG and Killbrook, which Rodriguez did not think they should do. *Id.* 503:13–17. Howard agreed and, noting that Rodriguez and Starkes had not really hurt him during the robbery, told Rodriguez that he would forget about it. *Id.* 503:18–504:2. Howard then told Rodriguez that his "main focus down the block" was Samuel. *Id.* 503:22–504:3. Rodriguez

---

[6] While Rodriguez testified on direct that it was in 2014 or 2015, Tr. 502:17–503:1, Feb. 28, 2019, he testified on cross that he was "certain" that this conversation took place in 2015. *Id.* 511:19–512:14. He explained that it must have been 2015 because that is when he started working for a State Island–based company, and the only reason he was on the ferry that day was to pick up a pay check. *Id.* 511:19–512:15. The Government appears to concede that this conversation occurred in 2015. Gov't Mem. Opp. at 9, ECF No. 500 (describing conversation between Rodriguez and Howard "[s]everal months after the Shooting").

understood this to mean that Samuel and Howard "had an issue," which was that Samuel had

broken Howard's jaw. *Id.* 504:4–11. Rodriguez believed that Samuel broke Howard's jaw

because, after moving to Mill Brook from Queens, he was "trying to get in good with Killbrook,

so he put in work on [Howard]," a member of MBG.[7] *Id.* 504:12–505:6. Rodriguez believed

this to be the case because, to his knowledge, Samuel and Howard did not have any interactions

before Samuel moved into Mill Brook and started associating with Killbrook; thus, he felt that

Mill Brook was the only thing that Samuel and Howard had in common. *Id.* 505:7–13.

According to Rodriguez, Howard was not confiding in him during this conversation, but rather

"boasting" that Samuel was "the only person [he was] beefing with . . . from Mill Brook." *Id.*

513:7–15.

     In addition to this testimony, the Government introduced the following evidence from

Howard's Facebook account regarding his injury. On April 10, 2011, Howard sent a message to

MBG member Devin White complaining about his broken jaw. Tr. 233:6–22, Feb. 26, 2019; GX

407. On April 12, 2011, Howard sent another message to Devin White complaining about his

jaw and stating, "[N]o lie i gotta catch one of dese niggaz n show dem i aint playing n i knoo ur

situation so u just gotta take care ur kids." GX 407. According to Colon, Howard was telling

Devin White that he wanted to retaliate against someone from down the block but did not want

Devin White getting in the middle of it because he had children. Tr. 237:8–18, Feb. 26, 2019. In

that same message, Howard wrote, "[I] havent heard niggaz try to get niggaz yet n datz brazy cuz

when i was out here looking 4 niggaz niggaz was talking a gd one but i aint expecting niggaz to

do anythi[n]g." GX 407. Colon testified that in this message, Howard was talking about Colon

and his friends possibly retaliating against Samuel for breaking Howard's jaw. Tr. 236:14–

---

[7] Rodriguez testified that he would "peace [Samuel] KB" and that Samuel would hang out with other Killbrook members. *Id.* 504:12–19.

237:7, Feb. 26, 2019.  On April 22, 2011, Howard sent Devin White a message telling him to "go to kelly santana['s] profile[.] dat nigga in dat pic is da one who snuk me," which Colon testified meant the person who broke Howard's jaw.  GX 407; Tr. 238:12–14, Feb. 26, 2019.  Howard then wrote, "I want to murk dat nigga real shit." GX 407.  Colon understood this to mean that Howard wanted to kill that person.  Tr. 238:15–17, Feb. 26, 2019.  In another message dated April 23, 2011, Howard told Devin White that he wanted to "peter roll one of dese niggaz especially dat birch ass nigga dat suckerpunched me."  GX 407.  Colon explained that "peter roll" means to kill somebody.  Tr. 239:15–20, Feb. 26, 2019.

The Government likewise introduced hospital records indicating that Howard was treated for a broken jaw in April 2011.  GX 800–B.

### 2.  The Shooting

New York Police Department ("NYPD") Officer Surfraz Syed ("Officer Syed") testified that, at 3:10 a.m. on August 17, 2014, he and another officer were patrolling on 138th Street between St. Ann's Avenue and Brook Avenue when they received a report of shots fired at 137th Street and St. Ann's Avenue.  Tr. 30:13–18, Feb. 25, 2019; *id.* 31:24–32:25; *id.* 34:15–35:2; *id.* 35:5–20.  Upon arriving at the scene, Officer Syed saw one person who had been shot, as well as two other people who were complaining that they had been shot.  *Id.* 40:16–19.  He also observed a large group of people standing around a nearby deli.  *Id.* 41:1–8.  Officer Syed later identified the victims as Samuel, Jonathan Perez, and Aaron Dykes.[8]  *Id.* 42:16–25.

NYPD Detective Scott Patterson testified that he was notified of a shooting in Mill Brook on August 17, 2014 and arrived at the scene around 3:30 a.m.  Tr. 114:16–20, Feb. 26, 2019.  In

---

[8] Hospital records indicated that Dykes was treated at the hospital for a gunshot wound to his right upper arm in the early hours of on August 17, 2014, GX 801A; that Jonathan Perez was treated for a suspected gunshot wound to his right thigh, GX 802A; and that Samuel was treated for a gunshot wound to his left shoulder/arm, GX 803A.

connection with the investigation that followed, he contacted certain individuals who had called 911 around the time of the incident.  *Id.* 110:10–111:1.  Although he had no recollection at trial of calling someone named Nikiena Perez, Detective Patterson had notes from that call and read them as part of his testimony.[9]  *Id.* 113:13–114:5.  According to these notes, Perez reported the following: "I was, 165 St. Ann's, smoking a cigarette . . .  [when] a guy, some dude, came out of nowhere.  I ran.  He came from – three or four shots, braids, red fitted hat, skinny, possibly Hispanic, tall."  *Id.* 115:4–8.  The notes further state, "She said that she was standing in front of her building, and she saw a male."  *Id.* 115:8–9.

Perez was called to testify during trial and provided the following testimony about the events of August 17, 2014.  On the night of the Shooting, Perez was inside her apartment at 165 St. Ann's Avenue ("Building 165"), on the corner of St. Ann's Avenue and 135th Street, listening to music and smoking marijuana with one of her friends.  *Id.* 78:12–80–25; GX 300; GX 306.  Around midnight, she walked her friend out to St. Ann's Avenue to put her in a cab home.  Tr. 81:3–82:22, Feb. 26, 2019.  As she walked back from St. Ann's Avenue to her apartment building, Perez saw about four or five men in the courtyard in front of Building 165 sitting on benches underneath a flagpole.  *Id.* 84:6–86:7; GX 211; GX 214.  She recognized two of the men, Jonathan Perez and Dykes, from growing up in the neighborhood.  *Id.* 86:8–10; *id.* 87:2–6; *id.* 87:23–88:1.  Upon reaching her building, Perez stopped outside the entrance to finish a cigarette, facing the courtyard.  *Id.* 88:14–89:7.  Two or three minutes later, Perez saw a man coming from the same route she had just taken to St. Ann's Avenue.  *Id.* 89:15–25; GX 211; GX 218.  The man, who was alone, approached the group on the benches but then stopped abruptly before he reached them, approximately four or five feet from the flagpole.  *Id.* 89:15–19; *id.*

---

[9] Detective Patterson's notes reflected that he began returning 911 calls at approximately 4:08 a.m.  Tr. 114:11–15, Feb. 26. 2019.

104:18–21; *id.* 106:2–6.  A couple of seconds later, Perez saw the individual raise his hand and heard three to four gunshots.  *Id.* 89:13–20.  She then ran into an apartment on the fourth floor of her building, where Jonathan Perez's mom, Milka, lived.  *Id.* 93:6–15.  Perez told Milka that she thought something bad may have happened to her son and that she should call him to make sure he was okay.  *Id.* 95:8–12.  About 10 to 15 minutes after the Shooting, Perez and Milka went to 137th Street, where Perez saw ambulances outside of a deli.  *Id.* 95:18–96:25; GX 209.  She stood nearby for about another 15 to 20 minutes before heading back home; at this point, nearly an hour had passed since the Shooting.  *Id.* 97:17–24.  When Perez got back to her apartment that night, she smoked some marijuana to calm her nerves and help her sleep.  *Id.* 99:1–5.

During direct examination, Perez testified that she did not see the shooter's face and could not recall how he was dressed or anything else about his appearance, other than that he was slim and on the tall side.  *Id.* 91:14–92:1.  She explained that, although it was dark outside at the time, there were light posts near the flagpole, in front of her building, and elsewhere in the area. *Id.* 93:18–94:24.  Perez likewise testified that she may have called the police that night to report the Shooting and that she remembered the police coming to her apartment after the Shooting, though she could not recall what exactly she said during those conversations.  *Id.* 98:4–11.

During cross examination, Perez was asked about her previous statements to law enforcement regarding the Shooting.  Perez testified that she "probably" told police she did not hear any shots until she was already inside her building taking the stairs up to her apartment, but she could not remember.  *Id.* 100:13–24.  Perez further stated that she did not recall telling police that she went into her building when she saw the person raise his hand, but supposed that was what happened if that was what she told police that night.  *Id.* 101:11–15.  As for identification of the shooter, Perez remembered telling police that she could not identify the perpetrator but

thought that she told police that he was Hispanic. *Id.* 103:23–24. She likewise acknowledged that, a couple of weeks before trial, she told prosecutors that the shooter was "not too tall." *Id.* 104:14–17.

Kelly Santana, the mother of Samuel's children, was also called to testify about the Shooting. *Id.* 124:17–23. Santana testified that she "somewhat" remembered the night when Samuel was shot. *Id.* 127:12–14. Earlier that evening, she, Samuel, and Dykes had been drinking in a courtyard in between Building 165 and a building at 530 East 137th Street ("Building 530").[10] *Id.* 127:12–128:14; *id.* 129:19–130:10; GX 211. Around 9 p.m., Santana left Samuel and Dykes to go home because she was drunk. *Id.* 130:11–21. Sometime later, she received a call from someone telling her that Samuel had been shot and made her way to 137th Street, where she saw Samuel and Dykes. *Id.* 130:22–132:20. Samuel was getting into an ambulance and told Santana that he had been shot. *Id.* 132:4–7. Dykes had been grazed. *Id.* 132:19–20. Santana joined Samuel in the ambulance to the hospital. *Id.* 132:21–23. On the ride there, she did not ask him who was responsible for the Shooting. *Id.* 132:24–133:1. Santana explained that she did not want to be involved and did not have any interest in what happened; all she cared about was Samuel's well-being. *Id.* 133:2–133:17.

Melendez, who testified that he was present for the Shooting,[11] provided the following details. Earlier in the night, before the incident, Melendez was hanging out with some friends outside a store in down-the-block Mill Brook when he noticed that someone from up-the-block was also hanging around outside the store. *Id.* 149:22–150:15. Melendez thought it was "weird" for this person to be there because people from up-the-block typically did not go down the block,

---

[10] Santana lived in Building 165 in down-the-block Mill Brook from approximately 2005 until 2015. *Id.* 124:4–15; *id.* 126:16–127:2; GX 300. Samuel was originally from Queens but moved into Santana's apartment when he was 16 years old; in 2014, he was living with her full time. *Id.* 127:5–10; *id.* 139:11–15.
[11] In 2014, Melendez told law enforcement that he was not present for the Shooting. *Id.* 166:9–25.

and vice versa. *Id.* 150:16–23. Melendez did not know the person's name but identified him as the individual pictured in Government Exhibit 4.[12] *Id.* 164:10–19; *id.* 165:2–3. Eventually, Melendez and his friends—but not the person from up the block—made their way back into the projects, specifically, into the courtyard between Buildings 165 and 530. *Id.* 153:1–154:5; GX 211. Melendez testified that he and some others, including Jonathan Perez and Samuel, spent the night hanging out, drinking, and smoking near the flagpole in that courtyard. Tr. 154:9–17, Feb. 26, 2019. At some point, Melendez saw one of his friends freeze; when Melendez followed his gaze, he saw Howard approaching from St. Ann's Avenue with the same person from up-the-block who Melendez had noticed earlier in the night. *Id.* 154:18–1562:4; GX 211; GX 218. After they arrived, Melendez heard shots being fired and ran to his apartment in Building 165. *Id.* 150:16:19; *id.* 154:25–155:1; *id.* 157:7–12. Sometime later, Melendez went up the block with a gun looking for Howard because he wanted to retaliate. *Id.* 157:13–158:2. Melendez did not find Howard but instead ran into Colon, someone named Dre, and another person whose name he did not know. *Id.* 158:3–18. Melendez, who was upset, asked them if they knew where Howard was and if they knew why he had shot at the group down the block. *Id.* 158:19–23. Melendez also told Colon and the others about what he witnessed. *Id.* 158:24–159:1.

Sometime after the Shooting, a memorial was held in Mill Brook for Dykes, who had passed away in a car accident. *Id.* 154:10–15; *Id.* 159:2–14. According to Melendez, people from both up and down the block, including Howard, were present. *Id.* 159:11–14. When he saw Howard, Melendez asked him "[w]hat happened with [his] aim." *Id.* 159:15–18. Melendez explained that he asked this because he thought that Howard was only trying to shoot one person, but a couple of others ended up getting hit. *Id.* 159:18–23. Howard "kind of . . . laughed" in

---

[12] Colon and Seda identified the person depicted in Government Exhibit 4 to be MBG member Jose. (*Id.* 201:17–22; Tr. 364:17–22, Feb. 27, 2019.)

response, and Melendez told him that people were upset. *Id.* 159:24–160:2. Then Howard clarified that he was only coming for Samuel and was not trying to hit anyone else. *Id.* 160:3–4. Melendez told Howard that he would "deliver the message" but he did not know how much this apology would accomplish. *Id.* 160:4–5.

Colon testified that, on the night of the Shooting, he was alone in up-the-block Mill Brook selling drugs. *Id.* 255:6–256:6. At some point, Melendez approached him "kind of anxious[ly]" and "with an attitude" and asked where Howard was, but did not say anything more. *Id.* 256:10–257:3. After this interaction, Colon texted his friends—specifically, Seda, Bush, Wingo, and James Robinson—to find out what was going on. *Id.* 257:4–258:4. Colon explained that he wanted to know what happened in case someone tried to retaliate; as a leader of MBG, Colon felt that he would be a target for any act of retaliation by someone from down-the-block. *Id.* 258:7–22. Colon also testified that he was about 6 feet, 2 inches tall, and that, in 2014, he weighed about 160 pounds and wore his hair in braids. Tr. 305:5–21, Feb. 27, 2019.

Seda testified that he was at a strip club on the night of the Shooting when he heard from Colon that something had happened in Mill Brook. *Id.* 404:5–24. Seda stayed at the strip club for some time after that and then went back to his apartment to hang out with his girlfriend. *Id.* 404:25–405:10. While there, Seda called Melendez to find out what had happened. *Id.* 404:9–15. Eventually, Seda left his apartment and went down the block to meet Melendez. *Id.* 406:5–8. Seda brought a gun with him for this meeting because, having heard that something happened, he did not want to go down the block empty–handed. *Id.* 405:16–406:1. Melendez told him what happened and then Seda went back home for the night. *Id.* 406:5–8; *id.* 406:24–407:1. A week or two later, Seda discussed the Shooting with Jose. *Id.* 407:2–6. According to

Seda, Jose told him that he went down the block with a girl, called Howard to tell him that Samuel was in the "park," and that Howard shot Samuel. *Id.* 407:7–16.

About a month and a half after the shooting, Seda saw Howard, Jose, and Devin White at a restaurant near Mill Brook. *Id.* 408:22–409:3; *id.* 410:9–12; *id.* 479:2–3. Seda explained that his relationship with Howard was not "really cool" at this point; Howard had been telling people that he had issues with Seda because Seda would not help Howard retaliate after he got cut by someone from another housing project. *Id.* 409:4–13. Seda, who was angry about this, asked Jose to tell Howard that he should stay in Staten Island because Seda would punch him in the face the next time they saw each other. *Id.* 409:20–24. When Seda tried to peace Howard MBG that day, Howard confronted Seda about this threat. *Id.* 410:17–20. In response, Seda punched Howard in the face. *Id.* 410:21–24. Howard threw his hands up, but nobody swung. *Id.* 410:25–411:2. Howard then told Seda he would "do [him] dirty," which Seda understood to mean that Howard would shoot him rather than beat him up. *Id.* 411:2–6. Seda then said to Howard, "[y]ou think you're tough because you shot [Samuel]," and told Howard to "get [his] punk ass .40"—referring to the gun that he saw at Howard's house in 2013. *Id.* 400:11–403:23; *id.* 411:7–14. Howard did not deny the accusation that he shot Samuel. *Id.* 411:15–17. Afterward, Seda went back to his apartment to get his guns—two .357s—and then went down the block to an apartment where the mother of Devin White's children lived. *Id.* 411:18–25. When he got there, he saw Jose outside and told him to get Howard. *Id.* 411:24–25. Howard never came out, however, and eventually Seda went home. *Id.* 412:1–4. The next day, Seda awoke to several missed calls and text messages telling him that Howard wanted to fight. *Id.* 412:7–9. Around 8 p.m. that night, the two fought; Seda beat Howard up. *Id.* 412:21–413:1. Jose ultimately broke

up the fight, at which time Seda and Howard "squashed" their problems, meaning they "gave each other a handshake, peace[d] each other MBG, and gave each other a hug." *Id.* 413:3–8.

The Government also introduced evidence that Howard had braids when he was arrested on October 11, 2017 and continued to have braids until approximately three days before trial. Tr. 119:24–120:15, Feb. 26, 2019; *id.* 140:25–145:7; GX 503; GX 504A.

The defense introduced an affidavit from Jose which stated that he has never been a member of MBG or the YGz; that he has no knowledge or belief that Howard shot anyone; that he did not help Howard locate Samuel on August 17, 2014 or otherwise assist Howard in setting up the Shooting; and that he never told anyone that Howard was responsible for any alleged shooting.  DX A.

### 3.  The Ballistics Evidence

Detective Estafani Cerda, a member of the NYPD's Evidence Collection Team, testified that she recovered two .40 caliber shell casings and a live .40 caliber bullet in front of 165 St. Ann's Avenue at approximately 4:20 a.m.  on August 17, 2014.  Tr. 48:10–13, Feb. 25, 2019; *id.* 57:4–28; *id.* 58:7–9; GX 100.  NYPD Detective Jonathan Fox, the Government's ballistics expert, testified that the shell casings and the live bullet recovered by Detective Cerda were from the same manufacturer and of the same caliber (.40 caliber) and that the shell casings were fired from the same firearm.  Tr. 544:3–5, Feb. 28, 2019; *id.* 547:1–4.  He could not determine whether the live bullet was cycled through the same firearm as the two shell casings.  *Id.* 544:6–14.  During his analysis, he found nothing to suggest that the shell casings were fired from anything other than a .40 caliber semi–automatic handgun.  *Id.* 546:8–11.  He noted, however, that it would be possible to fire .40 caliber ammunition out of other types of firearms.  *Id.* 544:25–545:17.

20

**DISCUSSION**

## I.     Standard of Review

Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's

motion must enter a judgment of acquittal on any offense for which the evidence is insufficient

to sustain a conviction." Fed. R. Crim. P. 29(a). Specifically, a court must grant a motion under

Rule 29 if there is "no evidence upon which a reasonable mind might fairly conclude guilt

beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal

quotation marks and citation omitted). "The ultimate question is not whether [the court]

believe[s] the evidence adduced at trial established [the defendant's guilt], but whether any

rational trier of fact could so find." *United States v. Eppolito*, 543 F.3d 25, 45–46 (2d Cir. 2008)

(internal quotation marks, citation and emphases omitted). Therefore, "a defendant making an

insufficiency claim bears a very heavy burden." *United States v. Desena*, 287 F.3d 170, 177 (2d

Cir. 2002).

In considering the sufficiency of the evidence, the court must "view all of the evidence in

the light most favorable to the government, crediting every inference that could have been drawn

in the government's favor." *United States v. Ware*, 577 F.3d 442, 447 (2d Cir. 2009). A court

must analyze the pieces of evidence not separately, in isolation, but together, in conjunction with

one another. *See United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) ("[W]e consider the

evidence in its totality, not in isolation, and the government need not negate every theory of

innocence.").

## II.    Count One (The MBG Racketeering Conspiracy)

Howard argues that there was insufficient evidence to convict him of the MBG

racketeering conspiracy charged in Count One. In particular, Howard contends that the

Government failed to prove (i) that Howard conducted or conspired to conduct the MBG

enterprise by engaging in a pattern of racketeering activity;[13] and (ii) that any of the alleged

criminal acts committed by MBG gang members were interrelated or related to the MBG

enterprise.  Def. Mem. at 3.

## A.  Applicable Law

The RICO conspiracy statute prohibits an individual from conducting or conspiring to

conduct an enterprise by engaging in a pattern of racketeering activity.[14] 18 U.S.C. §§ 1926(c),

(d).  To sustain a conviction under this statute, the Government must prove that the defendant

"agreed with others (a) to conduct the affairs of an enterprise (b) through a pattern of

racketeering." *United States v. Applins*, 637 F.3d 59, 77 (2d Cir. 2011) (internal quotation marks

omitted).

"A pattern of racketeering involves, at minimum, two predicate racketeering

activities . . . that occur within ten years of one another."  *United States v. Vernace*, 811 F.3d

609, 615 (2d Cir. 2016) (citation omitted).  Moreover, predicate acts only form a pattern if they

have "the same or similar purposes, results, participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing characteristics and are not isolated events."  *H.J. Inc.*

*v. Nw. Bell. Tel. Co.*, 492 U.S. 229, 240 (1989) (internal quotation marks omitted).  In other

words, to constitute a pattern of racketeering activity, the predicate acts "must be related to each

---

[13] In Howard's opening memorandum, he appears to argue that the Government failed to prove he personally committed two predicate acts.  *See, e.g.*, Def. Mem. at 3.  In his reply, however, he contends that the Government failed to prove that he agreed that the MBG enterprise would engage in a pattern of racketeering activity.  Reply Mem. at 4, ECF No. 507.  Moreover, the Government addressed this latter argument in opposing Howard's motion; it has not, either in its opposition memorandum or thereafter, argued that Howard waived his right to challenge the sufficiency of the evidence regarding his agreement that MBG would be conducted through a pattern of racketeering activity.  Gov't Mem. at 12.  The Court thus concludes that Howard's challenge to his RICO conspiracy prediction is squarely before it.

[14] RICO defines an "enterprise" as, *inter alia*, any union or group of individuals associated in fact although not a legal entity. 18 U.S.C. § 1961(4).  Howard does not challenge the jury's determination that MBG was an enterprise as defined by the statute.

other ('horizontal' relatedness), and they must be related to the enterprise ('vertical'

relatedness)." *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir. 1992). "[O]ne way to

show that the predicate acts are horizontally related to each other is to show that each predicate

act is related to the RICO enterprise," that is, "by linking each predicate act to the enterprise,

although the same or similar proof may also establish vertical relatedness." *United States v.*

*Daidone*, 471 F.3d 371, 375 (2d Cir. 2006.)

      To be found guilty of RICO conspiracy, a defendant "need only know of, and agree to,

the general criminal objective of a jointly undertaken scheme." *United States v. Yannotti*, 541

F.3d 112, 122 (2d Cir. 2008); *see also, e.g.*, *United States v. Zichettello*, 208 F.3d 72, 100 (2d

Cir. 2000) ("To be convicted as a conspirator [under RICO], one must be shown to have

possessed knowledge of only the general contours of the conspiracy."). "Neither overt acts, nor

specific predicate acts that the defendant agreed personally to commit, need be . . . proved for a

section 1962(d) offense." *United States v. Benevento*, 836 F.2d 60, 81 (2d Cir. 1987), *abrogated*

*on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (internal citation

and quotation marks omitted); *see also United States v. Ciccone*, 312 F.3d 535, 542 (2d Cir.

2002) (stating that conviction on a racketeering conspiracy charge does not require a showing

that the defendant committed or even agreed to commit the predicate acts). Simply put, the

Court "need inquire only whether an alleged conspirator knew what the other conspirators 'were

up to' or whether the situation would logically lead an alleged conspirator 'to suspect he was part

of a larger enterprise.'" *Zichettello*, 208 F.3d at 99 (quoting *United States v. Viola*, 35 F.3d 37,

44–45 (2d Cir. 1994)).

### B.  Application

      The Court first turns to the question of whether the MBG enterprise conducted its affairs

through a pattern of racketeering activity.

Here, the evidence regarding the shootings committed by MBG members was sufficient to support a finding that they were related to the gang. Colon, Seda, and Rodriguez testified that MBG was a neighborhood gang comprised of people from up-the-block Mill Brook, and that MBG engaged in a rivalry with Killbrook, the gang associated with down-the-block Mill Brook. Tr. 194:23–24, Feb. 26, 2019; *id.* 195:4–10; *id.* 198:6–8; *id.* 213:13–22; Tr. 363:11–13, Feb. 27, 2019; *id.* 363:18–25; *id.* 366:13–14; Tr. 493:20–494:24, Feb. 28, 2019. According to Colon, after this rivalry began, the two gangs "wanted to hurt each other." Tr. 216:10–15, Feb. 26, 2019. Colon also testified that he and other MBG members committed multiple acts of violence, including shootings, in connection with the MBG/Killbrook rivalry. *See, e.g.*, Tr. 212:22–213:2, Feb. 26, 2019; *id.* 281:5–6. Seda likewise stated that, when an MBG member would commit a shooting, he would often bring other members with him to "be [his] eyes." Tr. 408:3–8, Feb. 27, 2019. Colon and Seda provided numerous examples of shootings directed at rival gang members that they committed or were involved in with other MBG members, which were committed on behalf of MBG or its members. Tr. 273:11–275:12, Feb. 26, 2019; *id.* 277:22–279:8; *id.* 280:7–281:19; Tr. 414:2–25, Feb. 27, 2019; *id.* 416:13–21; *id.* 416:22–427:20; *id.* 419:6–22.

The evidence is also sufficient to show that Howard agreed to participate in MBG's affairs. At the outset, the Court notes that it is apparent from the record that Howard's membership in MBG did not entail active participation in the gang's violent crimes. As previously noted, however, the Government need not prove that Howard personally engaged in any predicate acts, or even that he agreed to personally commit any predicate acts, in order to sustain a conviction under the RICO conspiracy statute. *See, e.g.*, *Ciccone*, 312 F.3d at 542.

Instead, the Government must prove only that Howard "kn[e]w the general nature of the conspiracy and that the conspiracy extend[ed] beyond [his] individual role." *United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000). This prong is satisfied so long as he "knew what the other conspirators 'were up to,'" or if "the situation would logically lead [him] to suspect he was part of a larger enterprise." *Id.* (internal quotation marks and citation omitted).

Here, the Government presented evidence to satisfy this standard. For one, there was more than enough evidence to show that Howard was a member of the gang. Colon and Seda testified that they would peace Howard MBG, and that Howard would frequently hang out with other MBG members. Howard referenced MBG repeatedly in his Facebook posts and messages, including posts in which he shows support for incarcerated members of MBG. *See, e.g.*, GX 404; GX 405; GX 408. And the evidence shows that Howard was well aware of the general contours of the conspiracy of which he was a member, including the gang's rivalry with Killbrook and related acts of violence. He would hang out in the Robinson Apartment, where guns were kept, drugs were sold, and MBG members discussed their exploits. Tr. 269:24–270:2, Feb. 26, 2019; Tr. 434:21–24, Feb. 27, 2019. He spoke to Seda about Seda's committing crimes and shooting people. Tr. 479:4–11, Feb. 27, 2019, and was sometimes present when Colon was selling drugs. Tr. 270:3–4, Feb. 26, 2019. Moreover, the Government introduced Facebook messages between Howard and other MBG members in which the gang and the rivalry with people from down-the-block Mill Brook is discussed. *See, e.g.*, GX 407.

Accordingly, Howard's motion for acquittal on Count One of the Superseding Indictment is DENIED.

### III.   Count Six (Violent Crime in Aid of the MBG Racketeering Conspiracy)

Count Six of the Superseding Indictment charges that, on August 17, 2014, Howard, for the purpose of gaining entrance to and maintaining and increasing position in MBG, a racketeering enterprise, shot at, injured, and attempted to murder members of a rival gang near Mill Brook, in violation of 18 U.S.C. §§ 1959(a)(3), (a)(5), and 18 U.S.C. § 2.

#### A.   Applicable Law

For a defendant to be convicted of committing a violent crime in aid of racketeering under 18 U.S.C § 1959(a), the Government must prove five elements: "(1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992).

#### B.   Howard's Motive

Howard contends that the Government failed to prove beyond a reasonable doubt that he committed the Shooting "for the purpose of maintaining or increasing his position in the enterprise." Def. Mem. Supp. at 28–31.  The Second Circuit has noted that this phrase was "included [in the VICAR statute] as a means of proscribing murder and other violent crimes committed as an integral aspect of membership in [RICO] enterprises." *Concepcion*, 983 F.2d at 381 (internal quotation marks, brackets, and citation omitted).  Accordingly, to convict a defendant under the VICAR statute, the Government need not prove that maintaining or increasing position in the enterprise was the defendant's "sole or principal motive." *Id.*; *see also United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) (holding that the government must prove

that "the defendant's *general purpose* in committing the crime of violence was to maintain or increase his position in the enterprise." (emphasis added)).  Instead, the motive requirement is satisfied "if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Concepcion*, 983 F.2d at 381.

In accordance with these principles, courts have found the motive requirement met where, for example, the defendant's act was committed or authorized by leaders of an enterprise as part of an effort to protect its operations against threats or advance its objectives.  *See, e.g.*, *United States v. Aquart*, 912 F.3d 1, 19–20 (2d Cir. 2018) (sufficient evidence to infer that defendant, as a leader of the enterprise, was expected to act based on threat posed to enterprise by competitor's drug sales and that failure to do so would have undermined his position within the enterprise); *United States v. Rivera*, 273 F. App'x  55, 58 (2d Cir. 2008) (affirming conviction where evidence showed "that [the defendant's] motives for the murders were not only based on self–preservation, but also on preservation of the enterprise."); *United States v. Diaz,* 176 F.3d 52, 95–96 (2d Cir. 1999) (defendant sanctioned murders of both rival drug dealer and suspected informant to protect drug gang's territory and to maintain defendant's leadership position in the gang); *United States v. Pimentel*, 346 F.3d 285, 295–96 (gang chapter president participated in murder to advance his position within the gang).

Courts have likewise found this element satisfied where the defendant's act was consistent with the enterprise's goals, rules, policies, or culture.  For instance, VICAR convictions have been affirmed upon the Government's showing that members of the gang are expected to respond violently to certain actions by outsiders, and that failure to do so would undermine a member's standing in the gang.  *See, e.g.*, *United States v. Rubi–Gonzalez*, 311 F.

App'x 483, 486 (2d Cir. 2009); *United States v. Roye*, No.  3:15 Cr. 29, 2017 WL 3670651, at *2

(D. Conn. Aug. 25, 2017), *rev'd on other grounds sub nom. United States v. Frank*, 749 F. App'x

5 (2d Cir. 2018) (denying acquittal on VICAR conviction because evidence was sufficient for a

reasonable juror to "conclude that Defendant perceived [the victim] to be a threat to the

enterprise and its members, and that Defendant's actions were in accordance with the

expectations of the gang and were done with the intention of meeting his obligations as a

member").

The Government contends that the motive element was satisfied by evidence that Howard

was a member of MBG; Samuel was a member of Killbrook; as part of the MBG/Killbrook

rivalry, MBG members shot at Killbrook members on several occasions; and committing acts of

violence would increase Howard's status within MBG.  Gov't Mem. at 21–23.  The Government

also highlights evidence that Howard discussed retaliating against Samuel with Devin White,

another MBG member, and that Jose, an MBG member, assisted Howard in connection with the

Shooting.  *Id.* at 23.  These arguments fail for the reasons discussed below.

First, the VICAR motive element may not be satisfied merely by the fact that Howard

was a member of MBG, Samuel was a member of Killbrook, and members of the two gangs shot

at each other on several occasions as a result of a rivalry between them.  The Second Circuit has

held that such reasoning "misses the point, which asks only whether the intended assault,

*whatever the association of its victims*, was intended to aid defendants' racketeering." *United*

*States v. Sanchez*, 623 F. App'x 35, 41 (2d Cir. 2015) (emphasis added).  *Sanchez* held that an

assault could satisfy VICAR's motive prong even when the victims were not members of a rival

gang.  *See* 623 F. App'x at 41.  But the opinion's logic applies just as strongly in reverse:  even

when the victim was a member of a rival gang, the Government must show that the assault was

intended to aid the defendant's racketeering. *See United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008) (holding, in a case where the victim of an assault was a member of a rival gang, that it was impermissible to "convict [the defendant] on the VICAR counts even if it found that his battle with [the victim] was generally motivated by personal animosity and by a desire to regain the respect and affection of his girlfriend").

Courts in this circuit and elsewhere have also rejected the assumption that any violence in response to a personal affront to a member of an enterprise can satisfy VICAR's motive prong. For example,  in *United States v. Jones*, 291 F. Supp. 2d 78 (D. Conn. 2003), the court rejected "[t]he government's argument that any personal act of disrespect toward [the defendant] was tantamount to an act of disrespect against the [e]nterprise," because that theory "blurs *Concepcion*'s distinction between violent crimes that are committed in connection with a criminal enterprise's affairs and those that arise from purely non-enterprise-related matters. Indeed, taking the government's theory to its logical conclusion, any act of violence committed by a member of a drug-trafficking group, whether related to its drug–trafficking objectives or not, would be a VICAR offense." *Id.* at 89; *see also, e.g.*, *United States v. Hunter*, No. 5 Cr. 188, 2018 WL 268065, at *8 (E.D.N.Y. 2008), *aff'd*, 388 F. App'x 1 (2d Cir. 2010) ("I [] reject the government's argument that [the victim's] disrespect for [a gang member] (by sleeping with his girlfriend) damaged the reputation of the enterprise, thus leading [other gang members] to defend the enterprise against the 'threat' posed by this affair."); *United States v. Barbeito*, No. 2:09 Cr. 00222, 2010 WL 2243878, at *19 (S.D. W. Va. 2010) ("[C]ourts have rejected unsupported inferences, proffered by the Government, that acts of violence by a member of a racketeering enterprise committed for ostensibly personal reasons were motivated by a desire to increase the member's position.").

Moreover, while shooting Killbrook members and enlisting the assistance of other MBG members in doing so may have been acts that were *generally* consistent with MBG's modus operandi, such evidence is not necessarily dispositive. *See, e.g.*, *Thai*, 29 F.3d at 818 (racketeering motive could not be evidenced merely by the fact that the bombing of an Asian restaurant was committed by a leader of a gang that earned money by committing violent crimes against Asians). The evidence in this case fails to show that the Shooting was consistent with MBG's operations or goals *at the time it was committed*. Melendez testified that, at the time of the Shooting, the relationship between Killbrook and MBG was "cordial" and there had not been any rivalry–related shootings for approximately a year. Tr. 151:24–152:9, Feb. 26, 2019. Melendez testified that this was because drug dealers decided that it would be better for business if there were not any shootings. *Id.* 152:10–23; *id.* 183:21–25. Colon, MBG's leader, was an active drug dealer in 2014; in fact, he was dealing drugs on the night of the Shooting. *Id.* 212:22–25; *id.* 255:6–17; *id.* 268:19–25. Rodriguez testified that, when Howard approached him to fight on the ferry in 2015, he told Howard that he did not want to fight because he did not want to reignite the rivalry between the two gangs. Tr. 503:13–17, Feb. 28, 2019. In short, it was clear to virtually everyone that the rivalry between MBG and Killbrook had reached a standstill by August 2014 and that there was an interest in keeping things that way. If the Shooting were indeed related to the MBG/Killbrook rivalry, it would make no sense for Howard to retaliate in 2014—three years after Samuel broke his jaw, and during a time when there was a truce between the two gangs—rather than in 2011—immediately after Samuel punched him, and when tension between the two gangs was at a high.

The foregoing facts distinguish Howard's case from those in which a defendant's conduct was explicitly or implicitly authorized by the gang's leaders. Here, MBG's leaders did not help

Howard plan the Shooting or in any way direct him to commit it.  On the contrary, Colon—one

of the gang's leaders—did not even know about it until Melendez informed him, and Howard

used his own gun, as opposed to an MBG gun, to commit the Shooting.  (Tr. 257:256:10–258:4,

Feb. 27, 2019; *Id.* 402:23–403:23.)  Indeed, the evidence indicated that the Shooting was directly

contrary to the gang's interests because members were actively trying to reduce violence

between the gangs at the time.  Tr. 151:24–152:9, Feb. 26, 2019; Tr. 503:13–17, Feb. 28, 2019.

*See United States v. D'Angelo*, No.  02 Cr. 399 (JG), 2004 WL 315237, at *13 (E.D.N.Y. Feb.

18, 2004) (insufficient evidence of VICAR motive where the evidence showed that the defendant

was "acting *against* the interests of [the gang] by suddenly shooting someone whom [the gang]

members would be suspected of killing, even though those same [gang] members did not want

the murder to occur").

Moreover, Howard clearly did not have any noteworthy status in the gang such that his

actions might be understood to evidence his interest in preserving his particular position in the

gang.  Nor does the evidence allow the inference that Howard—or anyone else—viewed

Samuel's breaking of Howard's jaw as an affront to the gang such that one could infer Howard's

desire to commit the Shooting in order to protect the gang's operations or reputation.  On the

contrary, Seda explicitly testified that he did not help Howard retaliate.  Tr. 461:23–25, Feb. 27,

2019.  This suggests that the attack on Howard was not viewed as an affront to the gang.

Howard seemed aware of this, given that he told another MBG member that he did not expect

anyone to retaliate on his behalf.  GX 407.

Further, the evidence failed to show that Howard's position in the gang would be in

question if he failed to retaliate against Samuel.  Seda acknowledged that Howard was a "real

member[]" of MBG even though he was not a "shooter" or "killer[,]" and explained that there

were "a lot" of MBG members who did not engage in acts of violence or any other criminal acts.

Tr. 461:23–462:6, Feb. 27, 2019; *id.* 464:12–465:1.  Furthermore, Howard was evidently a

member of the gang for roughly a decade before he committed a single crime.  Tr. 195:11–12,

Feb. 26, 2019; *id.* 199:3–5; 464:5–11, Feb. 27, 2019.  This is true notwithstanding the fact that in

2009 another Killbrook member, Rodriguez, robbed Howard at knifepoint and then publicly

burned Howard's jacket in an attempt to establish Killbrook's dominance over MBG—an act

that would readily be understood as a threat to the enterprise.  Tr. 499:8–502:9, Feb. 28, 2019; *id.*

502:10–18; *id.* 511:19–512:20; *id.* 515:15–18.  The evidence, therefore, cannot support any

inference that Howard committed the Shooting because it was expected of him by way of his

MBG membership or because his position might have been undermined if he failed to retaliate.

*Cf. Rubi–Gonzalez*, 311 F. App'x at 486–87 (citing evidence that the gang had a "fight at first

sight" policy with regard to rival gangs in affirming VICAR conviction); *United States v.*

*Eldridge*, No.  1:09 Cr. 329, 2017 WL 3699312, at *11 (W.D.N.Y. Aug. 28, 2017) (finding

sufficient evidence of gang–related motive where the defendant was recorded making statements

such as: "The way I gotta respond to certain things in Buffalo . . .  I don't have to respond when

I'm somewhere else because there are no expectations of me . . ."; "I be around a lot of criminals

and all that and I am the one who is looked up to"; "I ain't just being the average individual

amongst the whole bunch"); *United States v. Smith*, No. 09 Cr. 331–A, 2017 WL 3529047, at *5

(W.D.N.Y. Aug. 17, 2017) (affirming VICAR conviction based on evidence "that [a rival gang's

shooting of the brother of the defendant's gang member] was a compelling event for [the

defendant's gang] members, that retaliation against the [rival gang] was widely viewed as

essential to the gang among [] members, and that [the defendant] concluded he would not be left

out of it").

As for enhancing his position, although there was testimony that MBG members could gain respect by committing acts of violence, Tr. 213:3–4, Feb. 26, 2019, there was virtually no evidence that in 2014 Howard had any interest in becoming a leader or otherwise advancing his status in the gang.  There were, of course, the Facebook messages from 2011 in which Howard expressed a desire to harm Killbrook members, including Samuel.  GX 404; GX 407.  But there is nothing in the record between the time Howard made those statements and the night of the Shooting—a gap of more than three years—to indicate that Howard had any desire to gain status in MBG.  The evidence, therefore, does not show that Howard intended to further his status or MBG's operations when he committed the Shooting.  Indeed, if Howard were at all motivated by a desire to maintain or increase his standing within MBG, one would expect him to talk about the Shooting with other members, such as one of the gang's leaders, after the fact.  *See, e.g.*, *United States v. Farmer*, 583 F.3d 131, 142 (2d Cir. 2009) (affirming VICAR conviction based on evidence that the defendant "boasted about the crime to his fellow [gang members] in the days and months" after the crime); *United States v. Whitten*, 610 F.3d 168, 179–81 (2d Cir. 2010) (citing evidence showing that the defendant was "proud" of his crimes and "wanted others to be made aware of them," and that the defendant reported back to one of the gang's leaders after the crimes, to support conclusion that VICAR motive element was satisfied); *United States v. Mayes*, No. 12–CR–385, 2014 WL 3530862, at *8–9 (E.D.N.Y.  July 10, 2014) ("[The defendant's] later references to this murder shed light on his motive for committing it[;] . . .  numerous witnesses testified that [the defendant] told them about the murder, either directly or by implication."); *id.* ("[T]he jury could have inferred that Anthony Mayes committed the murder to increase his position in the enterprise, based on the way that he later referred to the murder to intimidate members and rivals, *coupled with* Timmons' testimony that a murder by a younger

member of a group can play a critical role in helping that person gain respect.") (emphasis

added).  That is especially so given Seda and Colon's testimony that they generally did brag

about their criminal exploits.  *See* Tr. 279:24–280:2, Feb. 26, 2019; Tr. 424:24–425:5, Feb. 27,

2019.  But here, the evidence shows that Howard made no effort to tell any MBG members about

his role in the Shooting.  For instance, when Seda confronted Howard about the Shooting,

Howard did not deny it—but he also did not admit to it, much less boast about it.  Tr. 411:7–17,

Feb. 27, 2019.  Indeed, it appears that the only person to whom Howard *did* admit to the

Shooting was Melendez—someone from down-the-block, who was not a member of MBG (or

Killbrook) and could not have any influence over Howard's status in the gang.  Tr. 147:15–20,

Feb. 26, 2019; *id.* 159:15–160:4; *id.* 169:3–4.

On this point, the Court notes that Howard's statement to Melendez about the Shooting—

that he was only coming for Samuel, *id.* 159:24–160:4—also undermines any conclusion that he

committed the Shooting in connection with MBG or its rivalry with Killbrook.  Colon, for

example, testified about multiple instances in which he shot at one Killbrook member or another,

and that at times, his target was any Killbrook member he could find.  *See, e.g.*, Tr. 328:3–7,

Feb. 27, 2019.  Seda likewise testified about multiple instances in which he shot at Killbrook

members who had not specifically done anything to him.  *See, e.g.*, *id.* 429:18–430:16.  Howard,

by contrast, was not seeking to shoot at any Killbrook member; instead, as he explained to

Melendez, he was only coming for one person—the same person who had previously attacked

him.  The same is also true of Howard's conversation with Rodriguez in 2015, in which Howard

effectively told Rodriguez that Samuel was "the only person [Howard was] beefing with . . .

from Mill Brook."  Tr. 513:7–15, Feb. 28, 2019.

Finally, there was no evidence that Howard's status was enhanced by the Shooting. No member praised Howard for his accomplishment or otherwise addressed the Shooting in a manner that could allow for the inference that it was done in furtherance of the enterprise. Of course, "the question is not whether [a defendant's] position in the [enterprise] was advanced in fact by the murder he committed, but whether his purpose in committing the murder was to benefit his position." *Farmer*, 583 F.3d at 142. But it is nonetheless significant, in light of the substantial evidence of Howard's personal dispute with Samuel, that the shooting may have "actually *decreased* his standing in the [enterprise.]" *United States v. Bruno*, 383 F.3d 65, 85 (2d Cir. 2004), *as amended* Oct. 6, 2016. Just a few weeks later, Howard was in a fight with Seda, a senior member of MBG, and during the fight Seda mocked Howard for the shooting. Tr. 400:11–411:7–14, Feb. 27, 2019.

Even straining to draw every inference in favor of Howard's having a motive of maintaining or improving his position in MBG, it is clear that the trial evidence "gave nearly equal circumstantial support to competing explanations," if not substantially greater support. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted). In that circumstance, "a reasonable jury must necessarily entertain a reasonable doubt." *Id.* (internal quotation marks and citation omitted). The Court therefore must conclude that the evidence was insufficient for a reasonable juror to conclude that Howard committed the Shooting in order to maintain or increase his position in MBG. Howard's motion for a judgment of acquittal on Count Six is GRANTED.[15]

---

[15] Because the Court grants Howard's motion for acquittal on Count Six on this basis, there is no need to address the difficult question of whether the evidence was sufficient to demonstrate that he "had a position in the enterprise," *Concepcion*, 983 F.2d at 381. *See* Def. Mem. at 27, 29–30.

**IV.     Count Twelve (Firearm Offense)**

As noted above, the jury convicted Howard on Count Twelve in connection with both
Count One, the racketeering conspiracy, and Count Six, the VICAR.  Tr. 726:5–727:2, Mar. 6,
2019.  Because Howard's motion for a judgment of acquittal as to Count Six has been granted,
however, his conviction on Count Twelve now rests solely on his conviction for Count One.

Count Twelve is charged under 18 U.S.C. § 924(c), which criminalizes using a firearm
"during and in relation to," any "federal crime of violence," or possessing a firearm " in
furtherance of" such a crime.  The statute defines "crime of violence," in relevant part, as an
offense that is a felony and [] has as an element the use, attempted use, or threatened use of
physical force against the person or property or another."  *See* § 924(c)(3).[16]  The Second Circuit
has made it clear that a RICO conspiracy can be a crime of violence if the underlying RICO
offense is based on crimes of violence.  *See United States v. Scott*, 681 F. App'x 89, 95 (2d Cir.
2017) ("Where, as here, the jury finds two RICO predicates constituting crimes of violence have
been proven, [*United States v. Ivezaj*, 568 F.3d 88, 96 (2d Cir. 2009),] instructs us to treat the
RICO offense as a crime of violence, and [*United States v. Elder*, 88 F.3d 127, 129 (2d Cir.
1996),] instructs us to treat the conspiracy to commit that offense—that is, the RICO conspiracy
charged here—as a crime of violence as well.").  In this case, the RICO predicate acts included
multiple acts involving murder, ECF No. 169 ¶ 5(a), so the RICO offense was a crime of
violence, and conspiracy to commit the RICO offense is a crime of violence too.  *Scott*, 681 F.
App'x at 95.

The evidence does not show, however, that Howard used a firearm "in relation to" the

---

[16] Section 924(c)(3)(B) also defines a crime of violence as including an offense "that by its nature, involves a
substantial risk that physical force against the person or property of another may be used in the course of committing
the offense."  But the Supreme Court invalidated that portion of the definition as unconstitutionally vague earlier
this year.  *See United States v. Davis*, 139 S. Ct. 2319, 2336 (2019).

RICO conspiracy or possessed it "in furtherance of" the conspiracy. "The phrase 'in relation to' . . . at a minimum, clarifies that the firearm must have some purpose or effect with respect to the . . . crime." *Smith v. United States*, 508 U.S. 223, 238 (1993). Likewise, for possession of a firearm to be "in furtherance" of a conspiracy, "[t]he defendant must be shown to have possessed the gun for the purpose of playing some role, even if small, in the furtherance of the conspiracy." *United States v. Gardner*, 602 F.3d 97, 100 (2d Cir. 2010) (affirming jury instruction with that language). Here, there was no evidence that Howard used his .40 caliber gun to any purpose or effect related to the RICO conspiracy, or that his possession of the gun played any role in furthering the conspiracy. The evidence at trial demonstrated Howard's use of the gun only twice: when he showed it to Seda on Staten Island in 2013, *see* Tr. 400:21–402:22, Feb. 27, 2019; *id.* 403:10–23; *id.* 403:24–404:1, and when he used it to shoot Samuel at Mill Brook in 2014, *see* Tr. 48:10–13, Feb. 25, 2019; *id.* 57:4–28; *id.* 58:7–9; Tr. 544:3–5, Feb. 28, 2019; *id.* 544:6–14; *id.* 546:8–11; *id.* 547:1–4. The former incident had no meaningful relationship to the RICO conspiracy, other than that Howard showed the gun to a co-conspirator in a social setting. The latter incident, too, did not further the conspiracy or have any purpose or effect related to it; as described above, Howard's motive for the Shooting was entirely personal, and if anything the shooting was contrary to MBG's goals at the time. *See supra* Section III.B.

Accordingly, Howard's motion for acquittal on Count 12 is GRANTED.

## CONCLUSION

For the foregoing reasons, Howard's motion is GRANTED as to Counts Six and Twelve of the Superseding Indictment and DENIED as to Count One of the Superseding Indictment. Howard is, therefore, entitled to a judgment of acquittal on the jury's verdict finding him guilty on Counts Six and Twelve of the Superseding Indictment, and his conviction on those counts is

VACATED.  The Clerk of the Court is directed to terminate the motions at ECF Nos. 479 and

484.

      SO ORDERED.

Dated:  November 4, 2019
      New York, New York

                                            _____
                                             ANALISA TORRES
                                   United States District Judge