**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**FOLEY SQUARE DIVISION**

— — — — — — — — — — — — — — — — — — x
UNITED STATES OF AMERICA       :

      :     1:17-CR-00611-AT-8

     v.                     :

      :

CHRISTOPHER HOWARD       :
— — — — — — — — — — — — — — — — — — x


## SENTENCING MEMORANDUM


Murdoch Walker, II. Esq.
Katryna Lyn Spearman, Esq.
Attorneys for Christopher Howard

## TABLE OF AUTHORITIES

**Federal Cases**

*Braxton v. United States*, 500 U.S. 344 (1991) …………………………….…..… 4

*United States v. Alston*, 899 F.3d 135 (2nd Cir. 2018) …………………………… 18

*United States v. Biba*, 788 F. App'x 70 (2nd Cir. 2019) …………….…………… 17

*United States v. Booker*, 543 U.S. 220 (2005) ………………………………………… 5

*United States v. Davis*, 139 S. Ct. 2319 (2019) ……………………………..… 14, 17-19

*United States v. England*, 555 F.3d 616 (7th Cir. 2009) ………………….………… 6

*United States v. Guerrero*, 52 F. Supp. 3d 643 (S.D.N.Y. 2014) ……….………… 10

*United States v. Ivezaj*, 568 F.3d 88 (2nd Cir. 2009) …………………………..…… 7

*United States v. Kwong*, 14 F.3d 189 (2nd Cir. 1994) ……………………………… 4

*United States v. Payne,* 591 F.3d 46, 64 (2d Cir.2010) …………………………… 26

*United States v. Stroman*, 420 Fed. App'x. 100 (2nd Cir. 2011) ………………..… 4

*United States v. Vaughn*, 430 F.3d 518 (2nd Cir. 2005) …………………………… 5

*United States v. Vazquez*, 271 F.3d 93, 101 (3d Cir. 2001) ……………………….. 14

*United States v. White*, 7 F.4th 90 (2nd Cir. 2021) …………………..… 5, 18, 22, 30

*United States v. Whiteside*, 207 F. Supp. 3d 311 (S.D.N.Y. 2016) …………..… 6, 10

*United States v. Wilson*, 992 F.2d 156 (8th Cir. 1993) …………………………… 10

**State Cases**

*People v. Gardner*, 144 N.Y. 119 (1894) ………………………………………………… 9

## SENTENCING MEMORANDUM

Mr. CHRISTOPHER HOWARD respectfully submits the following sentencing memorandum:

## I.  Sentencing Guidelines

As a preliminary matter, it is critical to note that the Pre-Sentence Report (PSR)'s Guidelines applications resulted in a bizarre outcome far exceeding relevant statutory maximum sentences. Based upon a total offense level of 38 and a criminal history category of I, the Probation calculated that Mr. Howard's guideline range is 235 - 293 months on Counts 1 and 6, more than the twenty-year statutory maximums thereunder (*see* 18 U.S.C. § 1962, 1959), followed by a consecutive ten-year's imprisonment on Count 12. PSR ¶ 152. The Probation eventually had to rectify such an unjust sentencing by taking it down to 80 months with a variance on Counts 1 and 6, and recommended a total sentence of 200 months. The extent of the Probation's variance on Counts 1 and 6 is thus 34.0% of the floor (80/235 x 100% = 34.0%), 27.3% of the ceiling (80/293 x 100% = 27.3%), or 30.3% of the middle (80/264 x 100% = 30.3%).

Mr. Howard objects to the Probation's Sentencing Guidelines application and calculation as contained in Paragraphs 64 through 90, for reasons and authorities demonstrated herein below.

      i.   The attempted murder guideline USSG § 2A2.1 should not apply

Mr. Howard objects to the Probation's application of the attempted murder guideline USSG § 2A2.1 to Counts 1 and 6 and the Guidelines computation thereunder. PSR, ¶¶ 64-90.

In order to apply the attempted murder guideline USSG § 2A2.1, a sentencing court must first find, at least by a preponderance of evidence, that the defendant possessed a specific intent to kill. This is so because "specific intent to kill" is an essential element of attempted murder. "Although a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." *Braxton v. United States*, 500 U.S. 344, 351 n. * (1991). *See also United States v. Kwong*, 14 F.3d 189, 194 (2nd Cir. 1994) (requiring specific intent to kill to convict for attempted murder). In *United States v. Stroman*, 420 Fed.App'x. 100 (2nd Cir. 2011), the Second Circuit found the district court's application of base offense level for second-degree murder in sentencing the defendant for being a felon in possession of a ammunition was clear error, absent finding of specific intent to commit murder.

Here, USSG § 2A2.1 should not apply because evidence is insufficient to show that Mr. Howard possessed a specific intent to kill. Specifically, when announcing the verdict as to Count 6 of the Superseding Indictment (which was renumbered as Count 2 at trial), the foreperson was asked "did the defendant commit attempted murder, assault with a dangerous weapon, neither, or both?" The foreperson answered: "Assault with a dangerous weapon." App'x Vol. 2, A-599, Trial Tr. 725: 20-23, ECF No. 41, *United States v.*

*White*, 7 F.4th 90 (2nd Cir. 2021)(No. 19-3313). Although the jury found Mr. Howard guilty of Count 1 (the RICO conspiracy), nothing in the record indicates that they found Mr. Howard had a specific intent to kill. *Id.*, Trial Tr. 724:16 - 725:10. Thus, the jury clearly chose to convict Mr. Howard of assault with a dangerous weapon over the charged attempted murder; and by doing so the jury actually acquitted him of the latter.

Under New York Penal Law 120.05 (assault in the second degree), which is listed under Count 6 (*see* Superseding Indict., ECF No. 169 at 14) and which the jury found Mr. Howard committed, the *mens rea* for "assault with a dangerous weapon" is "intent to cause (serious) physical injury to another person," as opposed to specific intent to kill. N.Y. Penal L. § 120.05. "[W]hile district courts may take into account acquitted conduct in calculating a defendant's Guidelines range, they are not required to do so. Rather, district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence." *United States v. Vaughn*, 430 F.3d 518, 527 (2nd Cir. 2005). Indeed, if the sentencing court treats the application of the attempted murder guideline as mandatory, it would be contrary to *United States v. Booker*, 543 U.S. 220 (2005) and violate Mr. Howard's due process right.

Any contention that Mr. Howard's Facebook posts proved his specific intent to kill would be meritless. Following a 2011 altercation where Shadean Samuel broke Mr. Howard's jaw, Mr. Howard discussed retaliating against

5

Samuel in Facebook posts and conversations. However, those posts were dated 2011 and therefore too remote to prove a specific intent to kill in 2014. Moreover, said evidence at most shows an intent to hurt, as opposed to kill, Samuel. While the Government interpreted some languages in those posts to mean kill someone, those words that Mr. Howard made when he was nineteen years old were just billingsgate, not an expression of genuine intent to kill. This holds particularly true when considering that Mr. Howard has no criminal history. PSR, ¶ 93. Rather, he was a good student in school who was bullied and robbed (*see* PSR ¶¶ 100, 128, 129), so he tried to protect himself among the gang culture by using their languages and by appearing to be tough. *See United States v. Whiteside*, 207 F. Supp. 3d 311 (S.D.N.Y. 2016) (Whiteside killed a rival pimp, the court found, for sentencing purposes, that the applicable crime of violence is voluntary manslaughter, despite that Whiteside and the pimp did have a heated exchange over money in which Whiteside said he would kill the pimp; the court interprets that exchange as billingsgate, not an expression of genuine intent to kill.)

Furthermore, at trial the defense introduced an affidavit from Jonathan Jose which stated that Jose has no knowledge or belief that Howard shot anyone; thus contradicting the Government's case in chief. Trial Tr., ECF No. 453 at 178-179. Where, like here, "the evidence appears at least in equipoise, the preponderance standard is not met." *United States v. England*, 555 F.3d 616

(7th Cir. 2009)(preponderance of the evidence did not support district court's belief that defendant was akin to an attempted murderer.)

    ii.  <u>Appropriate Guidelines Calculation without Application of § 2A2.1</u>

Thus, rejecting the erroneous application of §2A2.1, USSG § 2E1.1 applies to Count 1, and USSG § 2E1.3 applies to Count 6.

Under Count 1, according to § 2E1.1 the Base Offense Level should be the greater of level 19 or the offense level applicable to the underlying racketeering activity. USSG § 2E1.1. Although Application Note 1 to § 2E1.1 provides that each underlying offense is treated as if contained in a separate count of conviction for the purposes of determining the offense level, here the attempted murder guideline is no longer a valid option as demonstrated herein above. Thus, Mr. Howard's base offense level under Count 1 should be 19. USSG § 2E1.1(a)(1).

Moreover, since Mr. Howard played only a minor, if not minimal, role in the entire RICO conspiracy, a decrease of at least two levels should apply under USSG § 3B1.2. *See United States v. Ivezaj*, 568 F.3d 88 (2nd Cir. 2009)(a defendant's role adjustment is to be made on the basis of the defendant's role in the overall RICO enterprise).

As such, Mr. Howard's total offense level under Count 1 should be 17.

Under Count 6, according to § 2E1.1 the Base Offense Level should be the greater of 12 or the offense level applicable to the underlying crime or racketeering activity. The underlying crime, New York offense of assault in the

second degree, triggers USSG § 2A2.2. Pursuant to § 2A2.2, Mr. Howard's base offense level under Count 6 is 14, increased by 5 levels for discharging a firearm and another 5 levels for the victims' serious bodily injury, resulting in a total offense level of 24.

Pursuant to the grouping rules set forth in USSG § 3D1.4, Count 6 should be assigned 1 unit as the Group with the highest offense level, and Count 1 should be assigned 0.5 unit as it is 7 levels less serious. Thus, the total 1.5 unit results in an increase of one offense level, rendering a total offense level of 25.

As such, based upon a total offense level of 25 and a criminal history category of I, the guideline imprisonment range on Counts 1 and 6 should be 57 - 71 months, not 235 - 293 months. Applying the same extent of variance as the Probation did (30.3% of the middle), Mr. Howard's guideline range on Counts 1 and 6 should be **19 months**.

iii. <u>At the very least, the attempted murder guideline § 2A2.1 should not apply as to the two victims other than Samuel.</u>

Should this Court find that the attempted murder guideline § 2A2.1 somehow applies, Mr. Howard submits that in no way could it apply as to the two victims other than Samuel because nothing in the record shows he specifically intended to kill them.

Specifically, after the incident Mr. Howard told Raynaldo Melendez that "I wasn't trying to hit somebody else. I was coming for Scraps [referring to

Samuel]." Trial Tr. 159-160, ECF No. 451 at 88-89. In 2014 or 2015, Mr. Howard told a Killbrook member Jose Rodriguez that his "main focus" down-the-block was Samuel. Trial Tr. 504, ECF No. 455 at 16.

Notably, the offense of attempt "depends upon the mind and intent of the wrongdoer, not on the effect or result upon the person sought to be coerced." *People v. Gardner*, 144 N.Y. 119, 124–26 (1894). New York case law is relevant here because the attempted murder was charged under New York law. Thus, what Mr. Howard said after the incident most accurately reflected his state of mind - he only intended to retaliate against Samuel and not any others.

    iv.  <u>The Probation erred in determining the base offense level under § 2A2.1, even assuming *arguendo* that § 2A2.1 somehow applies.</u>

Moreover, even assuming *arguendo* that the attempted murder guideline § 2A2.1 applies as to Samuel, the base offense level should be 27 under § 2A2.1(a)(2), not 33 under § 2A2.1(a)(1) as the Probation erroneously determined. PSR ¶¶ 66, 72, 78. § 2A2.1(a) provides for two different Base Offense Levels:

> (1) 33, if the object of the offense would have constituted first degree murder; or
>
> (2) 27, otherwise.

USSG § 2A2.1(a). Application Note 1 to § 2A2.1 defines "first degree murder" to mean conduct that, if committed within the special maritime and territorial jurisdiction of the United States, would constitute first degree murder under

18 U.S.C. § 1111. USSG § 2A2.1, Application Note 1. And, 18 U.S.C. § 1111

provides that

> Murder is the unlawful killing of a human being with malice
> aforethought. Every murder perpetrated by poison, lying in wait, or any
> other kind of willful, deliberate, malicious, ***and premeditated*** killing; or
> committed in the perpetration of, or attempt to perpetrate, any arson,
> escape, murder, kidnapping, treason, espionage, sabotage, aggravated
> sexual abuse or sexual abuse, child abuse, burglary, or robbery; or
> perpetrated as part of a pattern or practice of assault or torture against a
> child or children; or perpetrated from a premeditated design unlawfully
> and maliciously to effect the death of any human being other than him
> who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

*Id*.

Thus, "in order to prove murder in the first degree [for sentencing

purposes], the government must establish, among other things that the

'defendant acted with premeditation.'" *See United States v. Guerrero*, 52 F.

Supp. 3d 643, 652 (S.D.N.Y. 2014)(offense of intentional murder while engaged

in crack cocaine conspiracy was analogous to second degree murder, rather

than first degree murder or manslaughter, for purpose of determining

applicable sentencing guideline; second degree murder requirement of malice

aforethought was analogous to the "intentionally killed" element of the

offense, which could be satisfied without premeditation or deliberation). *See

also United States v. Wilson*, 992 F.2d 156, 158 (8th Cir. 1993)(§ 2A2.1(a)(1)

requires "proof of premeditation and deliberation"); *United States v. Whiteside*,

207 F. Supp. 3d 311 (S.D.N.Y. 2016)(at the sentencing the Government failed to

show with a preponderance of evidence that the defendant acted with

premeditation, therefore the killing did not constitute first degree murder under 18 USC 1111).

As demonstrated herein above, the evidence in this case is insufficient to show Mr. Howard's "specific intent to kill," let alone "premeditation." Critically in this regard, when the trial judge instructed the jury on the "intent" element of the New York offense of murder, he explicitly stated that "[i]ntent *does not require premeditation,*" thus eliminating any factual finding of premeditation. Trial Tr. 636:16, ECF No. 457 at 27 (emphases added). As a result, in no way could the underlying shooting constitute first degree murder within the meaning of 18 U.S.C. § 1111. Thus, the Probation erred in applying a base offense level of 33 under § 2A2.1.

v.   The Probation erred in concluding that each of the three victims suffered serious bodily injury.

Furthermore, the Probation also erred in concluding that each of the three victims suffered serious bodily injury and in increasing two levels as to each victim. PSR ¶¶ 67, 73, 79.

USSG § 2A2.1(b)(1) provides that

If (A) the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) the victim sustained serious bodily injury, increase by 2 levels; or (C) the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels.

*Id*. For definition os "serious bodily injury," Application Note 1 to § 2A2.1 refers to Application Note 1 to § 1B1.1, which contains the following definitions:

(B)    "Bodily injury" means any significant injury; e.g., an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought.

(M)    "Serious bodily injury" means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation.

USSG § 1B1.1, Application Note 1.

Here, a careful review of the records in this case reveals that at least one victim did not suffer serious bodily injury. Specifically, Jonathan Perez's medical records showed as follows:

Reason for Consult, GSW right thigh.

. . .

This is a 29 Y/O man who initially presented with suspected GSW to right inner thigh. However, *wound was punctate, less than 1 cm. Did not appear consistent with GSW.* No scrotal pain. Pulses 2 plus B/1; ABI 1 B/1. X-ray of right femur, knee, and also pelvis unremarkable. No fracture. No bullet fragments appreciated.

Trial Tr. 65-66, ECF No. 449 at 65-66. It is patently obvious that Perez's injury does not constitute a "serious bodily injury," because nothing in his medical records shows extreme physical pain or the protracted impairment of a function of a bodily member. Indeed, the medical professionals concluded that his wound "did not appear consistent with" a gun shot wound. *Id.*

vi. Appropriate Guidelines Calculation with Application of § 2A2.1

In light of the foregoing arguments, should this Court find that § 2A2.1 somehow applies, Mr. Howard's applicable Guidelines range on Counts 1 and 6 should be calculated as follows:

Pursuant to USSG § 2E1.1(a)(2), § 2A2.1 is referenced when determining the offense level only as to one victim, Samuel (Group 1), not all three victims. Under § 2A2.1, the base offense level is 27, because the predicate act cannot constitute first degree murder. A two-level increase applies for Samuel's serious bodily injury. Thus, the total offense level under Count 1 is **29**.

As to Perez (Group 2), pursuant to USSG § 2E1.3, § 2A2.2 is referenced when determining the offense level for the underlying New York offense of assault in the second degree. Under § 2A2.2, Mr. Howard's base offense level is 14, increased by 5 levels for discharging a firearm, resulting in a total offense level of **19**. The Probation erred in applying another five-level increase for serious bodily injury, because Perez's medical records clearly belies such a determination. Nor does Perez's "punctate" wound, which was "less than 1 cm" and "[d]id not appear consistent with GSW" qualify as a bodily injury under the definition of § 1B1.1, because such a wound was not significant.

Similarly, as to Dykes (Group 3), under § 2A2.2 Mr. Howard's base offense level is 14, increased by 5 levels for discharging a firearm and another 5 levels for serious bodily injury, resulting in a total offense level of **24**.

Pursuant to the grouping rules set forth in USSG § 3D1.4, Group 1 should be assigned 1 unit; Group 2 should be disregarded because it is 10 levels less serious than Group 1; and, Group 3 should be assigned 0.5 unit because it is is 5 levels less serious than Group 1. Thus, the total units are 1.5,

resulting in an increase of 1 offense level. Consequently, the total offense level after grouping is **30**.

Based on a total offense level of 30 and a criminal history category of I, the guideline imprisonment range is 97 - 121 months, not 235 - 293 months. Applying the same extent of variance as the Probation did (30.3% of the middle), Mr. Howard's guidelines range on Counts 1 and 6 should be **33 months**.

## II. Mr. Howard should not be sentenced under Count 12 because his conviction thereunder is void.

Mr. Howard submits that no sentence should be imposed under Count 12 because his conviction thereunder is void. In this regard, federal courts have long recognized circumstances where, like here, "the sentencing error (imposing a sentence beyond the prescribed statutory maximum) is inextricably intertwined with a trial error (failing to submit an element of the offense to the jury)." *United States v. Vazquez*, 271 F.3d 93, 101 (3d Cir. 2001).

Notably, Mr. Howard is not repeating his previous argument at appeal which has already been rejected by the Second Circuit. Rather, Mr. Howard submits that his conviction under Count 12 is void on a completely new and different ground, to wit: as to Count 12, the trial court only instructed the jury under the "residual clause" of 18 U.S.C. § 924(c) which was later declared unconstitutional by the Supreme Court in *United States v. Davis*, 139 S. Ct. 2319

(2019), thus eliminating any possibility for the jury to convict him under the remaining "elements clause."

Specifically, 18 U.S.C. § 924(c) criminalizes the use or carrying of a firearm in furtherance of a crime of violence or drug trafficking crime. "Crime of violence" is defined as a felony offense that either

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3). § 924(c)(3)(A) is usually referred to as the "elements clause," while § 924(c)(3)(B) is referred to as the "residual clause."

At Mr. Howard's trial, the court instructed the jury that the firearm offense, which was numbered as Count 12 in the Superseding Indictment and renumbered at trial as Count 3, has an essential element that "the defendant used or carried a firearm during and in relation to a crime or crimes of violence, or possessed the firearm in furtherance of such a crime." Trial Tr. at 648-649, ECF No. 457 at 39-40. Then, the court further explained this element to the jury as follows:

> The second element that the government must prove beyond a reasonable doubt with respect to Count Three is that the defendant, or someone he aided and abetted, either used or carried a firearm during and in relation to a crime of violence, or possessed a firearm in furtherance of such a crime. ***An offense qualifies as a crime of violence if you find that the offense, as committed, involved a substantial risk that physical force might be used against the person or property of another.*** To prove Count Three, the government must have established that Counts One, Two, or both qualify as a crime of violence.

Trial Tr. at 652, ECF No. 457 at 43 (emphases added).

It is critical to note that, when defining the term "crime of violence," the court only instructed the jury under the 18 U.S.C. § 924(c)(3)(B) (the residual clause), without mentioning § 924(c)(3)(A) (the elements clause). By doing so, the court only presented to the jury the elements of the firearm offense under the residual clause, and thus precluded the jury from any possibility of convicting Mr. Howard under the elements clause. As a result, any guilty verdict that the jury reached against Mr. Howard under the firearm offense could only possibly be based on the theory under the residual clause.

The governing effect of the court's jury charge is evidenced by the court's repeated instructions that the jury must follow the law as he has described or defined:

> . . . if the government has established elements of Count Three *as I have just described*, you will be asked to indicate on the verdict form whether you unanimously find that the defendant was guilty of the firearm offense . . .
> . . .
> You have to accept the law *as I've stated it to you*.
> . . .
> If the government has proven all the elements of its case *as I've defined* them for you beyond a reasonable doubt, then the guilt of the defendant can be established.
> . . .
> [The verdict] has to be unanimous as to whether or not the government has met its burden of establishing each element *as I've described* the elements, and the burden of proof.

Trial Tr. at 654, 659, 669, 676, ECF No. 457 at 45, 50, 60, 67 (emphases added).

On June 24, 2019, more than three months after the conclusion of Mr. Howard's jury trial, the Supreme Court in *United States v. Davis*, 139 S. Ct. 2319 (2019) found that the residual clause, 18 U.S.C. § 924(c)(3)(B), which triggers enhanced penalties for using a firearm during a "crime of violence," is unconstitutionally vague. *Davis*, 139 S. Ct. at 2319. The Supreme Court rejected the Government's position that § 924(c)(3)(B)'s residual clause could be saved from unconstitutionality if read to encompass a conduct-specific, rather than a categorical, approach. *See id.*, 139 S. Ct. at 2325 & n.2, 2332-33. The categorical approach requires judges to disregard how the defendant actually committed the crime and instead to "imagine the idealized ordinary case of the defendant's crime and then guess whether a serious potential risk of physical injury to another would attend its commission." *Id*. at 2326. As a result, the only way a crime can qualify as a "crime of violence" for purposes of 18 U.S.C. § 924(c) is under the elements clause 18 U.S.C. 924(c)(3)(A).

Courts in this Circuit have applied *Davis* to render post-conviction reliefs for § 924(c) violations that occurred prior to *Davis*. In *United States v. Heyward*, 3 F.4th 75 (2nd Cir. 2021), Heyward was convicted of a RICO conspiracy, a drug conspiracy, and a firearm offense in violation of 18 U.S.C. § 924(c) predicated on either conspiracy following a jury trial in 2016. He appealed post-*Davis*. The Second Circuit vacated Heyward's conviction under 18 U.S.C. § 924(c). *See also United States v. Biba*, 788 F. App'x 70 (2nd Cir. 2019)

(vacating a section 924(c) conviction predicated on both conspiracy to commit

Hobbs Act robbery and attempted Hobbs Act robbery in light of *Davis*).

Here, it is patently clear that "letting [the] guilty verdict stand would

be a manifest injustice," *United States v. Alston*, 899 F.3d 135, 146 (2nd Cir.

2018), because the guilty verdict under the firearm offense was based on an

invalid statute which was declared unconstitutionally vague by the Supreme

Court. This holds true even when considering that at appeal in this case the

Second Circuit addressed and rejected certain *Davis* issues presented by the

Government. In this regard, the Second Circuit wrote that

> [i]n light of *Davis*, the government does not here contend that Count
> One is a valid predicate crime of violence to sustain a conviction under
> 18 U.S.C. § 924(c). But, post-*Davis*, the VICAR offense in Count Six
> remains a valid predicate crime of violence ***as defined under the
> elements clause***. It is premised on the New York offense of assault in the
> second degree, which ***categorically*** "has as an element the use,
> attempted use, or threatened use of physical force against the person or
> property of another." Accordingly, in view of our holding today that the
> evidence was sufficient to sustain the conviction on Count Six, the
> conviction on Count Twelve also should stand.

*United States v. White*, 7 F.4th 90, 104 (2nd Cir. 2021)(emphases added, internal

cites omitted). However, the Second Circuit did not contemplate the particular

and unusual circumstances surrounding Mr. Howard's *Davis* argument as

presented in the instant motion.

Specifically, the plain language of the appellate opinion makes it clear

that the Second Circuit, when reinstating Mr. Howard's guilty verdict for the

firearm offense, completely relied on the concept of "crime of violence" "***as***

*defined under the elements clause*." *Id.* (emphasis added.) However, since the trial court only defined the term "crime of violence" under the void residual clause and simply omitted the elements clause, in no way could the jury convict Mr. Howard under the elements clause. Rather, as instructed, the jury could only have possibly found Mr. Howard guilty of the firearm offense predicated on a "crime of violence" which only fell within the definition provided in the void residual clause. Consequently, it is impossible for the conviction on Count 12 to stand as the appellate court reasoned, because the trial court's jury instruction eliminated any possibility for the jury to find a "crime of violence" under the elements clause. This holds true regardless of whether the offenses charged in Count 1 and/or Count 6 qualify as valid predicate crimes of violence as defined under the elements clause.

Moreover, the trial court also erred in instructing the jury to find an offense constitutes a "crime of violence" under the residual clause "*as committed*." Trial Tr. at 652, ECF No. 457 at 43 (emphasis added). By using the term "as committed," such instructions were clearly contrary to the *Davis* Court's teaching of applying a categorical approach, as opposed to a conduct-specific approach, thus adding another error on top of the court's failure to instruct on the elements clause.

As such, Mr. Howard's conviction under Count 12, and any sentence imposed under Count 12, would be void in violation of his Fifth Amendment right to Due Process.

19

### III. 18 U.S.C. § 3553(a)

The Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)," which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2). In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)–(7).

Here, Mr. Howard submits that the following mitigating factors are highly relevant to the purposes of sentencing, but none of which is taken into account by the guideline range.

### A. Just Punishment in Light of the Seriousness of the Offense

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements: the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in

particular, his degree of intent (*mens rea*), motives, role in the offense, and mental illness or other diminished capacity." Richard S. Frase, E*xcessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005).

Here, the PSR concluded that the applicable Guidelines range is an imprisonment of 235-293 months, which exceeds the statutory maximum of 20 years. The sentence include none of the factors bearing on Mr. Howard's degree of culpability, as specifically demonstrated as follows:

Racketeering conspiracy is undoubtedly a serious offense, and Mr. Howard accepts responsibility for the poor decisions he made to become involved in gang activity. However, Mr. Howard's convictions must be carefully viewed in the context of the community gang and gun problems, of which he is a victim himself.

Mr. Howard grew up in the Mott Haven neighborhood of the Bronx, one of the poorest in NYC with a poverty rate of 43% which is more than three times the national average. *See* NYC HEALTH, *Community Health Profiles 2015, Bronx Community District 1: Mott Haven and Melrose*, https://www1.nyc.gov/ assets/doh/downloads/pdf/data/2015chp-bx1.pdf (2015)(last visited January 16, 2022). The incarceration rate in the area is almost twice the overall rate in the Bronx and more than three times the citywide rate. *Id*. The community's serious crime rate was 25.0 serious crimes per 1,000 residents in 2020. *See* NYU Furman Center, *Mott Haven/Melrose BX01*, https://

furmancenter.org/neighborhoods/view/mott-haven-melrose (last visited

January 16, 2022).

Growing up in this environment had become a daily exercise in survival

for Mr. Howard. As the PSR recognized, there were always several fights in

Mr. Howard's school every day, and Mr. Howard was robbed of his ID and

money on streets at multiple occasions. PSR, ¶¶ 128, 129. Due to the constant

bullying at school, Mr. Howard was moved between schools multiple times.

PSR, ¶¶ 124-129; Sentencing Submission, ECF No. 648 at Ex. B. And, Mr.

Howard began to friend individuals who were affiliated with local gangs for

acceptance and protection. Mr. Howard did not choose to join the gang.

Instead, people in the neighborhood were forced to pick the side that

corresponded to their residence: buildings eight, nine, and ten within the Mill

Brook, the "up-the-block" section, were MBG's territory; buildings one

through six, the "down-the-block" section, were Killbrook's territory. *United

States v. White*, 7 F.4th 90 (2nd Cir. 2021). When Mr. Howard was 16 years old,

he was shot twice and when he was 17 years old, he was shot once; he was

caught in shootout all three occasions. PSR, ¶ 107.

At trial, the Government's witnesses testified that in 2009 member of

"Killbrook" robbed Mr. Howard of his property by threatening to cut his face

with a razor. To add further humiliation to this episode, the individuals filmed

a video of them burning Mr. Howard's clothing and posted it on social media

for the entire neighborhood to observe. Trial Tr. 499:8–500:4; 501:20–502:9, ECF

No. 455 at 11-14. In a fight in 2011 Samuel broke Mr. Howard's jaw because Samuel "was trying to get in good with [Killbrook]." Trial Tr. 504-505, ECF No. 455 at 16-17. Thus, Mr. Howard committed the charged offenses against Samuel for retaliation, as that was what he had to do in a world flood with violence. It is important to note that, as the Government's witnesses testified, in all the years they were involved with MBG they never observed Mr. Howard engaging in drug dealing. Trial Tr. 431:4 - 432:9, ECF No. 453 at 143-144.

As such, community gang problem is a heavy topic, and its solution requires the entire society to put in systematic efforts. Indeed, it is criticized that RICO's application demonstrates systemic racial bias, where a strong majority (approximately 86%) of the prosecutions involved gangs that were affiliated with at least one racial minority group, and a similarly strong majority (approximately 83%) of prosecutions involved individuals who were allegedly in racial-minority gangs. Jordan B. Woods, *Systemic Racial Bias and RICO's Application to Criminal Street and Prison Gangs*, 17 MICH. J. RACE & L. 303 (2012). Thus, simply imposing severe punishment on a young man like Mr. Howard, who is a victim of the community gang problem himself, does not help improve this complicated social issue.

### B. History and Characteristics of the Defendant

Mr. Howard experienced a difficult childhood while residing in the Bronx, New York. PSR, ¶ 99. His father abused crack cocaine and was

physically abusive towards Howard and his mother. *Id*. His mother wore sunglasses in order to hide the bruises on her face. *Id*. When young Mr. Howard attempted to intervene, he was beaten and choked by his father. *Id*. During another altercation, his father cut Mr. Howard's long braided hair with a pair of scissors. *Id*. When Mr. Howard was approximately 13 years old, his father left the residence, returned later, and left again. *Id*. Mr. Howard lived with his mother and siblings for approximately ten years. PSR, ¶ 103.

Despite his familial ordeal, Mr. Howard earned good school grades and did well in school. PSR, ¶¶ 100, 105. He enjoyed playing basketball in high school and in tournaments sponsored by several NBA basketball players in the Bronx, New York. *PSR,* ¶ 100. His grandmother, Gail Halliday, characterized him as a wonderful kid who is highly intelligent, ambitious, and a homebody. PSR, ¶ 104. Mr. Howard's mother characterized him as being smart, efficient, hardworking, and well-mannered. PSR, ¶ 105. However, because of the abuse at home and the bullying in school, Mr. Howard had to transfer between schools for more than one time. PSR, ¶¶ 125-129. He eventually graduated from the Phillips Global Institute High School, Jersey City, New Jersey, on June 30, 2017 while on pretrial release. PSR, ¶ 124.

Mr. Howard is ready to become a productive member of society. He obtained his security guard license from the State of New York, Division of Licensing Services, his Fire Guard License from the New York City Fire Department, his FO2 license in 2015 from Metro Tech, Brooklyn, New York,

and his CPR and AED certifications from Cambridge Security, New York. PSR, ¶¶ 130-135. Moreover, he completed the City of New York 40-hour Pre-Deployment Training, completed another eight-hour annual in-service training course for security guards, the alternative to drug dealing program, and a parenting class. *Id*.

Mr. Howard has an extensive employment history. From June 2018 and until his remand in 2019, Mr. Howard was employed as a security guard /fire inspector at Allied Universal FJC/DCAS, New York, New York. PSR, ¶ 137. His supervisor had planned to promote him to a supervisory position; however, because of his remand, he lost this employment. *Id*. For a few months in 2017, Mr. Howard was employed as a maintenance worker at Alliance Building Services, New York. PSR, ¶ 138. From June 1, 2017 to August 18, 2017, Mr. Howard was employed as an unarmed security guard at Metro One, New York. PSR, ¶ 139. From 2015 to 2016, he was employed as a security guard at Securitas Security USA, New York. PSR, ¶ 140. From 2014 to 2015, he was employed as a maintenance worker at Handybook Cleaning Company, New York, and a front desk clerk/clean team member at New York Sports Club, New York. PSR, ¶¶ 141, 142. From 2011 to 2012, Mr. Howard was employed as an inventory clerk at WIS International, Staten Island, New York. PSR, ¶ 144. In the summer months of 2007 to 2009, he was employed at St. Mary's Recreation Center and St. Luke's Church, Bronx, New York, through a

summer youth program. PSR, ¶ 145. One of Mr. Howard's aunts works in marketing and is willing to hire him. PSR, ¶ 104.

Mr. Howard is still in his young adulthood at the age of twenty-two. He has a three-year-old child, Sahyra Howard, with his girlfriend, Ciara Brown. PSR, ¶ 102. His family members remain emotionally supportive after learning about the instant criminal matter, and believe that Mr. Howard has the potential to "be great." PSR, ¶¶ 98, 102, 104.

### C. Need for Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

Here, Mr. Howard lived a law-abiding life until the instant offenses occurred. PSR, ¶¶ 91-92. His total criminal history score is zero. *Id*., ¶ 93. He was a student with good grades and characterized as a wonderful kid who is highly intelligent, ambitious, and a homebody. *Id*., ¶ 100, 104. He did not engage in criminal conduct before. His offense is completely uncharacteristic when viewed in the context of his entire juvenile and adult life. The aberrant nature of his conduct is certainly a mitigating factor under Section 3553. *See United States v. Payne,* 591 F.3d 46, 64 (2d Cir.2010) (the pattern element serves to prevent application of the racketeering statute to "perpetrators of isolated

or sporadic criminal acts.") It also suggests that the severe punishment as suggested in the PSR would not yield significant deterrent effects.

### D. Need to Protect the Public

Offenders like Mr. Howard with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, *Recidivism and the "First Offender,"* at 13-14 (May 2004), available at https://www.ussc.gov/research/research-publications/recidivism-and-first-offender. Moreover, the Sentencing Commission's studies concluded that the Guidelines overstate the risk of recidivism and that, on the contrary, "there is no correlation between recidivism and [a] guidelines' offense level." *Id*. at 15. Here, Mr. Howard possesses qualities which make him unlikely to recidivate, including the support of his family and his extensive work history, as well as his success as a security guard while on pretrial release in this case.

### E. Needed Medical Treatment in the Most Effective Manner

The sentence imposed must ensure that "needed . . . medical care" is provided "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The Commission recognizes that "[p]hysical condition . . . may be relevant in determining whether a departure is warranted." USSG § 5H1.4.

Mr. Howard was diagnosed with vertigo and anxiety in or about 2018 and was prescribed Lexapro 5mg and meclizine 12.5mg. PSR, ¶ 108. He experiences shortages of breath, fatigue, dizziness, and "feels like he is always moving." *Id*. Since his incarceration, his symptoms have worsened. *Id.* Mr.

Howard was further diagnosed with orthostatic tremor, which is "a rare movement disorder characterized by a rapid tremor in the legs that occurs when standing" and "a constant problem that can affect the quality of life of affected individuals." PSR, ¶ 110. Mr. Howard's tremors become more severe over time. PSR, ¶¶ 110, 112.

Mr. Howard was also diagnosed with depression, anxiety disorder and normocytic anemia, seasonal allergies, penile lesion. PSR, ¶ 111. He was referred to participate in individual counseling once per week. PSR, ¶ 115.

Unfortunately, the medical treatment that Mr. Howard received in custody was frustrating. While incarcerated at the MDC, Howard reported that he has met with a psychiatrist on at least three occasions; however, the psychiatrist believes his condition to be a "severe medical condition;" therefore, he is always referred to the medical doctor. The defendant further indicated that when he meets with the medical doctor, he is told that his condition "is a psychiatrist matter" and is therefore referred to the psychiatrist. PSR, ¶ 113.

In addition, Mr. Howard has a prior substance abuse history consisting of alcohol, marijuana, and ecstasy, starting when he was approximately 14 years old. PSR, ¶¶ 116, 117.

Considering Mr. Howard's health conditions, the long prison term suggested in the PSR certainly does not help him to receive medical care in the most effective manner.

**F. Need to Avoid Unwarranted Sentencing Disparities**

Most of the co-conspirators in this case received a sentence much lighter than the 200 months recommended by the Probation. Specifically,

- Miguel Calderon was sentenced to 60 months' imprisonment and

- 3 years' supervised release on an firearm offense;

- Anthony Bush was sentenced to 5 years' imprisonment with credit for time served followed by 4 years' supervised release for racketeering conspiracy and drug conspiracy;

- Oscar Briones was sentenced to 5 years' imprisonment with credit for time served followed by 2 years' supervised release on a firearm offense;

- James Snipes was sentenced to 2 years' imprisonment with credit for time served followed by 3 years' supervised release for racketeering conspiracy;

- Wesley Monge was sentenced to 5 years' imprisonment with credit for time served followed by 2 years' supervised release on a firearm offense;

- Christian Perez was sentenced to 97 months' imprisonment followed by 3 years' supervised release for racketeering conspiracy;

- James Robinson was sentenced to 5 years' imprisonment with credit for time served followed by 4 years' supervised release for drug conspiracy;

- Demetrius Wingo was sentenced to 2 years' imprisonment with credit for time served followed by 3 years' supervised release for racketeering conspiracy and drug conspiracy;

- Roy Robinson was sentenced for drug conspiracy to Time Served to run concurrently with any state sentence imposed for pending New York State case;

- David Oquendo was sentenced to Time Served (980 days) followed by 3 years' supervised release for attempted murder and assault with a dangerous weapon in aid of racketeering; and,

- Joey Colon, "one of MBG's leaders" (*see United States v. White*, 7 F.4th 90, 95 (2nd Cir. 2021)), was sentenced to 915 days' imprisonment, followed by 5 years' supervised release for racketeering conspiracy, drug conspiracy and firearm offense.

As such, a sentence of 200 months as recommended by the Probation would create significant, unwarranted disparities among co-defendants in this case and unfair prejudice to Mr. Howard.

## III. Supporting Letters

Mr. Howard respectfully submits the attached letters in support of leniency at his sentencing. *See* Exhibit A, Supporting Letters.

## IV. Conclusion

Based on the foregoing, Mr. Howard respectfully presents the foregoing sentencing memorandum for this Court's consideration.

Date:  January 18, 2022

Respectfully Submitted,

*s/ Murdoch Walker II, Esq.*

30

Murdoch Walker, II. Esq.
Ga. Bar No. 163417
mwalker@lowtherwalker.com

***s/ Katryna Lyn Spearman, Esq.***
Katryna Lyn Spearman, Esq.
Ga. Bar # 616038
kspearman@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St., NW, Ste. 3325
Atlanta, GA 30303
404.496.4052
www.lowtherwalker.com

Attorneys for Christopher Howard

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**FOLEY SQUARE DIVISION**

— — — — — — — — — — — — — — — — — x
UNITED STATES OF AMERICA              :
                                                      :      1:17-CR-00611-AT-8
          v.                                          :
                                                      :
CHRISTOPHER HOWARD                  :
— — — — — — — — — — — — — — — — — x

## CERTIFICATE OF SERVICE

I certify that on January 17, 2022, I electronically filed the foregoing

SENTENCING MEMORANDUM with the Clerk of the United States District

Court for the Southern District of New York by way of the CM/ECF system,

which automatically will serve this document on the attorneys of record for

the parties in this case by electronic mail.

Date:  January 18, 2022

Respectfully Submitted,

***s/ Murdoch Walker II, Esq.***
Murdoch Walker, II. Esq.
Ga. Bar No. 163417
  mwalker@lowtherwalker.com

Lowther | Walker LLC
101 Marietta St., NW, Ste. 3325
Atlanta, GA 30303
404.496.4052
www.lowtherwalker.com

Attorney for Christopher Howard