USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________________
DATE FILED: 9/10/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

–against–

CHRISTOPHER HOWARD, a/k/a "JuJu,"

Defendant.

17 Cr. 611-8 (AT)

**ORDER**

ANALISA TORRES, United States District Judge:

Defendant, Christopher Howard, moves for a reduction of his term of imprisonment under 18 U.S.C. § 3582(c)(1)(A). *See* Mot., ECF No. 947; Reply, ECF No. 994; Def. Supp., ECF No. 995; *see also* Opp., ECF No. 958.[1] Howard is serving a sentence of ten years and one day for racketeering conspiracy, committing a violent crime in aid of racketeering, and using a firearm in furtherance of those offenses. 2023 Judgment at 1–2, ECF No. 872. Howard has served about seven years of his sentence, and the BOP projects an October 7, 2029 release date. Opp. at 3. For the reasons stated below, Howard's motion is GRANTED.

**BACKGROUND**

Howard grew up in the Mill Brook Houses, a public housing development in the South Bronx. *See* Def. Sent'g Mem. at 4–5, ECF No. 648. His grandmother, Gail Halliday, describes him as a quiet and shy child who preferred playing games at home rather than being out on the streets. Def. Sent'g Mem. Exs. at 2, ECF No. 648-1.[2] He performed well in school and once spent an entire weekend at her home preparing a sixth-grade paper on the Civil Rights Movement. *Id.* He also hoped to play basketball in college. *Id.* at 3.

[1] Howard's initial motion was filed *pro se*. Before Howard's reply brief was due, the Court appointed Megan Benett to represent Howard under the Criminal Justice Act. *See* ECF No. 959.
[2] Because all exhibits to Howard's sentencing memorandum were submitted in one document at ECF No. 648-1, the Court uses the pagination of the PDF to refer to specific exhibits in Howard's submission.

During Howard's childhood, he witnessed and suffered abuse and violence. *See* Def. Sent. Mem. at 2–3. His father beat and choked his mother and, on one occasion, attempted to throw her down their building's incinerator. *Id.* His father also beat and choked Howard and once, when Howard was fourteen, chased him with a knife. *Id.* Halliday's home became Howard's place of safety where he was able to enjoy her cooking and play with the family dog. *Id.* at 3.

Outside the home, Howard was bullied and assaulted. He transferred from school to school, including for safety reasons, spent about one month in a group home, and was shot three times, twice at age sixteen and once at age seventeen. *Id.* at 5–6. Seeking protection, Howard began associating with members of the Money Bitches Guns ("MBG") gang based in the Mill Brook Houses. *Id.* at 6; Presentence Investigation Report ("PSR") ¶¶ 36, 49, ECF No. 762.

MBG had a longstanding rivalry with Killbrook, a gang based in another section of the Mill Brook Houses. PSR ¶ 36. In 2011, Howard fought with Killbrook member Shadean Samuel, who broke Howard's jaw. *Id.* ¶ 49. On August 17, 2014, Howard and another MBG member approached Samuel and two other Killbrook members; Howard fired several rounds, striking all three. *Id.* ¶¶ 49–52.

Following this incident, Howard was charged with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); committing a violent crime in aid of racketeering ("VICAR"), in violation of 18 U.S.C. §§ 1959(a)(3), 1959(a)(5), and 2 (Count Six); and using a firearm in furtherance of the racketeering conspiracy and VICAR, in violation of 18 U.S.C. §§ 924(c) and 2 (Count Twelve). *See* S2 Superseding Indictment, ECF No. 169; PSR ¶¶ 1–2, 7, 13. The charged racketeering conspiracy began when Howard was fourteen, and he was only twenty-two when he shot the Killbrook members in August 2014. Reply at 8. Howard had no

prior convictions. *See* Def. Resent. Mem. at 26, ECF No. 789.

On March 6, 2019, a jury found Howard guilty on all three counts. PSR ¶ 15. On November 4, 2019, the Court granted Howard's motion for a judgment of acquittal on Counts Six and Twelve, concluding that the evidence did not establish that Howard committed the shooting to maintain or increase his position in MBG. *See* Order, ECF No. 608. On June 11, 2020, the Court sentenced Howard to twenty-four months' imprisonment on Count One. *See* 2020 Judgment, ECF No. 668. The Government appealed, and Howard cross-appealed. On August 3, 2021, the Second Circuit reinstated the jury's verdict on Counts Six and Twelve and remanded for resentencing. *See United States v. White*, 7 F.4th 90, 101–04 (2d Cir. 2021).

On March 28, 2023, the Court resentenced Howard. *See* 2023 Sent. Tr., ECF No. 877. The Court calculated a Guidelines range of fifty-seven to seventy-one months' imprisonment on Counts One and Six, followed by a mandatory, consecutive term of 120 months' imprisonment on Count Twelve. *Id.* at 24:25–25:3. The Court imposed a below-Guidelines sentence of 120 months and one day. 2023 Judgment at 2. In doing so, the Court explained:

> On the one hand, this was a serious crime. Mr. Howard committed himself to advancing the aims of a racketeering enterprise that dealt drugs and committed frequent acts of violence over a period of years, and on August 17th, 2014, Mr. Howard approached three members of a rival gang and fired several shots, hitting all three of them. On the other hand, Mr. Howard's role in the conspiracy was a minor one. He did not engage in drug dealing and outside of a single incident, he did not make a habit of attacking rival gang members or members of the public.
>
> 2023 Sent. Tr. at 26:3–12.

Howard has now served about eighty-three months of his sentence. He is incarcerated at FCI Berlin. On March 11, 2025, Howard requested a sentence reduction from the warden of FCI Berlin. Mot. at 52–70. The warden denied the request the next day. *Id.* at 50–51. Howard then filed this motion. The government concedes that Howard has satisfied § 3582(c)(1)(A)'s

exhaustion requirement. Opp. at 3.

## DISCUSSION

### I. Compassionate Release Standard

Under 18 U.S.C. § 3582(c)(1)(A), a defendant may move for a reduction of sentence once he exhausts his administrative remedies by first requesting a reduction from the BOP. *See United States v. Saladino*, 7 F.4th 120, 121–23 (2d Cir. 2021) (per curiam); 18 U.S.C. § 3582(c)(1)(A). A court may grant a defendant's motion if, after reviewing the factors set forth in 18 U.S.C. § 3553(a) to the extent applicable, it concludes that "extraordinary and compelling reasons" warrant a reduction. *See United States v. Keitt*, 21 F.4th 67, 71 (2d Cir. 2021) (per curiam).

Although a court is free to "consider the full slate of extraordinary and compelling reasons that an imprisoned person" might argue warrant a reduction in sentence, *United States v. Brooker*, 976 F.3d 228, 236–37 (2d Cir. 2020); *see also Keitt*, 21 F.4th at 71 n.2, § 1B1.13(b) of the United States Sentencing Guidelines (the "Guidelines") provides examples of circumstances that can constitute extraordinary and compelling reasons. Rehabilitation by itself is not an extraordinary and compelling reason, but the Court may consider it in combination with other circumstances and in determining the extent of a reduction. *See* Guidelines § 1B1.13(d); 28 U.S.C. § 994(t). A district court may grant a reduction in sentence even where the original sentence was imposed under a statutory mandatory minimum. *See United States v. Halvon*, 26 F.4th 566, 570 (2d Cir. 2022) (per curiam).

### II. Analysis

Howard contends that three circumstances, considered together, establish extraordinary and compelling reasons for a sentence reduction: his grandmother's medical conditions require

daily full-time care; at the time of the offense, he was young and since then, has shown extensive rehabilitation; and his medical conditions have not been adequately treated. The Court finds that Halliday's incapacity and Howard's status as her only available caregiver, in connection with the history and characteristics of Howard's upbringing, the circumstances of his criminal conduct, and his outstanding rehabilitation, justify a sentence reduction. *See* 18 U.S.C. § 3553(a). The Court holds, however, that Howard's medical conditions do not qualify as extraordinary and compelling.

A. Extraordinary and Compelling Reasons

1. Gail Halliday's Incapacitation and Need for Care

Section 1B1.13(b)(3)(D) recognizes an extraordinary and compelling circumstances when an immediate family member, like a grandparent, is incapacitated and the defendant would be the only available caregiver. "When a defendant relies on section [1B1.13(b)(3)]'s sole-caregiver provision, 'courts generally require a showing of evidence from several sources indicating that the defendant is the only available caregiver for a family member in dire conditions.'" *United States v. Young*, No. 24 Cr. 273, 2025 WL 3496277, at *3 (S.D.N.Y. Dec. 5, 2025) (citation omitted). That is the case here.

Halliday is seventy-nine. Her cardiologist, Kiruthika Balasundaram, M.D., reports that Halliday has coronary artery disease that required bypass surgery, rheumatic mitral stenosis that required a bioprosthetic valve, persistent atrial fibrillation, atrial tachycardia, a pacemaker, and a history of cardiac ablations. *See* Mot. Ex. at 8, ECF No. 947-1. Halliday also suffers from long-COVID symptoms and severe pain that prevents her from walking more than half a city block without stopping. *Id.* Balasundaram describes "multiple significant cardiac comorbidities that render her daily activities difficult to perform" and "strongly advocate[s]" for additional

assistance in Halliday's home. She also reports that the presence of a family member "at all times" would help "immensely." *Id.*

Prima Charles, the medical office manager at Castle Hill Medical of New York, a facility where Halliday is treated for osteoarthritis, reports that, during the last two years, Halliday suffered frequent falls. *Id.* at 9. The falls resulted in a torn shoulder and caused a thoracic fracture and facial bruising. *Id*. Halliday also experiences radiculopathy, osteoarthritis, unsteadiness, and post-COVID fatigue. *Id.* Charles states that Halliday requires consistent help with bathing, dressing, preparing meals, managing medication, shopping, and other daily activities. *Id.*

Halliday's own statements provide further insight into her incapacity. She states that she quickly becomes weak and breathless, struggles to put on a coat or enter a bathtub, and cannot reliably cook, clean, do laundry, shop for groceries, retrieve prescriptions, or travel to medical appointments. Reply Ex. A at 2–3, ECF No. 994-1. Severe arthritis has left one knee "bone-on-bone," yet she has postponed recommended knee-replacement surgery because no one is available to care for her during recovery. *Id.* at 3. She may also require gallbladder surgery in the near future. *Id.* She cannot afford a private aide and fears falling where she cannot reach a telephone. *Id.* at 2–3. In her words: "I need help and plead with this Court to understand how restricted I am without it." *Id.* at 3.

The government argues that Halliday is not "completely unable" to care for herself, noting that she has continued to live without Howard's help. Opp. at 5. But § 1B1.13(b)(3)(D) does not require total helplessness. The relevant question is whether Halliday's condition leaves her incapable of adequate self-care without regular assistance. For example, in *United States v. Stokes*, the court found an extraordinary and compelling need for care where the defendant's

mother could barely cook, clean, use stairs, or attend appointments without assistance, and other relatives could not provide daily care because of work, family obligations, and their own health conditions. *See* No. 19 Cr. 307, 2024 WL 216643, at *2–3 (D. Conn. Jan. 19, 2024). And in other cases, courts have emphasized that conditions such as arthritis and forgetfulness may constitute extraordinary and compelling circumstances even when they reflect the effects of ordinary aging. *See, e.g.*, *United States v. Simon*, No. 07 Cr. 474, 2024 WL 3666364, at *5 (S.D.N.Y. Aug. 5, 2024) (rejecting the argument that a family member must be incapacitated "beyond what is to be expected of an adult in her early 80's").

Howard has shown that Halliday requires assistance. Halliday reports that her present arrangement has resulted in her missing important medical appointments, delaying needed surgery, going without meals she cannot prepare, and remaining alone despite her history of falls. *See* Reply Ex. A at 2–3. The Court will not require Howard to demonstrate an immediate medical emergency to recognize Halliday's incapacity.

Howard has presented sufficient evidence that no other relatives are reasonably available to provide the daily, in-home assistance his grandmother needs. Contrary to the Government's suggestion, *see* Opp. at 5, the mere existence of other relatives does not suggest that other available caretakers exist. *See Stokes*, 2024 WL 216643, at *2 ("Although Mr. Stokes and his mother have other family members who live in Connecticut, none are 'available' to serve in a caregiving capacity because of their work and familial obligations, and their own health issues."); *United States v. Snype*, 683 F. Supp. 3d 351, 362 (S.D.N.Y. 2023) (noting that "other family members are unable to help because they have jobs that would interfere with providing full-time care . . . , live in [other states] . . . , have dependents . . . , or need help of their own"). Although Halliday has two daughters, one lives in Philadelphia and the other, Howard's mother,

resides in a different borough of New York. Reply. Ex. A at 2. Furthermore, Howard's mother works full time from 10:00 a.m. to 6:00 p.m. and supports three children—Howard's siblings—who all live with her and attend school. Reply Ex. B at 2, ECF No. 994-2. Howard's mother also has her own physical disabilities, namely knee issues. *Id.* Although Howard's older brother, like Halliday, lives in the Bronx, he works in Connecticut full time and supports five children who live in Brooklyn. Reply. Ex. A at 2. Similarly, Halliday's partner works almost every day from about 6:30 a.m. until 10:00 p.m. *Id.* As a result, Halliday is typically alone for over half of the day, despite her important medical needs, and her documented history of frequent falls and restricted mobility make it clear that she should not be left alone without daily care.

Halliday does not merely prefer Howard's help; she needs in-home care, and the Court finds that no other person is reasonably available to provide it. *See* Mot. Ex. at 3–15; Reply Ex. A; Reply Ex. B. Howard would have lodging in Halliday's building, Mot. Ex. at 3; Reply at 6, and Halliday states that Howard has a track record of being capable of helping her, as he provided care while he was previously released. *See* Reply Ex. A at 3; Reply at 6. In sum, the Court finds that Halliday is incapable of self-care because of her medical conditions and that Howard is her only available caregiver. In combination with the other circumstances present in this case, the Court finds that these circumstances are extraordinary and compelling.

2. Howard's Youth, Upbringing, and Rehabilitation

The Government contends that the Court already considered Howard's childhood and age when it imposed a below-Guidelines sentence. Opp. at 5–7. It did. But Guidelines § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at

sentencing," and Howard also relies on significant evidence of his maturation after resentencing.[3] The charged conspiracy began when Howard was fourteen, and he was twenty-two at the time of the shooting. Def. Reply at 8; Gov't Sent. Mem. at 7, ECF No. 653.

Although Howard was legally an adult when he committed the shooting, his relative youth remains relevant to his culpability and capacity for change. *See Brooker*, 976 F.3d at 238 (noting that "Congress seemingly contemplated that courts might consider such circumstances when it passed the original compassionate release statute"); *United States v. Ramsay*, 538 F. Supp. 3d 407, 417–24 (S.D.N.Y. 2021); *see also United States v. Nunez*, No. 10 Cr. 392-7, 2023 WL 1470502, at *1 (S.D.N.Y. Feb. 2, 2023) (recognizing that at twenty-two years old, "the brain is not fully developed and terrible decisions can result"); *Gall v. United States*, 552 U.S. 38, 58 (2007) (describing studies concluding that "human brain development may not become complete until the age of twenty-five").

Several courts have explained the "penological significance of . . . age at the time of [a defendant's] offenses," including that youthful offenders possess traits like "immaturity, susceptibility, salvageability, and dependence," all of which warrant lesser punishment. *United States v. Chan*, 645 F. Supp. 3d 71, 82 (E.D.N.Y. 2022); *Ramsay*, 538 F. Supp. 3d at 416–17. In this case, Howard's "immaturity in making the unwise choices he did speaks for itself, while his susceptibility to gang [association] . . . is likewise self-evident," particularly given the violence and instability he experienced in his childhood. *Chan*, 645 F. Supp. 3d at 82; *see also Ramsay*, 538 F. Supp. 3d at 422 (explaining that because adolescents "have been dependent on others for most or all of their lives," their "crimes are less a product of their choices and more a product of

[3] Moreover, the Court sentenced Howard based on a mandatory minimum ten-year term of imprisonment on Count Twelve, such that the Court lacked full discretion to factor Howard's age in the sentencing decision. *See* 2023 Sent. Tr. at 8:1–3.

their environment"). Although a difficult childhood does not, by itself, justify a sentence reduction, his upbringing and youth do help explain why he began associating with MBG members for protection, bear on whether the offense describes the person now before the Court, and provide important context for the Court's consideration of evidence of rehabilitation.

That evidence is strong. Howard's track record while incarcerated has been outstanding. Maury Yeakel, Howard's BOP unit manager who has known him since 2023, reports that Howard has shown an "excellent commitment" to programming, completed numerous classes, held various jobs, and "always displayed a professional attitude" toward staff. Reply Ex. C at 2, ECF No. 994-3. Yeakel concludes that Howard "learned from his past" and "will be successful in the community." *Id.* Additionally, despite nearly seven years of incarceration in BOP facilities, including during an extremely difficult period of incarceration at the Metropolitan Detention Center ("MDC") during the COVID-19 crisis, there is no record of Howard receiving any infractions while incarcerated. *See generally* Reply; *see also* Reply Ex. E at 2–4, ECF No. 994-5; Opp. at 6 (conceding that Howard's "behavior in custody has been positive"). Howard has productively worked in food service, completed drug-treatment programming, and prison records document his "[o]verall progress" as "excellent." Reply Ex. E at 2–5, ECF No. 994-5.

Howard has also enrolled in a paralegal certificate program and earned two scores of 90% and two of 100% on four examinations; the two perfect scores each drew the notation, "Excellent work!" Reply Ex. D at 2–5, ECF No. 994-4. Remarkably, in support of his application for a sentence reduction, Howard submitted a thoughtful, well-written, and helpful *pro se* reply brief. *See* Pro Se Reply, ECF No. 998-1. When he is released, Howard states he will continue his courses "to become certified as a paralegal/legal assistant." *Id.* at 41. BOP assesses Howard as low risk for both general and violent recidivism. Reply Ex. G at 2, ECF No. 994-7.

Compliance with prison rules is expected. Howard's record, however, goes beyond mere compliance. He has demonstrated persistent, impressive efforts to better himself while incarcerated and has won praise from the BOP employee who observes him daily. Howard's supplemental letter is consistent with that record: he acknowledges that his upbringing does not excuse his actions and describes his maturation, family responsibilities, and plans to contribute to the community. *See* Supp. Ex. at 2, 7, 10–11, ECF No. 995-1. Courts have credited this type of sustained growth, particularly when prison staff concur that a defendant's efforts at rehabilitation have been impressive. *See United States v. Tavarez*, 747 F. Supp. 3d 557, 564 (E.D.N.Y. 2024); *United States v. Van Putten*, 726 F. Supp. 3d 245, 257–58 (S.D.N.Y. 2024).

In sum, Howard's conduct during two periods of release and his sustained efforts in custody provide extensive and remarkable evidence of rehabilitation, and when considered alongside his youth at the time of the offense and the medical needs of his grandmother, the Court finds that Howard has shown extraordinary and compelling circumstances warranting a sentencing reduction. *See Tavarez*, 747 F. Supp. 3d at 564 ("District courts in this circuit have correspondingly exercised their broad, sound discretion to find that a defendant's strong record of rehabilitation while incarcerated may congeal with other factors to generate an extraordinary and compelling circumstance, even where none of these alone would necessarily justify a reduced sentence." (collecting cases)).

3. Howard's Medical Conditions and Conditions of Confinement

Howard is prediabetic and has suffered from dizziness, vertigo, loss of balance, and anxiety for several years. Reply at 8–9; Reply Ex. F at 2–5, 16, ECF No. 994-6. But his records show continuing evaluation, including with an Ear, Nose, Throat ("ENT") specialist and audiology services, and BOP classifies him as Medical Care Level One. Reply Exs. E–F. The

record does not show that the absence of an identified treatment puts Howard at risk of serious deterioration or death, as contemplated by § 1B1.13(b)(1)(C). The Court, therefore, does not find that Howard's medical conditions independently constitute an extraordinary and compelling basis for a sentence reduction. Howard also points to about fourteen months of unusually restrictive confinement at the MDC given the pandemic. *See* Reply at 9. The Court credits those conditions insofar as they underscore the impressiveness of Howard's rehabilitation and record while incarcerated.

B. Section 3553(a) Factors

The Court must also consider the applicable § 3553(a) factors, including the nature and circumstances of the offenses; Howard's history and characteristics; and the need for the sentence imposed to reflect the seriousness of the offenses, avoid unwarranted disparities among similarly situated defendants, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, and protect the public. *See* 18 U.S.C. § 3553(a).

The Court has considered the gravity of Howard's offense conduct. The Government urges that Howard's sentence should not be reduced because it reflected a substantial downward variance based on his personal circumstances and that, when the Government filed its opposition, he had served "only" sixty-seven months of his over-120-month sentence. Opp. at 6–7. In imposing a 120-month-and-a-day sentence, the Court considered Howard's minor role in the broader conspiracy, the fact that the shooting was his first and only violent offense, and the mandatory minimum controlling the sentence. *See* 2023 Sent'g Tr. at 25:25–26:13; 2023 Judgment at 2. Howard has now served nearly seven years in custody, including during the pandemic. A reduction in sentence to time served does not erase this lengthy punishment or the consequences of Howard's convictions.

Howard's history and characteristics also support a reduction. The Court considers Howard's challenging upbringing and his conduct since then. His record at FCI Berlin reflects continued maturity rather than violence. *See* Reply at 6–8; Reply Exs. C–E, G. This record also addresses deterrence and the protection of the public. Howard has maintained good conduct for nearly seven years and earned a low BOP recidivism assessment. *See* Def. Reply Exs. C–E, G. His term of supervised release will provide monitoring and permit a swift response to any breach of the Court's trust. *See* 2023 Judgment at 3. The Court also finds that further incarceration is not necessary to deter Howard or protect the public. *See also United States v. Lawrence*, 254 F. Supp. 3d 441, 447 (E.D.N.Y. 2017) ("The key to both general and specific deterrence is the known risk of detection and punishment, not the length of the sentence.").

The Court concludes, therefore, that a sentence reduction to time served is sufficient to accomplish the purposes of sentencing.

Finally, to the extent relevant, a sentence reduction is not inconsistent with the Guidelines Policy Statement. Considering the factors in 18 U.S.C. § 3142(g), Howard "is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(a)(2). Howard's offense was violent and dangerous. He approached three people in a residential area and fired several rounds, striking each person and placing bystanders at risk. *See* PSR ¶¶ 49–52; 2023 Sent. Tr. at 26:3–8. That conduct weighs heavily in the Court's assessment. The relevant question, however, is Howard's present danger. Howard had no prior convictions. Def. Resent. Mem. at 26; PSR ¶¶ 91–96. And, as the Court explained at sentencing, his role in the broader conspiracy was relatively minor. 2023 Sent. Tr. at 26:8–12. Over the course of this case, Howard spent almost twenty-two months at liberty after his first sentencing, and he surrendered without issue as directed after the Second Circuit's reversal of this Court's judgment of acquittal.

*See* Reply at 7. Upon release, he will have stable housing in Halliday's building, where he will assume his role as her caregiver. He will have access to family support and will be supervised by the Probation Department,[4] and has made meaningful plans to obtain gainful employment. These protections, along with Howard's record of compliance and rehabilitation, establish that he does not now pose a danger to another person or the community.

**CONCLUSION**

For the foregoing reasons, Howard's motion for a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A) is GRANTED. Howard's term of imprisonment is reduced to time served. Should Howard wish to refile his 28 U.S.C. § 2255 petition based on his ongoing term of supervised release, he shall do so by **October 8, 2026**. Otherwise, the motion will be denied.

The Clerk of Court is respectfully directed to terminate the motion at ECF No. 947.

SO ORDERED.

Dated: September 10, 2026
New York, New York

ANALISA TORRES
United States District Judge

[4] Howard's sentence includes a two-year term of supervised released on Counts One, Six, and Twelve, to be served concurrently. *See* 2023 Judgment at 3.